**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AIR & LIQUID SYSTEMS CORPORATION and AMPCO-PITTSBURGH CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> ALLIANZ UNDERWRITERS INSURANCE COMPANY, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. 11-247 |

**MEMORANDUM OPINION**

**Conti, Chief District Judge**

## I.    <u>Introduction</u>

This matter concerns the coverage obligations owed by certain excess liability insurers to

insured entities who have been sued by individuals alleging injuries attributable to asbestos

exposure.  Relief in this action is sought pursuant to the Declaratory Judgment Act, which

permits a court to "declare the rights and other legal relations of any interested party seeking

such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

Pending before the court are two motions to dismiss filed pursuant to Federal Rule of Civil

Procedure 12(b)(1) and six motions for partial summary judgment filed pursuant to Federal Rule

of Civil Procedure 56.[1]  ECF Nos. 579, 671, 672, 674, 677, 690, 763 & 764.  For the reasons that

follow, both motions to dismiss will be denied, and five of the motions for partial summary

---

[1] Since the parties are familiar with the procedural and factual background to this case, the court will discuss only the procedural and factual matters that are directly relevant to the eight pending motions.  *Howden N. Am., Inc. v. ACE Prop. & Cas. Ins. Co.*, 875 F.Supp.2d 478, 484 n.4 (W.D.Pa. 2012).

judgment will be granted in part and denied in part.  The second motion for partial summary

judgment filed by Howden North America, Inc., will be denied.  ECF No. 763.

## II.    <u>Background</u>[2]

Ampco-Pittsburgh Corporation ("Ampco-Pittsburgh") and Air & Liquid Systems

Corporation ("Air & Liquid") (collectively referred to as the "Ampco-Pittsburgh Companies")

are Pennsylvania corporations maintaining their principal places of business in Pittsburgh,

Pennsylvania.  ECF No. 758 ¶ 1.  Air & Liquid is a wholly-owned subsidiary of Ampco-

Pittsburgh.  *Id.*  Ampco-Pittsburgh was founded in 1929.  ECF No. 756 ¶ 1.  Since its founding,

Ampco-Pittsburgh has maintained its headquarters in Pittsburgh.  *Id.*  During the early 1980s,

Ampco-Pittsburgh was engaged in business activities relating to railroad freight cars, air and

liquid handling equipment, specialty metal products, steel products, and farm equipment.  *Id.* ¶ 2.

Its business units were located in California, Connecticut, Illinois, Michigan, New Jersey, New

York, Pennsylvania, Tennessee, Texas, Virginia, Wisconsin, Canada and Mexico.  *Id.* at 3.

On November 28, 1896, Buffalo Steam Pump Company was incorporated under the laws

of New York.  ECF No. 758 ¶ 10.  The company was engaged in the business of manufacturing

industrial pumps.  *Id.*  Buffalo Forge Company ("Buffalo Forge I") was incorporated under New

York law on September 5, 1901.  *Id.* ¶ 11.  Buffalo Forge I acquired Buffalo Steam Pump

Company in 1904.  *Id.* ¶ 12.  In 1931, the name of Buffalo Steam Pump Company was changed

to Buffalo Pumps, Inc. ("Buffalo Pumps I").  *Id.*  Buffalo Pumps I was a subsidiary of Buffalo

Forge I until 1955, when it merged with Buffalo Forge I.  *Id.*  The business of Buffalo Pumps I

constituted a division of Buffalo Forge I until 1982.  *Id.*  Buffalo Forge I's plant is located in

North Tonawanda, New York, which is near Buffalo, New York.  *Id.* ¶ 13.

---

[2] Facts relevant to only specific issues will be addressed separately in the discussions about those issues.

Aerofin Corporation ("Aerofin") was incorporated under the laws of New Jersey in 1923. ECF No. 758 ¶ 14.  In 1967, Aerofin became a wholly-owned subsidiary of Buffalo Forge I.  *Id.* Aerofin was engaged in the manufacture of coils for heating and air conditioning.  *Id.*  Ampco-Pittsburgh acquired Buffalo Forge I in 1981.  *Id.* ¶ 15.  In 1982, Aerofin merged with Buffalo Forge I.  *Id.* ¶ 16.  Two days later, a Delaware corporation became known as Buffalo Forge Company ("Buffalo Forge II") and assumed Buffalo Forge I's pre-merger assets and liabilities. *Id.*  Buffalo Forge I became known as Aerofin Corporation ("Aerofin/Buffalo Forge I").  *Id.*

In 1985, a Delaware subsidiary of Ampco-Pittsburgh known as Buffalo Pumps, Inc. ("Buffalo Pumps II"), acquired from Buffalo Forge II the assets and liabilities of Buffalo Forge I's Buffalo Pumps division.  ECF No. 758 ¶ 16.  Aerofin/Buffalo Forge I merged into Air & Liquid on December 31, 2009.  *Id.*  Air & Liquid is the successor-by-merger to Buffalo Forge I. *Id.*

Ampco-Pittsburgh Securities V Corporation is a wholly-owned subsidiary of Ampco-Pittsburgh.  *Id.* ¶ 17.  In May 1993, Howden Group America, Inc., Howden Group Canada, Ltd., and Howden Group. Plc. (collectively referred to as the "Howden Entities") entered into a stock purchase agreement with Ampco-Pittsburgh and Ampco-Pittsburgh Securities V Corporation. *Id.*  Pursuant to the 1993 agreement, the Howden Entities acquired all Buffalo Forge II's outstanding stock and its factory in Buffalo, New York.  *Id.*  Buffalo Forge II was renamed the Howden Fan Company in 1994.  *Id.* ¶ 18.  The name was changed to Howden Buffalo, Inc. ("Howden Buffalo"), in 1999.  *Id.*  In 2000, Howden Buffalo moved its headquarters to Camden, South Carolina.  *Id.*  Its name was changed to Howden North America, Inc. ("HNA"), in 2010. *Id.*  HNA presently operates facilities in Canton, Michigan, New Philadelphia, Ohio, and Mexico City, Mexico.  ECF No. 755 ¶ 108.

3

Between June 1, 1961, and June 1, 1981, Buffalo Forge I's operations were covered by primary liability insurance policies purchased from Utica Mutual Insurance Company ("Utica"). ECF No. 758 ¶ 22.  During most of that same period, Utica also issued umbrella liability insurance policies to Buffalo Forge I.  *Id.* ¶ 23.  Buffalo Forge I's operations during the final year of that period were insured by an umbrella liability insurance policy provided by Pacific Employers Insurance Company ("PEIC").  *Id.* ¶ 24.  Excess liability insurance policies issued by Central National Insurance Company of Omaha, Nebraska ("Central National"), and Fireman's Fund Insurance Company ("Fireman's Fund") covered Buffalo Forge I's activities between February 9, 1976, and June 1, 1979.  *Id.* ¶¶ 25-26.

Ampco-Pittsburgh's operations during the early 1980s were covered by primary liability insurance policies issued by Argonaut Insurance Company ("Argonaut") and Hartford Accident & Indemnity Company ("Hartford").  ECF No. 758 ¶¶ 27-29.  Highlands Insurance Company ("Highlands") issued umbrella liability insurance policies covering Ampco-Pittsburgh's activities during that same period of time.  *Id.* ¶ 30.  Throughout the early 1980s, Ampco-Pittsburgh's operations were also insured by excess liability insurance policies purchased from Allianz Underwriters, Inc. ("Allianz"), American Excess Insurance Company ("American Excess"), American Insurance Company ("American"), Associated International Insurance Company ("Associated International"), Federal Insurance Company ("Federal"), First State Insurance Company ("First State"), Integrity Insurance Company ("Integrity"), Mission National Insurance Company ("Mission National"), Northbrook Excess and Surplus Insurance Company ("Northbrook"), Pine Top Insurance Company ("Pine Top"), Transit Insurance Company ("Transit"), Twin City Insurance Company ("Twin City"), Columbia Casualty Company ("Columbia Casualty"), Lexington Insurance Company ("Lexington"), Mt. McKinley Insurance

4

Company ("Mt. McKinley"), Old Republic Insurance Company ("Old Republic"), TIG

Insurance Company ("TIG"), and United States Fire Insurance Company ("U.S. Fire"). *Id.* ¶¶ 4-

9, 32-44. All these policies covered the activities of Buffalo Forge I during the relevant period

of time. *Id.* ¶¶ 4-9, 27-44. When the Howden Entities purchased Buffalo Forge II in 1993, they

acquired its rights under the pre-acquisition liability insurance policies purchased by Ampco-

Pittsburgh. ECF No. 687-8 at 47; ECF No. 755 ¶ 9.

Ampco-Pittsburgh purchased all its insurance policies from its headquarters in Pittsburgh,

Pennsylvania. ECF No. 755 ¶ 76. Ampco-Pittsburgh employees involved in the procurement of

the policies included Paul Brisson ("Brisson") and Douglas Rein ("Rein"), who served as the

manager of insurance, and Jerome Fleckenstein ("Fleckenstein"), who served as an assistant

manager of insurance. *Id.* Fred S. James & Co. ("Fred S. James"), a Pittsburgh broker, was

retained to assist in the procurement of the policies. *Id.* ¶ 77. Employees of Fred S. James

periodically met with Ampco-Pittsburgh employees in Pittsburgh to discuss the relevant

insurance needs. *Id.* ¶¶ 78-79. The annual renewal applications were sent to the insurance

companies from Fred S. James' offices in Pittsburgh. *Id.* ¶¶ 80-81. Ampco-Pittsburgh also

retained surplus lines brokers to assist in procuring liability insurance policies. *Id.* ¶ 82. Those

surplus lines brokers included Stewart Smith East, Inc. ("Stewart Smith"), Eastern Risks

Specialists ("Eastern Risks"), and Euings Limited ("Euings"). *Id.* Stewart Smith, Eastern Risks

and Euings were headquartered respectively in Pittsburgh, Pennsylvania, Philadelphia,

Pennsylvania, and Toronto, Canada. *Id.* Since only Lloyd's brokers were permitted to seek

coverage from Lloyd's underwriting syndicates, Fred S. James secured the services of Sedgwick

North America ("Sedgwick") to procure policies available in London, England. *Id.* ¶ 83. All the

brokers were directed by Fred S. James and Ampco-Pittsburgh. *Id.* ¶¶ 84-85. No Buffalo Forge

employees located in New York participated in the negotiation or procurement of the policies. *Id.* ¶¶ 92-93.

The liability insurance policies purchased by Ampco-Pittsburgh were delivered to its offices in Pittsburgh, Pennsylvania.  ECF No. 755 ¶ 94.  The excess insurers licensed to do business in Pennsylvania sent the policies directly to the offices of Fred S. James.  *Id.* ¶ 95.  The other excess insurers sent the policies to the surplus lines brokers, who forwarded them to Fred S. James personnel.  *Id.*  The policies were then delivered, by hand or mail, to Ampco-Pittsburgh's offices in Pittsburgh, Pennsylvania, by Fred S. James employees.  *Id.*  Before delivering some of the policies, Fred S. James employees countersigned them as the "authorized agent" of the excess insurers.  *Id.* ¶ 96.  The policies were reviewed by Ampco-Pittsburgh employees, who were responsible for verifying their correctness.  *Id.* ¶ 97.

The excess insurers sent premium invoices to the offices of Fred S. James in Pittsburgh, Pennsylvania.  ECF No. 755 ¶ 99.  The invoices were forwarded to Ampco-Pittsburgh's offices by Fred S. James employees.  *Id.*  The premium payments were made by Ampco-Pittsburgh employees located in Pittsburgh, Pennsylvania.  *Id.* ¶ 100.  The payments were sent directly to employees of Fred J. James on behalf of Ampco-Pittsburgh and its subsidiaries.  *Id.* ¶ 101.  Fred S. James personnel forwarded premium payments to each excess insurer licensed to do business in Pennsylvania.  *Id.*  The remaining premium payments were sent to the surplus lines brokers, who forwarded them to the other excess insurers.  *Id.*

Since 1999, Air & Liquid and its predecessors have faced thousands of lawsuits in forty different states stemming from injuries allegedly attributable to asbestos.  ECF No. 756 ¶¶ 22, 26.  The claims arise primarily from the manufacture of industrial pumps by Buffalo Forge's Buffalo Pumps division.  *Id.* ¶ 23.  A subset of the claims is based on exposure to heat exchange

coils and air handlers.  *Id.* ¶ 24.  The plaintiffs in the underlying cases typically assert that they

were injured by exposure to asbestos-containing products contained within pumps manufactured

by Buffalo Pumps.  *Id.* ¶ 25.  As a result of those cases, Ampco-Pittsburgh and its affiliates have

incurred indemnity and defense costs amounting to millions of dollars.  *Id.* ¶ 27.

The Ampco-Pittsburgh Companies and HNA eventually entered into a number of

settlement agreements with some of their insurers.  ECF No. 756 ¶ 68.  The negotiations resulted

in three global agreements executed in 2005, 2011 and 2012.  *Id.*  The 2005 and 2011 agreements

generally covered policies issued to Buffalo Forge I before its acquisition by Ampco-Pittsburgh,

along with six primary liability insurance policies procured by Ampco-Pittsburgh between 1981

and 1986.  *Id.* ¶ 69.  Those agreements provided for the payment of indemnity and defense costs

spread across a known coverage block, with each policy paying at least up to its face limits.  *Id.* ¶

70.  The 2012 agreement was entered into by the Ampco-Pittsburgh Companies and eight of their

excess insurers.  *Id.* ¶ 72.  That agreement released the participating insurers from any coverage

obligations premised on the underlying asbestos claims, subject to exceptions specifically

described in the agreement itself.  *Id.* ¶ 73.  Under the 2012 agreement, the Ampco-Pittsburgh

Companies enjoy the right to payment, upon demand, of specified percentages of costs not

otherwise payable under the 2005 and 2011 agreements.  *Id.* ¶ 74.  A parallel agreement executed

by HNA and the eight excess insurers contained terms that were not materially different from

those contained in the agreement between the Ampco-Pittsburgh Companies and those insurers.

ECF No. 685-20 at 255-78.

On February 24, 2011, Ampco-Pittsburgh and Air & Liquid commenced this action

against HNA and numerous domestic and foreign insurers who had issued excess liability

policies covering the period of time beginning on January 1, 1981, and ending on January 1,

1985, seeking declaratory relief defining their right to indemnification and defense costs from each defendant.  ECF No. 1.  HNA responded by filing counterclaims against Ampco-Pittsburgh and Air & Liquid, cross-claims against the insurer-defendants, and additional claims against thirteen other insurance companies.  ECF No. 31; ECF No. 755 ¶ 17.  On December 12, 2012, this action was consolidated with a separate action that had previously been commenced by Howden Buffalo in 2009.  ECF No. 652.  HNA's disputes with New Hampshire Insurance Company ("New Hampshire"), HDI-Gerling Industrie Versicherung AG, Swiss Re Europe S.A., QBE Insurance (Europe) Ltd., Portman Insurance Ltd., and ACE European Group Ltd. (collectively referred to as the "High Excess Howden Group Insurers") were severed pursuant to Federal Rules of Civil Procedure 21 and 42(b).  *Id.*

On September 26, 2012, Mt. McKinley and Old Republic moved for the dismissal of HNA's claims against them, contending that they were not involved in a justiciable controversy with HNA.  ECF No. 579.  Columbia Casualty later joined that motion.  ECF No. 744 at 1 n.1. Four separate motions for partial summary judgment were filed by the Ampco-Pittsburgh Companies, HNA, and the excess insurers who were not parties to the settlement agreements (collectively referred to as the "Non-Settled Insurers")[3] on December 20, 2012.  ECF Nos. 671, 672, 674 & 677.  One day later, the High Excess Howden Group Insurers filed a motion to dismiss, arguing that no justiciable controversy existed between them and HNA.  ECF No. 690. HNA and New Hampshire filed cross-motions for partial summary judgment on March 8, 2013. ECF Nos. 763 & 764.  On June 12, 2013, the parties stipulated to the dismissal of all cross-claims asserted against HDI-Gerling Industrie Versicherung AG, Swiss Re Europe S.A., QBE

---

[3] The Non-Settled Insurers include Certain Underwriters at Lloyd's London, Certain London Market Companies, Columbia Casualty Company, Lexington Insurance Company, Mt. McKinley Insurance Company, Old Republic Insurance Company, TIG Insurance Company (as the successor to International Insurance Company), and United States Fire Insurance Company.  ECF Nos. 671 & 674 at 1 n.1.

Insurance (Europe) Ltd., Portman Insurance Ltd., and ACE European Group Ltd.  ECF No. 797.

Two days later, the court entered an order dismissing those cross-claims without prejudice.  ECF

No. 798.  All eight motions filed by the parties will be addressed in this memorandum opinion.

The court will first address the motions raised with respect to the non-settled insurers and then

the motions raised with respect to New Hampshire.

## III.   <u>Standards of review</u>

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges

a court's subject-matter jurisdiction over the plaintiff's claims.  FED. R. CIV. P. 12(b)(1).  At

issue in a Rule 12(b)(1) motion is the court's "'very power to hear the case.'"  *Judkins v. HT*

*Window Fashions Corp.*, 514 F.Supp.2d 753, 759 (W.D.Pa. 2007)(quoting *Mortensen v. First*

*Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  As the party asserting that

jurisdiction exists, the plaintiff bears the burden of showing that his or her claims are properly

before the court.  *Dev. Fin. Corp. v. Alpha Hous. & Health Care*, 54 F.3d 156, 158 (3d Cir.

1995).  In reviewing a Rule 12(b)(1) motion, a court must determine whether the attack on its

jurisdiction is a facial attack or a factual attack.  A facial attack challenges the sufficiency of the

plaintiff's pleadings on jurisdictional grounds.  *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3

(3d Cir. 2006).  When considering a facial attack, a court must accept the allegations contained

in the plaintiff's complaint as true.  *Id.*  A factual attack on the court's jurisdiction must be

differently treated.  *Id.*  When considering a factual attack, the court does not attach a

presumption of truthfulness to the plaintiff's allegations, and the existence of disputed material

facts does not preclude the court from deciding for itself whether jurisdiction over the plaintiff's

claims can be properly exercised.  *Mortensen*, 549 F.2d at 891.

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).  The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof.  *Celotex Corp.*, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial.  *Id.* at 324.  The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

IV.    **Discussion**

The instant action was brought pursuant to the Declaratory Judgment Act, which

provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought.  Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  A declaratory judgment entered pursuant to this statutory provision may

serve as a predicate for "[f]urther necessary or proper relief."  28 U.S.C. § 2202.  The motions

for partial summary judgment filed on December 20, 2012, and March 8, 2013, seek declarations

pertaining to the rights and obligations of the parties.  ECF Nos. 671, 672, 674, 677, 763 & 764.

Mt. McKinley, Old Republic and Columbia Casualty challenge the court's subject-matter

jurisdiction to entertain HNA's claims against them.  ECF Nos. 579.

**A.  The disputes among the Non-Settled Insurers, Ampco-Pittsburgh Companies
and HNA**

> **1.  Motion to dismiss based upon whether the court has subject-matter
> jurisdiction to entertain HNA's claims against Mt. McKinley, Old Republic
> and Columbia Casualty which relates to non-settled insurers_____
> (ECF No. 579).**

Judicial tribunals established pursuant to Article III of the United States Constitution

exercise "[t]he judicial Power of the United States."  U.S. CONST., ART. III, § 1.  "This power is

validly exercised only where a live 'Case' or 'Controversy' exists between the parties."  *Burns v.
Alexander*, 776 F.Supp.2d 57, 74 (W.D.Pa. 2011)(quoting U.S. CONST., ART. III, § 1).  "To

invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an

actual injury traceable to the defendant and likely to be redressed by a favorable judicial

decision."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  "The Declaratory Judgment

11

Act creates a remedy by which federal courts 'may declare the rights and other legal relations of any interested party seeking such declaration' when there is a 'case of actual controversy.'" *Wyatt v. Gov't of the Virgin Islands*, 385 F.3d 801, 805 (3d Cir. 2004)(quoting 28 U.S.C. § 2201(a)).

> Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937).

The court's subject-matter jurisdiction to entertain this action is premised on the diverse citizenship of the parties.  U.S. CONST., ART. III, § 2; 28 U.S.C. § 1332(a)(1).  An exercise of diversity jurisdiction is permissible under Article III "so long as any two adverse parties are not co-citizens."  *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 531 (1967).  The statutory provision providing for the exercise of such jurisdiction, however, "applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant." *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996).  In other words, the applicable statutory grant of jurisdiction requires "complete diversity between all plaintiffs and all defendants" even though "minimal diversity" would be sufficient to satisfy the Constitution.  *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005).

Old Republic is a Pennsylvania corporation maintaining its principal place of business in Greensburg, Pennsylvania.  ECF No. 758 ¶ 7.  Like Ampco-Pittsburgh and Air & Liquid, Old Republic is a "citizen" of Pennsylvania for diversity purposes.  28 U.S.C. § 1332(c)(1).  An excess umbrella liability insurance policy covering 1982 was issued to Ampco-Pittsburgh by Old Republic.  ECF No. 685-12 at 6.  The Buffalo Forge entities and Aerofin were additional named

insureds under the policy.  *Id.* at 10.  Although Old Republic is similarly situated to the other excess insurers, it has not been sued by the Ampco-Pittsburgh Companies in this action.  ECF No. 579 at 1 n.1.  The Ampco-Pittsburgh Companies would have known that they could not assert claims against Old Republic without destroying this court's subject-matter jurisdiction.  ECF No. 744 at 4 n. 6.  The only claims asserted against Old Republic in this action are the additional-party claims brought by HNA.

Old Republic, Mt. McKinley and Columbia Casualty all move for the dismissal of the claims asserted against them by HNA.  ECF No. 744 at 1 n.1.  HNA correctly points out that the policies issued by Mt. McKinley and Columbia Casualty will have to be interpreted in any event, since jurisdiction over the Ampco-Pittsburgh Companies' claims against those insurers is beyond dispute.  ECF No. 714 at 5.  Nevertheless, Old Republic would be dismissed as a party to this case if jurisdiction were found to be lacking with respect to the claims asserted against it by HNA.  ECF No. 579 at 1 n.1.  Therefore, the court will address the motion to dismiss before proceeding to discuss the terms of the excess policies in question.

Excess liability insurance coverage is typically subject to an exhaustion requirement. *Nationwide Ins. Co. v. Schneider*, 960 A.2d 442, 449 (Pa. 2008).  The excess policies at issue in this case are no exception.  The policies issued by Old Republic, Mt. McKinley and Columbia Casualty provide for indemnification only after the underlying primary and umbrella policies have been exhausted.  ECF No. 684-10 at 3; ECF No. 684-11 at 3; ECF No. 685-8 at 3; ECF No. 685-9 at 3-4; ECF No. 685-12 at 4.  The motion to dismiss is based on an assertion that the excess policies in question are so unlikely to be reached that any declarations concerning their terms and conditions would be purely advisory.  ECF No. 581 at 8-14.

Richard O'Connell ("O'Connell"), HNA's corporate designee, testified that HNA had paid $2,439,800.00 in asbestos-related indemnity payments between 1999 and 2011. ECF No. 581-2 at 3. He stated that, during the same period of time, the sum of HNA's asbestos-related indemnity and defense costs had equaled roughly $18 million. *Id.* O'Connell explained that HNA's average indemnity payment for an asbestos claim was roughly $4,500.00, and that the individual claims had ranged from $500.00 to $400,000.00. *Id.* at 2. Old Republic, Mt. McKinley and Columbia Casualty rely on O'Connell's testimony for the proposition that their excess policies will never be reached by HNA. ECF No. 581 at 2-3.

In opposition to the motion to dismiss, HNA presented an expert report prepared by Patrick J. McGrath ("McGrath"), who presently serves as the managing director for the Chicago office of Navigant, Inc. ECF No. 715 at 17. In his report, McGrath describes "plausible" scenarios in which the excess policies in question could be reached within the next three to five years. *Id.* at 12-14. HNA points out that since the Ampco-Pittsburgh Companies are co-insureds under the policies, the exhaustion projections must also account for the claims brought against those entities. ECF No. 714 at 5. Old Republic, Mt. McKinley and Columbia Casualty respond by contending that the underlying primary and umbrella policies are unlikely to be exhausted even when the claims asserted against the Ampco-Pittsburgh Companies are taken into account. ECF No. 581 at 13.

A ripe controversy between an insured and an excess insurer can exist even in the absence of proof that the excess policy will be triggered. *Mendelson v. Delaware River & Bay Auth.*, 112 F.Supp.2d 386, 396 (D.Del. 2000). In *ACandS, Inc. v. Aetna Casualty & Surety Co.*, 666 F.2d 819, 823 (3d Cir. 1981), the United States Court of Appeals for the Third Circuit recognized that a court presented with a request for declaratory relief must consider the overall

14

context of the case, including "settlement offers and the conduct of settlement negotiations." Elaborating on this principle, the court of appeals explained:

> It would turn the reality of the claims adjustment process on its head to hinge justiciability of an insurance agreement on the maturation of a suit to a judgment when the overwhelming number of disputes are resolved by settlement. The respective interests and obligations of insured and insurers, when disputed, require determination much in advance of judgment since they will designate the bearer of ultimate liability in the underlying cases and hence the bearer of the onus and risks of settlement. So viewed, the controversy is then quite proper for a judicial determination now. To delay for the sake of more concrete development would prevent the litigants from shaping a settlement strategy and thereby avoiding unnecessary costs.

*ACandS, Inc.*, 666 F.2d at 823. Since it was clear in that case that a determination of the disputed "legal obligations" would "strongly affect present behavior," a justiciable "case or controversy" was found to exist. *Id.*

The principles implicated in *ACandS, Inc.*, are squarely applicable to this case. HNA correctly points out that several excess insurers have already entered into settlement agreements with the insured entities to provide coverage for the underlying asbestos claims. ECF No. 714 at 9. Under these circumstances, the declarations sought by the parties will undoubtedly "affect present behavior." *ACandS, Inc.*, 666 F.2d at 823. Furthermore, the parties are seeking declarations about whether the Non-Settled Insurers are obligated to defend the underlying claims or reimburse the insured entities for their defense costs. ECF Nos. 673 & 746. Because the duty to defend sweeps more broadly than the duty to indemnify, a dispute pertaining to an insurer's defense obligations weighs heavily in favor of a finding of justiciability. *Am. States Ins.Co. v. Component Technologies, Inc.*, 420 F.Supp.2d 373, 375-76 (M.D.Pa. 2005)(holding that no justiciable controversy existed in a case that did not implicate an insurer's duty to defend). For these reasons, the court concludes that the disputes between HNA and Old

Republic, Mt. McKinley and Columbia Casualty are "sufficiently definite or concrete to be justiciable." *Id.* at 376.

Even in the face of a justiciable controversy, a court may exercise "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). Since the language of the Declaratory Judgment Act is permissive rather than mandatory, the court is not *required* to enter declarations clarifying the respective rights and obligations of the parties. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136-37 (2007). Old Republic, Mt. McKinley and Columbia Casualty alternatively argue that the merits of their disputes with HNA should be avoided on a discretionary basis. ECF No. 581 at 14-15. They claim that forcing them "to defend against HNA's claims and scorched-earth discovery demands unjustly exposes them to enormous litigation expenses." *Id.* at 15.

Under the present circumstances, it would make little sense for the court to dismiss HNA's claims against the three movants for discretionary reasons. The excess policies issued by Mt. McKinley and Columbia Casualty must be interpreted to resolve the claims asserted by the Ampco-Pittsburgh Companies. ECF No. 714 at 5. Since the relevant issues must be litigated in any event, Mt. McKinley and Columbia Casualty may be precluded from collaterally attacking any adverse determinations in a subsequent action brought by HNA. *Matternas v. Stehman*, 642 A.2d 1120, 1125 (Pa.Super.Ct. 1994). Although a decision declining to interpret the Old Republic policy would result in Old Republic's dismissal from this action, that policy generally follows form to the underlying umbrella policy issued by Highlands. ECF No. 685-12 at 13. Many of the determinations sought by the parties will impact the interpretation of the Old Republic policy regardless whether Old Republic remains a party to this case. In this vein, any substantive arguments advanced by Old Republic should be considered at this time.

Among the main substantive issues dividing the parties is the question whether the excess policies should be construed in conformity with New York or Pennsylvania law. The projections contained in McGrath's report are premised on an assumption that Pennsylvania law governs the interpretation of the movant's policies. ECF No. 715 at 10. Old Republic, Mt. McKinley and Columbia Casualty appear to base their jurisdictional challenge, at least in part, on an assumption that their respective excess policies (and the underlying primary and umbrella policies) must be construed in a manner consistent with New York law. ECF No. 581 at 4-14; ECF No. 744 at 6-10. In this respect, the legal issues undergirding the motion to dismiss mirror the substantive issues that will need to be considered in order to resolve the pending motions for partial summary judgment. Because the arguments advanced by Old Republic, Mt. McKinley and Columbia Casualty in support of their motion to dismiss are inextricably intertwined with the merits of the Non-Settled Insurers' motion relating to allocation and exhaustion issues, the relevant legal issues will need to be addressed in any event. The motion to dismiss filed by Old Republic, Mt. McKinley and Columbia Casualty (ECF No. 579) will be denied.

### 2. Summary judgment motions -- the allocation of indemnity payments and exhaustion of underlying policies (ECF Nos. 671, 672, 674 & 677).

The Ampco-Pittsburgh Companies and HNA filed comprehensive motions relating to their alleged entitlement to both indemnity payments and defense costs. ECF Nos. 672 & 677. The Non-Settled Insurers filed separate motions for partial summary judgment regarding the allocation of indemnity payments among the different policies and their defense obligations under those policies. ECF Nos. 671 & 674. These issues will be considered in sequential order.

The umbrella policies issued to the Ampco-Pittsburgh Companies by Highlands covered the years 1981, 1982, 1983 and 1984. ECF No. 758 ¶ 30. The policies covering 1981, 1982 and 1983 have per-occurrence and aggregate limits of $10,000,000.00. ECF No. 684-17 at 6; ECF

17

No. 684-18 at 6; ECF No. 684-19 at 6.  The 1984 Highlands policy has per-occurrence and

aggregate limits of $20,000,000.00.  ECF No. 684-20 at 6.  Highlands is presently in the midst of

receivership and rehabilitation proceedings.  ECF No. 758 ¶ 30.  An injunction entered by a

Texas court prohibits policyholders from taking actions against Highlands or its property.  ECF

No. 689-11.

The excess policies standing above the Highlands policies are the ones at issue in this

case.  On October 5, 2012, the Ampco-Pittsburgh Companies entered into a settlement agreement

with eight of the excess insurers.  ECF No. 758 ¶ 76.  Section III(B) of the agreement contained

the following language:

> B.    Defense and Indemnity Cost Sharing.  Upon written request of the
> Ampco-Pittsburgh Companies, the Parties agree that Defense Costs and
> Indemnity Costs for Asbestos-Related Bodily Injury Claims not paid by the
> Ampco-Pittsburgh Companies as of the True-Up Date shall be billed as follows:
>
> 1.    BFC/Aerofin Agreements Contributions: The Ampco-Pittsburgh
> Companies will bill the BFC/Aerofin Insurers for the shares of Defense Costs and
> Indemnity Costs such insurers have agreed to pay under the BFC/Aerofin
> Agreements in accordance with the terms of such agreements and subject to
> remaining limits of liability under such agreements.  Any Defense Costs and
> Indemnity Costs not billable to the BFC/Aerofin Insurers under the BFC/Aerofin
> Agreements, including because of exhaustion of limits of any policy governed by
> the BFC/Aerofin Agreements, shall be paid as set forth in Sections III.B. 2.-3.
> below.
>
> 2.    Participating '81-'84 Insurer Contributions: Participating '81-'84 Insurers
> agree to pay their respective percentages, as set forth on Schedule B, of net
> Defense Costs and net Indemnity Costs remaining after billing to the
> BFC/Aerofin Insurers their respective shares, if any, under the BFC/Aerofin
> Agreements in accordance with Section III.B.1 above.  Notwithstanding the
> preceding sentence, if a claimant's First Exposure Date is on or after January 1,
> 1985, then the Participating '81-'84 Insurers will have no responsibility for the
> payment of Defense Costs or Indemnity Costs associated with that Asbestos-
> Related Bodily Injury Claim under this Agreement.
>
> 3.    Air & Liquid Funding and Reservation of Rights Against Non-
> Participating Insurers: The Ampco-Pittsburgh Companies reserve the right to: (i)
> tender to any Non-Participating '81-'84 Insurer(s) any Asbestos-Related Bodily

Injury Claim(s); (ii) otherwise seek recovery of Defense Costs and Indemnity Costs from any Non-Participating '81-'84 Insurer to the extent it does not obtain recovery of such Defense Costs and/or Indemnity Costs from the Participating '81-'84 Insurers under this Agreement; and (iii) pursue any other claims, of any nature whatsoever, they may have against any Non-Participating Insurer.  Subject to the foregoing reservation of rights, Air & Liquid agrees to pay in the first instance any Defense Costs and Indemnity Costs not billed to the BFC/Aerofin Insurers pursuant to Section III.B.1. or the Participating '81-'84 Insurers pursuant to Section III.B.2.

ECF No. 685-20 at 8-9.  The "True-Up Date" referenced in Section III(B) was March 22, 2012.

*Id.* at 7.  Section VIII(C) of the agreement provided as follows:

Upon execution of this Agreement by all Parties hereto, the Ampco-Pittsburgh Companies shall, without any further action by any party, release the Participating '81-'84 Insurers from any obligations to make payments within the Aggregate Limits of the Participating '81-'84 Insurer Policies, provided, however, that the Participating '81-'84 Insurers expressly are not released from performing their obligations under this Agreement.  It is the intention of the Parties that this Agreement will replace, and operate in lieu of, the Parties' respective rights and obligations under the Participating '81-'84 Insurer Policies for Asbestos-Related Bodily Injury Claims.

ECF No. 685-20 at 20-21.  Section X specifically provided that the agreement was not to be regarded as "a contract of insurance," and that it was to be construed in accordance with the rules governing the interpretation of contracts in general.  *Id.* at 21.

On October 5, 2012, HNA also entered into a settlement agreement with the same eight excess insurers that had settled with the Ampco-Pittsburgh Companies.  ECF No. 685-20 at 255-78.  The participating insurers agreed to "pay their respective percentages" of HNA's defense and indemnity costs in accordance with "Schedule B," which appeared in their agreement with the Ampco-Pittsburgh Companies.  *Id.* at 257.  The terms of HNA's agreement with the excess insurers were not materially different from the terms of the Ampco-Pittsburgh Companies' agreement with those insurers.  Like the Ampco-Pittsburgh Companies, HNA reserved its right to recover defense and indemnity costs from, and pursue claims against, the Non-Settled

Insurers.  *Id.*  HNA's agreement also contained language releasing the participating insurers from their obligations under the relevant policies.  *Id.* at 265.  It was understood that the agreement would "replace, and operate in lieu of," the policies issued by the covered excess insurers.  *Id.* Furthermore, the parties declared that the agreement was "not a contract of insurance," and that no language contained therein was to be construed against a particular party because of its status as a "drafter."  *Id.* at 265-66.

The policies not covered by the agreements include those issued by Certain Underwriters at Lloyd's London, Certain London Market Companies, Columbia Casualty, Lexington, Mt. McKinley, Old Republic, TIG, and U.S. Fire.[4]  ECF Nos. 671 & 674 at 1, n.1.  The primary disputes between the Ampco-Pittsburgh Companies, HNA and the Non-Settled Insurers concern the circumstances in which indemnity liability under the disputed policies is triggered, the allocation of responsibility among the different insurers, and the manner in which the Highlands policies may be deemed to have been exhausted.  The declarations sought by the parties generally pertain to these issues.  ECF Nos. 671-1, 672-1, 674-1 & 677-1.

Due to more recent settlement agreements executed by the parties, the Ampco-Pittsburgh Companies' disputes with the Non-Settled Insurers remain live only with respect to Columbia Casualty and Mt. McKinley.  ECF Nos. 800-804, 806.  Since HNA's disputes with the remaining insurers have not been settled, the court will address the substantive issues implicated by the pending motions for partial summary judgment in relation to each policy issued by the Non-Settled Insurers.  Any declarations concerning the application of the policies issued by Certain

---

[4] Fifteen excess policies issued to the Ampco-Pittsburgh Companies are presently at issue.  They are Columbia Casualty Policy RDX9176265 (1983), Columbia Casualty Policy RDX9176369 (1984), International Policy 5220112752 (1982), Lexington Policy 5514166 (1981), Lexington Policy B3SED6377014520 (1982), Lexington Policy 5522052 (1982), Lexington Policy 5525028 (1983), London Policy 551/UNA0017 (1981), London Policy 551/UNA0018 (1981), London Policy 551/UPA0019 (1982), London Policy 551/UPA0020 (1982), Gibraltar Casualty Policy GMX02082 (1983), Gibraltar Casualty Policy GMX02469 (1984), Old Republic Policy OZX-11904 (1982), and U.S. Fire Policy 5220106155 (1981).  ECF No. 684 at 1-3.

Underwriters at Lloyd's London, Certain London Market Companies, Lexington, Old Republic, TIG and U.S. Fire will apply only with respect to HNA.

The provisions of the four umbrella policies issued by Highlands are not materially different from one another.  The clauses defining the scope of "coverage" provide:

> The Company hereby agrees to indemnify the insured against such ultimate net loss in excess of the Insured's primary limit as the Insured sustains by reason of liability, imposed upon the Insured by law or assumed by the Insured under contract, for damages because of personal injury or property damage to which this policy applies, caused by each occurrence happening anywhere in the world.

ECF No. 684-17 at 2; ECF No. 684-18 at 2; ECF No. 684-19 at 2; ECF No. 684-20 at 2.  The term "ultimate net loss" is defined as "the total sum which the Insured, or any company as his underlying insurers as scheduled, or both, become obligated to pay as damages because of personal injury or property damage, either through adjudication or compromise."  ECF No. 684-17 at 3; ECF No. 684-18 at 3; ECF No. 684-19 at 3; ECF No. 684-20 at 3.  The term "occurrence" is defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the Insured."  *Id.*  The Highlands policies provide that "[a]ll personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." *Id.*  In most respects relevant to this case, the excess policies in dispute follow form to the four umbrella policies issued by Highlands.[5]  ECF No. 684-23 at 12; ECF No. 684-24 at 5; ECF No. 684-25 at 9; ECF No. 685-1 at 5; ECF No. 685-3 at 10; ECF No. 685-4 at 10; ECF No. 685-5 at 10; ECF No. 685-6 at 9; ECF No. 685-8 at 7; ECF No. 685-9 at 8; ECF No. 685-12 at 13; ECF No. 685-17 at 12.

---

[5] An excess policy "follows form" to an underlying policy by incorporating its terms and conditions by reference. *Lexington Ins.Co. v. W. Pa. Hosp.*, 318 F.Supp.2d 270, 274 n.3 (W.D.Pa. 2004).

a.      **Choice of law**

The dispute between the parties centers, in large measure, on the substantive law

applicable to this case.  The Ampco-Pittsburgh Companies and HNA maintain that the polices in

question should be construed in accordance with Pennsylvania law.  ECF No. 678 at 16-41; ECF

No. 682 at 13-33.  The Non-Settled Insurers contend that New York law should govern the

interpretation of the policies.  ECF No. 675 at 8-30.  As a federal court sitting in diversity, this

court must apply the choice-of-law rules applied by the Pennsylvania courts.  *Klaxon Co. v.*

*Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-497 (1941).  A party cannot be injured by the

application of a particular jurisdiction's law if that law "is not in conflict with that of any other

[interested] jurisdiction."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985).  For this

reason, an extensive choice-of-law analysis is necessary only if the law of Pennsylvania differs

from that of New York in relation to matters pertaining to this case.  *Pacific Emp'rs Ins. Co. v.*

*Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012).  Such an analysis is

necessary in this case, since the jurisprudence pertaining to similarly-worded insurance policies

reveals that Pennsylvania law differs from New York law in several relevant respects.

Under the policy language, an "occurrence" can trigger liability only if it takes place

"during the policy period."  ECF No. 684-17 at 3; ECF No. 684-18 at 3; ECF No. 684-19 at 3;

ECF No. 684-20 at 3.  Asbestos exposure must result in "personal injury or property damage" to

implicate the policies at issue.  *Id.* at 2.  The term "personal injury" is defined broadly enough to

include, *inter alia*, "bodily injury, mental injury, mental anguish, shock, sickness, disease, [and]

disability."  *Id.* at 3.

In *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 29, 35-36 (Pa. 1993), the

Pennsylvania Supreme Court recognized that a single instance of asbestos exposure can cause

various forms of "injury" over the course of several years.  The Supreme Court went on to hold

that, under Pennsylvania law, "all stages of the disease process" were to be regarded as "bodily

injury sufficient to trigger the insurers' obligation to indemnify."  *J.H. France*, 626 A.2d at 507.

The Pennsylvania Supreme Court described the legal consequences of this "multiple-trigger"

approach by stating as follows:

> The definition suggests that any insurance policy triggered under the "multiple-trigger" concept with respect to any specific claim is potentially liable for the entire amount of any judgment or settlement of that claim.  An "occurrence" includes "continuous or repeated exposure to conditions which result in bodily injury."  The insurers which drafted the definition obviously contemplated the possibility of injury resulting from continuous or repeated exposure to conditions, and specified that the process of exposure was to constitute one occurrence.  If prolonged exposure, constituting one occurrence, resulted in injury, and if the injury occurred during the time a given policy was in effect, then the injury is an insurable risk under the terms of that policy.  Being defined as one "occurrence," the entire injury, and all damages resulting therefrom, fall within the indemnification obligation of the insurer.  In other words, once the liability of a given insurer is triggered, it is irrelevant that additional exposure or injury occurred at times other than when the insurer was on the risk.  The insurer in question must bear potential liability for the entire claim.

*Id.* at 508.  Under Pennsylvania law, a single "injury" occurs "during the policy period" of *every*

policy in effect between the initial and final "triggers," thereby leaving the insured "free to select

the policy or policies under which it is to be indemnified."  *Id.*  "Any policy in effect during the

period from exposure through manifestation must indemnify the insured until its coverage is

exhausted."  *Id.* at 509.  The insurer selected to bear the cost of the injury is then "entitled to seek

indemnification from any of the remaining insurers which was on the risk during the

development of the disease."  *Id.*

New York does not follow the approach adopted by the Pennsylvania Supreme Court.

Under New York law, coverage is generally triggered only by "actual damage or injury during

the policy period."  *Cont'l Cas. Co. v. Emp'rs Ins. Co. of Wausau*, 871 N.Y.S.2d 48, 63 (N.Y.

App. Div. 2008).  In *Consolidated Edison Co. of New York, Inc. v. Allstate Insurance Co.*, 774 N.E.2d 687, 695 (N.Y. 2002), the New York Court of Appeals opined that the collection of indemnity payments from a single policy for injuries spanning periods covered by successive policies would improperly excise the phrase "during the policy period" from the policy language. According to the court of appeals, New York law permitted an injury to be linked to the policy covering a specific year only where the insured could "pin an accident to a particular policy period." *Consol. Edison Co.*, 774 N.E.2d at 695.  In order to account for any "uncertainty as to what actually transpired during any particular policy period[,]" New York law prorates liability for a "gradual harm" among the different policies covering the relevant periods of time.  *Id.*

The Highlands policies provide that "[a]ll personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  ECF No. 684-17 at 3; ECF No. 684-18 at 3; ECF No. 684-19 at 3; ECF No. 684-20 at 3.  Interpreting similar policy language in a case governed by Pennsylvania law, the United States Court of Appeals for the Third Circuit explained that "all injuries arising from the same source arise from one occurrence."  *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 336 (3d Cir. 2005).  "[T]he manufacture and sale of [an] asbestos-containing product" constitutes a "common source" within the meaning of the Court of Appeals' phraseology.  *Id.*  Therefore, under Pennsylvania law, "a single occurrence can clearly result in injuries to multiple persons."  *Id.*

New York takes a different position on that issue.  In *Appalachian Insurance Co. v. General Electric Co.*, 863 N.E.2d 994, 995-1001 (N.Y. 2007), the New York Court of Appeals held that the exposure of multiple individuals to asbestos contained in insulation used in steam turbines manufactured by the same company had constituted "multiple occurrences" for purposes

24

of a liability insurance policy.  It was noted that a "single occurrence" could encapsulate injuries sustained by multiple individuals only in a "mass tort scenario."  *Appalachian Ins. Co.*, 863 N.E.2d at 1001.  The court of appeals explained that "a series of explosions, the accidental release of a hazardous substance or some other calamity" could be fairly characterized as a "single occurrence" even if it "result[ed] in numerous injuries or losses."  *Id.*  Unlike Pennsylvania law, however, New York law does not treat injuries linked to "the manufacture and sale of [an] asbestos-containing product" as a "single occurrence."  *Liberty Mut.*, 418 F.3d at 336; *Appalachian Ins. Co.*, 863 N.E.2d at 1000-01.

Under Pennsylvania law, "an excess insurer is not required to 'drop down' to provide primary coverage if the underlying primary insurer is insolvent."  *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1454 (3d Cir. 1996).  The parties agree that the Non-Settled Insurers are not required to compensate the Ampco-Pittsburgh Companies and HNA for expenses attributable to the insolvency of primary or umbrella insurers.  ECF No. 719 at 36-37.  It is also undisputed that the underlying policies can be exhausted only by the payment of indemnity costs, and that the payment of defense costs cannot accelerate the exhaustion of those policies.  *Id.* at 37.  These concessions, however, do not eliminate the stark differences between the requirements of Pennsylvania and New York law under the circumstances of this case.

The application of Pennsylvania law would permit the Ampco-Pittsburgh Companies or HNA to attach the excess policies by incurring out-of-pocket expenses sufficient to exhaust a single Highlands policy.  For example, they could access the excess policies covering 1983 after paying expenses in the amount of $10,000,000.00, which would exhaust the Highlands policy covering that same year.  ECF No. 682 at 16.  The insured entities could access the excess policies covering 1984 by incurring expenses equal to $20,000,000.00, thereby exhausting that

year's umbrella policy. *Id.* Pennsylvania law would permit an injury spanning multiple years to

be allocated to a single year. *J.H. France*, 626 A.2d at 508 (explaining that "once the liability of

a given insurer is triggered, it is irrelevant that additional exposure or injury occurred at times

other than when the insurer was on the risk").

New York law would require the Ampco-Pittsburgh Companies or HNA horizontally to

exhaust all four Highlands policies on a *pro rata* basis in order to reach the excess policies. An

injury spanning the years 1981-1984[6] could not be tied to a single year, since such a scenario

would force an insurer to cover injuries occurring outside of the applicable "policy period."

*Consolidated Edison Co.*, 774 N.E.2d at 695. The application of New York law in this case

would force the insured entities to incur expenses sufficient to exhaust all four Highlands

policies, for a total of $50,000,000.00, in order to reach the excess policies. ECF No. 682 at 16-

17.

The interpretation of the word "occurrence" will also impact the manner in which the

underlying policies are exhausted and the scope of the Non-Settled Insurers' liability.

Pennsylvania law would treat multiple claims arising from "the manufacture and sale of the

[same] asbestos-containing product" as a *single* occurrence. *Liberty Mut.*, 418 F.3d at 336.

Aside from situations where a single calamity results in "numerous injuries or losses," New York

law would treat claims brought by multiple individuals as *separate* occurrences. *Appalachian*

*Ins.Co.*, 863 N.E.2d at 1001. The primary policies issued by Argonaut and Hartford have per-

occurrence limits of $1,000,000.00. ECF No. 756 ¶ 30. Relying on New York law, the Non-

---

[6] This example is used solely to illustrate how the application of Pennsylvania and New York law would yield different results in a hypothetical situation involving an injury spanning only the four years covered by the Highlands policies. The court acknowledges that, under the present circumstances, a *pro rata* allocation scheme consistent with New York law would force the Ampco-Pittsburgh Companies or HNA to incur additional expenses to exhaust claims predating 1961, when Buffalo Forge I first obtained insurance policies from Utica. ECF No. 682 at 16-17. In contrast, Pennsylvania law would not require such an entity to "act as a self-insurer during periods when it was uninsured." *J.H. France Refractories Co. v. Allstate Ins.Co.*, 626 A.2d 502, 507 (Pa. 1993).

Settled Insurers argue that a particular claim covered by the Argonaut policies can be allocated to a Highlands umbrella limit for 1982 or 1983 only if its *pro rata* share for that year exceeds $1,000,000.00.  ECF No. 675 at 43.

Since "relevant differences" exist between the laws of Pennsylvania and New York, a more detailed choice-of-law analysis is needed.  *Pacific Emp'rs*, 693 F.3d at 432.  In any case involving a choice-of-law question, Pennsylvania applies a "flexible rule" permitting a specific "analysis of the policies and interests underlying the particular issue before the court."  *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964).  This flexible analysis applies in cases involving contractual disputes.  *Budtel Assoc., LP v. Cont'l Cas. Co.*, 915 A.2d 640, 644-45 (Pa.Super.Ct. 2006).  The first step in the analysis is to ascertain whether the conflict between the competing laws constitutes a "true" conflict, a "false" conflict, or an "unprovided-for" case.  *Howden N. Am., Inc. v. ACE Prop. & Cas. Ins.Co.*, 875 F.Supp.2d 478, 495 (W.D.Pa. 2012).  A "true" conflict exists when each jurisdiction has an interest in applying its substantive law.  *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 n.15 (3d Cir. 1991).  "A false conflict exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law."  *Id.* at 187.  In the event of a false conflict, the court must apply the law of the interested jurisdiction.  *Kuchinic v. McCrory*, 222 A.2d 897, 899-900 (Pa. 1966).  An "unprovided-for" case exists when neither jurisdiction's interests would be impaired by the application of the alternative jurisdiction's law.  *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005).  In that situation, an insurance contract must be construed in accordance with the law of the place in which it was delivered.  *Howden*, 875 F.Supp.2d at 495 n.13.

In order "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that [the] choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins.Co. v. Hague*, 449 U.S. 302, 312-13 (1981)(plurality opinion).  Pennsylvania undoubtedly has an interest in applying its law to insurance policies issued by companies licensed to do business in the Commonwealth to companies maintaining their principal places of business in Pennsylvania.  *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 232 (3d Cir. 2010).  HNA argues for the application of Pennsylvania law even though it is presently domiciled in South Carolina.  ECF No. 678 at 16-38.  On the other hand, the Non-Settled Insurers correctly point out that the asbestos claims underlying the insurance disputes at issue arise primarily from products manufactured in New York.  ECF No. 675 at 12-20.  The Buffalo Forge entities operating in New York were named insureds under some of the policies.  ECF No. 684-23 at 13; ECF No. 684-25 at 10; ECF No. 685-1 at 6; ECF No. 685-3 at 6; ECF No. 685-4 at 6; ECF No. 685-5 at 6; ECF No. 685-6 at 13; ECF No. 685-12 at 10; ECF No. 685-17 at 10. These contacts implicate New York's regulatory interests even though none of the Non-Settled Insurers are domiciled in New York.  *Hammersmith v. TIG Ins.Co.*, 480 F.3d 220, 232 (3d Cir. 2007).  Consequently, the instant case presents a "true" conflict between the laws of Pennsylvania and New York.[7]  *Id.*

The next step in the analysis is to consider the contacts and interests of Pennsylvania and New York under the framework contained in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS.  *Specialty Surfaces*, 609 F.3d at 233.  Section 6 of the RESTATEMENT requires

---

[7] Given the "modest restrictions" that the Full Faith and Credit Clause and the Due Process Clause place on a state's ability to apply the law of a given jurisdiction, New York's contacts to the instant dispute are sufficient to render the application of its law *permissible*. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985).  As the Ampco-Pittsburgh Companies point out, however, the only New York interest at stake appears to be a generalized regulatory interest in applying its law to insurance policies covering entities operating in New York.  ECF No. 682 at 14 n.8.

28

consideration of "the needs of the interstate and international systems," "the relevant policies of

the forum," "the relevant policies of other interested states and the relative interests of those

states in the determination of the particular issue," "the protection of justified expectations," "the

basic policies underlying the particular field of law," "certainty, predictability and uniformity of

result," and "ease in the determination and application of the law to be applied." RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 6.  The most important factor relevant to the analysis in this

case is "the principal location of the insured risk during the term of the policy."[8] RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 193.  The underlying asbestos claims are based primarily on

products manufactured by the Buffalo Forge entities.  ECF No. 756 ¶¶ 22-25.  Seizing on this

fact, the Non-Settled Insurers maintain that New York was "the principal location of the insured

risk."  ECF No. 675 at 15-20.  That argument, however, mischaracterizes the nature of the

inquiry.  The "insured risk" must be ascertained by reference to the "contract of insurance" rather

than by reference to the underlying torts.  *Hammersmith*, 480 F.3d at 232-33 (quoting *McCabe v.*

*Prudential Prop. & Cas. Ins.Co.*, 514 A.2d 582, 586 (Pa.Super.Ct. 1986)).  The coverage

provided by the insurance policies in question was not *limited* to activities occurring in New

York.  Indeed, Buffalo Forge I was apparently *added* as a named insured under *pre-existing*

insurance policies after its 1981 acquisition by Ampco-Pittsburgh.  ECF No. 756 ¶¶ 11-12.  The

Ampco-Pittsburgh Companies were headquartered in Pennsylvania at all times relevant to this

case.  *Id.* ¶ 1.  It is beyond dispute that they were named insureds under *all* the relevant policies.

*Id.* ¶¶ 11-12.  The coverage generally extended to injuries "caused by each occurrence happening

anywhere in the world."  ECF No. 684-17 at 2; ECF No. 684-18 at 2; ECF No. 684-19 at 2; ECF

---

[8] The RESTATEMENT generally permits contracting parties to choose the law that they wish to govern their contract. RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 186-87.  HNA correctly notes that the Non-Settled Insurers could have placed choice-of-law provisions in their respective excess liability insurance policies.  ECF No. 678 at 19.

No. 684-20 at 2.  The underlying asbestos claims have been brought by plaintiffs in forty

American jurisdictions.  ECF No. 756 ¶ 26.  Under these circumstances, the court cannot

conclude that the "insured risk" was somehow centered in New York.  *Howden*, 875 F.Supp.2d

at 497.

Since the "insured risk" was not centered in a particular jurisdiction, the choice-of-law

analysis must proceed under § 188 of the RESTATEMENT.  *Hammersmith*, 480 F.3d at 233.  That

section provides as follows:

### § 188.  Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are
determined by the local law of the state which, with respect to that issue, has the
most significant relationship to the transaction and the parties under the principles
stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the
contacts to be taken into account in applying the principles of § 6 to determine the
law applicable to an issue include:
    (a) the place of contracting,
    (b) the place of negotiation of the contract,
    (c) the place of performance,
    (d) the location of the subject matter of the contract, and
    (e) the domicil, residence, nationality, place of incorporation and place of
    business of the parties.
These contacts are to be evaluated according to their relative importance with
respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the
same state, the local law of this state will usually be applied, except as otherwise
provided in §§ 189-199 and 203.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188.  The inquiry does not consist of "a mere

counting of contacts."  *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970).  Instead, the relevant

factors must be viewed "qualitatively as opposed to quantitatively."  *Myers v. Commercial Union*

*Assurance Cos.*, 485 A.2d 1113, 1116 (Pa. 1984).  The weight of each contact must be

determined in relation to its importance to the specific issues in question.  *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987).

An insurance contract is made in the state of delivery.  *Harry L. Sheinman & Sons, Inc. v. Scranton Life Ins.Co.*, 125 F.2d 442, 444 (3d Cir. 1942).  The excess liability policies at issue in this case were delivered to the Ampco-Pittsburgh Companies in Pennsylvania.  ECF No. 755 ¶ 94.  None of the policies were delivered in New York.  Therefore, Pennsylvania was "the place of contracting" for each of the policies.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)(a).

The Ampco-Pittsburgh Companies and Fred S. James conducted contract negotiations out of Pennsylvania.  ECF No. 755 ¶¶ 76-85.  The record indicates that some of the negotiations took place in Canada, England, Georgia, Illinois and Massachusetts.  *Id.* ¶¶ 82-83, 87-89, 91.  No Buffalo Forge employees were involved in the negotiations.  *Id.* ¶¶ 92-93.  Because New York had no involvement with the negotiations, the second factor weighs in favor of Pennsylvania.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)(b).

An insurance contract is "performed" in the state in which insurance premiums are received.  *Gould, Inc. v. Cont'l Ins. Co.*, 822 F.Supp. 1172, 1176 (E.D.Pa. 1993).  The Non-Settled Insurers sent premium invoices to Fred S. James personnel in Pittsburgh, Pennsylvania.  ECF No. 755 ¶ 99.  Ampco-Pittsburgh sent premium payments directly to the offices of Fred S. James.  *Id.* ¶¶ 100-01.  The payments were later forwarded to the excess insurers.  *Id.* ¶ 101.  The existing record supports a determination that the insurance contracts were performed in Pennsylvania.  *Armotek Indus., Inc. v. Emp'rs Ins. of Wausau*, 952 F.2d 756, 761 (3d Cir. 1991).  Even if some of the contracts were performed elsewhere, it is clear that none of them were performed in New York.

The fourth factor relevant to the analysis is "the location of the subject matter of the contract." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)(d).  As discussed earlier, the excess coverage provided under the policies extended to injuries "caused by each occurrence happening anywhere in the world." ECF No. 684-17 at 2; ECF No. 684-18 at 2; ECF No. 684-19 at 2; ECF No. 684-20 at 2.  In this respect, the "subject matter" of the relevant insurance contracts was not limited to Pennsylvania or New York.  Even if the "subject matter" is viewed narrowly enough to focus solely on the production of products, thereby excluding the subsequent use of those products, this factor would not weigh in favor of applying New York law.  The focus of the inquiry is on the *contract* rather than on the *underlying tort*.  *Hammersmith*, 480 F.3d at 232-33.  The governing law disfavors the application of different laws to the same insurance contract. *United Brass Works, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 819 F.Supp. 465, 469 (W.D.Pa. 1992).  Although the excess liability insurance policies purchased by the Ampco-Pittsburgh Companies covered Buffalo Forge activities occurring in New York, they also covered similar activities occurring in Pennsylvania.  The fact that the lawsuits underpinning the present dispute are based on manufacturing activities occurring in New York is mere happenstance. *Specialty Surfaces*, 609 F.3d at 237 (explaining that the choice-of-law inquiry turns on "the states' contacts with the contract of insurance" rather than on "the tort involved in the underlying suit").  The fourth factor weighs in favor of neither Pennsylvania nor New York law. *Howden*, 875 F.Supp.2d at 497.

Some consideration must also be given to where the parties are domiciled, their places of incorporation, and their principal places of business. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)(e).  The Ampco-Pittsburgh Companies are Pennsylvania corporations maintaining their principal places of business in Pittsburgh.  ECF No. 758 ¶ 1.  HNA is a

Delaware corporation maintaining its principal place of business in Columbia, South Carolina. *Id.* ¶ 2.  None of the Non-Settled Insurers have these kinds of contacts with New York.  *Id.* ¶¶ 3-9.  It is true that Buffalo Forge I was incorporated in New York, and that its manufacturing facilities were located there.  ECF No. 758 ¶ 13.  Nonetheless, Buffalo Forge I became a named insured under the excess policies only because of its acquisition by Ampco-Pittsburgh.  ECF No. 756 ¶ 11.  Since the Ampco-Pittsburgh Companies are domiciled in Pennsylvania, New York has no "comparable interest in the outcome of this matter."  *Hughes v. Prudential Lines, Inc.*, 624 A.2d 1063, 1066 n.2 (Pa.Super.Ct. 1993).

When the relevant factors are weighed on a "qualitative scale," they lead to the conclusion that the excess liability insurance policies in question must be interpreted in accordance with Pennsylvania law.  *Hammersmith*, 480 F.3d at 235.

### b.      The application of Pennsylvania law

Since the disputed policy language must be construed in conformity with Pennsylvania law, the Ampco-Pittsburgh Companies and HNA are entitled to a declaration that a given excess policy is "potentially triggered" if it covers "any time during the development of a claimant's asbestos-related disease."  *J.H. France*, 626 A.2d at 507; ECF No. 672-1 at 1, ¶ 2; ECF No. 677-1 at 2, ¶ 1.  The Ampco-Pittsburgh Companies and HNA can attach the excess policies in question by incurring expenses sufficient to exhaust the Highlands policy covering a single year.  Moreover, "the manufacture and sale of the [same] asbestos-containing product" constitutes a single "occurrence" under the policies.  *Treesdale*, 418 F.3d at 336.  Injuries suffered by multiple asbestos claimants can be aggregated to exhaust the per-occurrence limits of the underlying primary policies.  *Id.*

The Ampco-Pittsburgh Companies and HNA seek declarations that they are entitled to full indemnification under any "triggered" excess policies, provided that those policies cover a year falling between the date of a claimant's first exposure to asbestos and the manifestation of his or her disease. ECF No. 672-1 at 1, ¶ 2; ECF No. 677-1 at 2, ¶ 1. They also request declarations clarifying that they are entitled to select the "triggered" excess policies of their choice, leaving the selected insurers free to seek contribution from the others. ECF No. 672-1 at 1-2, ¶ 3; ECF No. 677-1 at 3, ¶ 3. Objecting to the proposed declarations, the Non-Settled Insurers contend that the amount of indemnification owed to the insured entities must be reduced by the *pro rata* shares of the settling insurers.[9]  ECF No. 708 at 29-35.

The disagreement between the parties centers on the decision of the United States Court of Appeals for the Third Circuit in *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440 (3d Cir. 1996). In *Koppers*, the court of appeals was presented with a situation in which an insured entity had settled with some liability insurers, but not others, for coverage attributable to environmental property damage claims. *Koppers*, 98 F.3d at 1443. After the settling insurers had already paid sums in settlement of their contractual obligations, a jury determined that the insured had incurred property damage liability in the amount of $70,000,000.00. *Id.* This assessment clearly failed to account for the settlement amounts previously received by the insured, since the court had advised that the award would be adjusted *after* the jury determined the "total damages figure." *Id.* at 1444. When presented with this situation, the court of appeals predicted that the Pennsylvania Supreme Court would find the nonsettling excess insurers to be "jointly and severally liable for the amount of the loss *in excess of* the settling insurers' pro rata

---

[9] Since this case is not governed by Ohio law, the court has no need to address the Non-Settled Insurers' arguments pertaining to decisions applying the law of that jurisdiction. ECF No. 708 at 24-29. It suffices to say that the Non-Settled Insurers point to no decision which suggests that *Pennsylvania* would adopt the rule applied in those decisions. *Id.*

shares of liability." *Id.* at 1452 (emphasis in original).  The court of appeals summarized its

holding as follows:

> In sum, taking all of the above rules together, we predict that the Pennsylvania
> Supreme Court would hold that the non-settling excess insurers are jointly and
> severally liable for the full amount of the loss in excess of: the sum of (1) the
> policy limits of the directly underlying, "exhausted" primary policies, and (2) the
> combined pro rata shares of other settling (primary and excess) insurers.  The
> beneficient consequences of this formula are that the insured bears the risk of
> settling too low while the non-settling insurers bear the risk of being unable to
> redistribute equitably among themselves the burden of paying the balance (if, for
> example, some of their number are insolvent).

*Id.* at 1455.  For purposes of the rule adopted in *Koppers*, the policies issued by settling primary

insurers were deemed to have been "functionally exhausted" by the prior settlement agreements.

*Id.* at 1454.  The rule formulated in *Koppers* was designed to "avoid a double recovery."  *Id.* at

1453.

The agreements executed in 2005 and 2011 covered policies issued to Buffalo Forge I

before its 1981 acquisition by Ampco-Pittsburgh, as well as six primary policies issued to the

Ampco-Pittsburgh Companies between 1981 and 1986.  ECF No. 756 ¶ 69.  Those agreements

provided for "the payment of indemnity and defense costs spread across a known coverage

block."  *Id.* ¶ 70.  The relevant "coverage block" began in June 1961 and ended in September

1986.  *Id.*  Each policy was required to pay "at least up to its face limits."  *Id.*

The agreements executed on October 5, 2012, require the eight participating excess

insurers to pay specified percentages of net defense and indemnity costs remaining after the

billing of such costs to insurers covered by the earlier agreements.  ECF No. 685-20 at 8-9.

Those agreements purported to "replace, and operate in lieu of," the parties' rights and

obligations under the excess policies issued by the participating insurers.  *Id.* at 20-21.  The

Ampco-Pittsburgh Companies and HNA expressly reserved the right to recover defense and

indemnity costs from the Non-Settled Insurers, provided that those same costs were not obtained from excess insurers who were parties to the agreements.  *Id.* at 9, 257.

Invoking the rule established in *Koppers*, the Non-Settled Insurers maintain that they are entitled to set-offs accounting for the *pro rata* shares of responsibility owed by the settling insurers.  ECF No. 675 at 30-37.  According to the Non-Settled Insurers, the Ampco-Pittsburgh Companies and HNA "must set off from their claim[s] not only the directly-underlying limits in any 'spiked' year, but also the indemnity limits provided by ***all*** other lower-attaching settled primary, umbrella and excess policies in other years," in order to attach the excess policies presently at issue.  *Id.* at 33 (boldface type and emphasis in original).  Taking their argument even further, the Non-Settled Insurers argue that the calculated set-off should also account for "amounts allocable to lower-attaching insolvent insurers."  *Id.* at 34.  The Non-Settled Insurers acknowledge that the amounts of the requested set-offs cannot be calculated until indemnity or defense payments are sought by the Ampco-Pittsburgh Companies or HNA under the excess policies.  *Id.*

The Ampco-Pittsburgh Companies and HNA differently read *Koppers*.  They contend that a set-off is required only where an insured seeks "a double recovery of a certain fixed sum." ECF No. 682 at 30.  In *Koppers*, the jury concluded that the insured had incurred property damage liability totaling $70,000,000.00.  *Koppers*, 98 F.3d at 1443.  That determination was made after the insured had already received payments from settling insurers.  *Id.* at 1452.  Since the insured was not entitled to recover indemnification payments *exceeding* the total amount of underlying liability, the court of appeals found it necessary to "reduce the judgment to account for the settling insurers' apportioned shares of liability."  *Id.*  In other words, the set-off required in *Koppers* was designed to prevent the insured from obtaining a "double recovery" for the

shares attributable to the settling insurers.  *Id.* at 1453.  Had the set-off not been implemented,

the insured would have received the sum of its total liability, as determined by the jury, *and* the

payments already made pursuant to the settlement agreements.  The court of appeals avoided this

"double recovery" by subtracting the *pro rata* shares of the settling insurers from the

$70,000,000.00 award.  *Id.* at 1453-55.

The order proposed by the Ampco-Pittsburgh Companies would render a "selected"

excess policy responsible for "all sums" attributable to the underlying claims, "without set-off or

reduction, except for any amounts actually paid by the settled pre-1981 insurers."  ECF No. 762-

1 at 1-2, ¶ 3.  The proposed order would specifically prevent the Ampco-Pittsburgh Companies

from recovering "more than 100% of their defense costs or indemnity costs."  *Id.*  Because they

"seek amounts for continuing losses not otherwise paid by the settling insurers" rather than "a

double recovery of a certain fixed sum," the Ampco-Pittsburgh Companies assert that no set-off

is required under *Koppers*.  ECF No. 719 at 20.

The court is not fully convinced by the arguments advanced by either side.  The

reasoning employed in *Koppers* requires nonsettling insurers to "bear the risk of being unable to

redistribute equitably among themselves the burden of paying the balance (if, for example, some

of their number are insolvent)."  *Koppers*, 98 F.3d at 1455.  For this reason, the set-off required

under that decision cannot account for "amounts allocable to lower-attaching insolvent insurers"

covering lower layers in other policy years.  ECF No. 675 at 34.  It is acknowledged that, under

Pennsylvania law, "an excess insurer is not required to 'drop down' to provide primary coverage

if the underlying primary insurer is insolvent."  *Koppers*, 98 F.3d at 1454.  In this vein, the

Ampco-Pittsburgh Companies concede that they must bear the costs necessary to functionally

*exhaust* the Highlands umbrella policy "in the selected tower of coverage."  ECF No. 719 at 22.

Contrary to the Non-Settled Insurers' position, however, *they* must bear the financial burdens resulting from Highlands' functional insolvency with respect to nonselected years. *Id.* The set-off required under *Koppers* accounts for only the apportioned shares of *settling* insurers. *Koppers*, 98 F.3d at 1455.

On the other hand, the declaration proposed by the Ampco-Pittsburgh Companies is similarly inconsistent with *Koppers*.[10]   The proposed declaration would permit set-offs or reductions only for "amounts actually paid by the settled pre-1981 insurers."  ECF No. 672-1 at 1-2, ¶ 3.  The total amount of recovery permitted would be capped at 100% of the Ampco-Pittsburgh Companies' defense or indemnity costs.  *Id.*  Under Pennsylvania law, however, a settling policyholder "loses any right to coverage of the difference between the settlement amount and the primary policy's limits." *Koppers*, 98 F.3d at 1454.  To the extent that the Ampco-Pittsburgh Companies and HNA settled with pre-1981 insurers for less than the amounts to which they were entitled, they cannot pass that difference along to the Non-Settled Insurers. *Id.* at 1455 (explaining that "the insured bears the risk of settling too low").

Pennsylvania's "multiple-trigger" approach permits the Ampco-Pittsburgh Companies or HNA to allocate "occurrences" to the excess policies in question even if the initial exposures or injuries predated 1981. *J.H. France*, 626 A.2d at 508.  A chosen insurer "must bear potential liability for the entire claim" despite the fact that "additional exposure or injury occurred at times other than when the insurer was on the risk."  *Id.*  Only the *directly underlying* primary and umbrella policies must be exhausted to "trigger" the excess policies in a selected year. *Koppers*, 98 F.3d at 1455-56.  Nonetheless, "the existence of other primary policies applicable to the indivisible loss" remains relevant for the purpose of determining the *extent* of an excess insurer's

---

[10] The court refers to the Ampco-Pittsburgh Companies' proposed declaration because the proposal put forth by HNA is less specific.  ECF No. 677-1.

liability.  *Id.* at 1456.  Since a policyholder "bears the risk of settling too low," the set-offs required under *Koppers* cannot be limited to the "amounts actually paid by the settled pre-1981 insurers."  *Id.* at 1455; ECF No. 672-1 at 1-2, ¶ 3.

In an attempt to establish that the set-offs required under *Koppers* should be allocated on a *pro tanto* basis rather than on a *pro rata* basis, HNA calls the court's attention to *Baker v. AC&S, Inc.*, 755 A.2d 664 (Pa. 2000).  ECF No. 738 at 11-15.  In that decision, the Pennsylvania Supreme Court permitted an asbestos plaintiff who had settled with some defendant tort-feasors, but not others, to recover the difference between the amount of the settlement and his total losses from the non-settling tort-feasors.  *Baker*, 755 A.2d at 665-72.  Because the defendants in *Baker* were joint tort-feasors with the settling parties, the case was governed by Pennsylvania's Uniform Contribution Among Tort-feasors Act ("UCATA"), 42 PA. CONS. STAT. § 8321 *et seq.* The applicable statutory provision was 42 PA. CONS. STAT. § 8326, which provides:

> **§ 8326.  Effect of release as to other tort-feasors**
> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 PA. CONS. STAT. § 8326.  The Pennsylvania Supreme Court interpreted this statutory language to mean that, where a settlement agreement is silent, "the set-off mechanism defaults to a *pro tanto* set-off," thereby requiring a subsequent award against nonsettling defendants to be reduced only "by the amount of consideration paid" by settling defendants.  *Baker*, 755 A.2d at 667.  It was further noted that the UCATA permitted a *pro rata* set-off only where such an allocation would yield a higher set-off figure than the amount of the consideration paid by the settling defendants.  *Id.* at 668.

As discussed earlier, the 2012 agreements expressly permit the Ampco-Pittsburgh Companies and HNA to pursue claims for defense and indemnity costs against the Non-Settled Insurers, except to the extent that they recover such costs from the settling insurers.  ECF No. 685-20 at 9, 257.  Seizing on this fact, HNA invites the court to offset its recoverable amounts on a *pro tanto* basis rather than on the *pro rata* basis discussed in *Koppers*.  ECF No. 738 at 11-15. The problem with this argument is that the insurers at issue in this case are not "joint tort-feasors."  The UCATA defines the term "joint tort-feasors" to mean "two or more persons jointly or severally liable *in tort* for the same injury to persons or property, whether or not judgment has been recovered against all or some of them."  42 PA. CONS. STAT. § 8322 (emphasis added). Although the underlying asbestos claims sound *in tort*, the *contractual* claims in this case do not. Thus, the statutory provision construed in *Baker* has no application in this case.  In light of the language in *Koppers* declaring that "the insured bears the risk of settling too low," a *pro tanto* set-off cannot be applied under the present circumstances.  *Koppers*, 98 F.3d at 1455.  A limited set-off of that kind would force the Non-Settled Insurers to make up the difference between the amounts that the pre-1981 insurers *actually paid* and the amounts that they *should have paid*. ECF No. 745 at 12.  The Non-Settled Insurers are clearly entitled to a *pro rata* setoff.

HNA correctly points out that the Non-Settled Insurers are not entitled to set-offs for policies that have already been exhausted.  ECF No. 738 at 8-9.  The Non-Settled Insurers concede as much.  ECF No. 745 at 13, n.5.  Under *Koppers*, a settlement agreement with a primary insurer functionally exhausts that insurer's policy and triggers the excess policy, leaving the insured responsible for satisfying "the difference between the settlement amount and the primary policy's limits."  *Koppers*, 98 F.3d at 1454.  The Ampco-Pittsburgh Companies

acknowledge that a particular payment can be used to functionally exhaust the limits of only one policy.  ECF No. 741 at 8.

The remaining question is whether set-offs are required for the untriggered, settled excess policies covering years other than those selected by the Ampco-Pittsburgh Companies and HNA. The reasoning employed in *Koppers* yields a negative answer to that question.  *Koppers*, 98 F.3d at 1456 (making reference to "the threshold triggering question"); *Koppers Co., Inc. v. Certain Underwriters at Lloyd's, London*, Civil Action No. 85-2136, 1997 U.S. Dist. LEXIS 16123, at *12-13 (W.D.Pa. June 23, 1997)(declining to consider the import of settlements reached with excess insurers whose policies were never triggered).  The set-offs required under *Koppers* extend only to "triggered" policies issued by *settling* insurers.  *Koppers*, 98 F.3d at 1453-56.

### c. The non-cumulation clauses

The following "condition" is contained in the four umbrella policies issued by Highlands:

> Prior Excess Insurance and Non-Cumulation of Liability.  It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof the limit of liability hereon as stated in Item 6 of the Declarations shall be reduced by any amounts due to the Insured on account of such loss under such prior excess insurance.

> Subject to the foregoing paragraph and to all the other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy the Company will continue to protect the Insured for liability in respect of such personal injury or property damage without payment of additional premium.

ECF No. 684-17 at 4; ECF No. 684-18 at 4; ECF No. 684-19 at 4; ECF No. 684-20 at 4.  The Old Republic policy and the four London policies contain clauses that are not materially different from the non-cumulation clauses found in the Highlands policies.  ECF No. 685-3 at 9; ECF No. 685-4 at 9; ECF No. 685-5 at 9; ECF No. 685-6 at 10; ECF No. 685-12 at 4.  As noted earlier, the other ten excess policies generally incorporate the provisions of the Highlands policies by

reference.  ECF No. 684-10 at 3; ECF No. 684-11 at 3; ECF No. 684-22 at 3, 10; ECF No. 684-23 at 12; ECF No. 684-24 at 5; ECF No. 684-25 at 9; ECF No. 685-1 at 5; ECF No. 685-8 at 7; ECF No. 685-9 at 8; ECF No. 685-17 at 12.

The Non-Settled Insurers maintain that the non-cumulation clauses effectively limit the Ampco-Pittsburgh Companies and HNA to the maximum amounts due in any one year of coverage.[11]  ECF No. 675 at 37-40; ECF No. 745 at 19-22.  The Ampco-Pittsburgh Companies and HNA dispute both the applicability and the enforceability of the non-cumulation clauses. ECF No. 711 at 31-48; ECF No. 719 at 24-36.  Since the Old Republic and London policies contain their own non-cumulation clauses, the argument concerning the *applicability* of the non-cumulation clauses found in the Highlands policies relates only to the remaining ten policies. ECF No. 685-3 at 9; ECF No. 685-4 at 9; ECF No. 685-5 at 9; ECF No. 685-6 at 10; ECF No. 685-12 at 4.

Although the ten policies in question generally follow form to the Highlands policies, they do not do so with respect to the applicable limits of liability.  ECF No. 684-10 at 3; ECF No. 684-11 at 3; ECF No. 684-22 at 3, 10; ECF No. 684-23 at 10, 12; ECF No. 684-24 at 5-6; ECF No. 684-25 at 4, 9; ECF No. 685-1 at 5; ECF No. 685-8 at 4, 7; ECF No. 685-9 at 6, 8; ECF No. 685-17 at 3, 5.  The Ampco-Pittsburgh Companies and HNA attempt to link the non-cumulation clauses in the Highlands policies to the limits of liability.  ECF No. 711 at 32-36; ECF No. 719 at 26-27.  They contend that the relevant excess policies do not incorporate the non-cumulation clauses by reference.  *Id.*  That argument, however, cannot be squared with the policy language.  The non-cumulation clauses appear as "conditions" listed in the underlying

---

[11] HNA apparently misunderstands the Non-Settled Insurers' argument.  According to HNA, the Non-Settled Insurers interpret the non-cumulation clauses to preclude coverage because of payments made by pre-1981 insurers. ECF No. 711 at 37-41.  The court understands the Non-Settled Insurers to argue that the Ampco-Pittsburgh Companies and HNA can obtain coverage up to the combined limits of the excess policies covering one year falling between 1981 and 1984.  ECF No. 745 at 21-22.

umbrella policies.  ECF No. 684-17 at 4; ECF No. 684-18 at 4; ECF No. 684-19 at 4; ECF No. 684-20 at 4.  The intent of contracting parties must be "inferred from the written provisions of the contract."  *Am. & Foreign Ins. Co. v. Jerry's Sports Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010).  Since the relevant excess policies generally incorporate the terms and "conditions" of the Highlands policies, they incorporate the non-cumulation clauses.  The court's analysis will proceed with the understanding that those clauses apply to all fifteen of the excess policies at issue.

Under Pennsylvania law, an insurer whose liability is triggered "must bear potential liability for the entire claim" even if "additional exposure or injury occurred at times other than when the insurer was on the risk."  *J.H. France*, 626 A.2d at 508.  Invoking this principle, the Ampco-Pittsburgh Companies suggest that the non-cumulation clauses cannot be enforced in Pennsylvania.  ECF No. 719 at 27-28.  Those clauses reduce the applicable limits of liability "by any amounts due" under another excess policy.  ECF No. 684-17 at 4; ECF No. 684-18 at 4; ECF No. 684-19 at 4; ECF No. 684-20 at 4.  According to the Ampco-Pittsburgh Companies, no prior amounts are "due" when an insured accesses excess policies covering a particular year.  ECF No. 719 at 27-28.  HNA appears to be under the same belief.  ECF No. 711 at 39-41.

The Non-Settled Insurers correctly point out that the argument advanced by the Ampco-Pittsburgh Companies and HNA, if accepted, would essentially render the non-cumulation clauses unenforceable in Pennsylvania.  ECF No. 745 at 20.  Such clauses, however, are clearly enforceable in certain instances.  In *Liberty Mutual Insurance Co. v. Treesdale, Inc.*, 418 F.3d 330 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit declared "anti-stacking clauses" to be "enforceable under Pennsylvania law as long as they are clear and

unambiguous." *Treesdale, Inc.*, 418 F.3d at 341.  The court cannot accept the view that the reasoning employed in *J.H. France* is somehow incompatible with non-cumulation clauses.

The non-cumulation clauses apply "if any loss . . . is also covered in whole or in part under any other excess policy . . . ."  ECF No. 684-17 at 4; ECF No. 684-18 at 4; ECF No. 684-19 at 4; ECF No. 684-20 at 4.  The term "loss" is not defined in the Highlands policies.  Those policies define the term "ultimate net loss" as "the total sum which the Insured, or any company as his underlying insurers as scheduled, or both, become obligated to pay as damages because of personal injury or property damage, either through adjudication or compromise."  ECF No. 684-17 at 3; ECF No. 684-18 at 3; ECF No. 684-19 at 3; ECF No. 684-20 at 3.  The policy language provides that "[a]ll personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  *Id.*  The Ampco-Pittsburgh Companies contend that the term "loss," as it appears in the non-cumulation clauses, refers to any amounts due for a particular asbestos claim rather than for an entire "occurrence."  ECF No. 719 at 32-33.  Under that interpretation, the non-cumulation clauses would reduce policy limits only as to a particular claim and would not change the applicable per-occurrence limits.  *Id.*

The United States District Court for the District of Oregon was presented with a similar argument in *California Insurance Co. v. Stimson Lumber Co.*, Civil Action No. 01-514, 2004 U.S. Dist. LEXIS 10098 (D.Or. May 26, 2004).  The non-cumulation clause implicated in that case was not materially different from the non-cumulation clauses at issue in this case. *California Ins.Co.*, 2004 U.S. Dist. LEXIS 10098, at *29.  The district court rejected the insured's argument by stating as follows:

> Stimson argues that the term "loss" as used in the non-cumulation provision refers only to each individual siding claim paid for by Stimson and that no single claim

will trigger application of the clause.  Albeit plausible, this interpretation is
unreasonable within the meaning of the policy.  Although the term "loss" is not
defined by the policies, it is also not limited by any other language.  There is no
policy language that ties the term "loss" to only individual occurrences.
Accordingly, the term should be afforded its broadest meaning.

*Id.* at *30-31.  In *Greene, Tweed & Co., Inc. v. Hartford Accident & Indemnity Co.*, Civil Action

No. 03-3637, 2006 U.S. Dist. LEXIS 21447, at *38-42 (E.D.Pa. Apr. 21, 2006), the United

States District Court for the Eastern District of Pennsylvania reached the same result while

interpreting similar policy language in accordance with Pennsylvania law.  For the reasons set

forth by two federal courts presented with virtually identical policy language the argument

advanced by the Ampco-Pittsburgh Companies will be rejected in this case as well.

The Ampco-Pittsburgh Companies and HNA further contend that the Non-Settled

Insurers' interpretation of the non-cumulation clauses would render them unenforceable "escape

clauses" under Pennsylvania law.  ECF No. 711 at 44-48; ECF No. 719 at 28-29.  "An escape

clause is one which purports to relieve the insurer from any obligation to the insured if other

coverage is available."  *Bowers v. Estate of Feathers*, 671 A.2d 695, 699 (Pa.Super.Ct. 1995).

Because Pennsylvania law disfavors escape clauses, insurance policies are frequently enforced as

if such clauses did not exist.  *Fryer v. Allstate Ins. Co.*, 573 A.2d 225, 226-28 (Pa.Super.Ct.

1990).

The status of the non-cumulation clause as an escape clause depends upon whether, under

the particular circumstances, its operation would "relieve the insurer from *any* obligation to the

insured."  *Bowers*, 671 A.2d at 699 (emphasis added).  The Non-Settled Insurers rely heavily on

*Treesdale* for the proposition that non-cumulation clauses are enforceable in Pennsylvania.  ECF

No. 675 at 37-40; ECF No. 745 at 20-21.  The non-cumulation clause at issue in *Treesdale*

provided as follows:

> If the same occurrence gives rise to personal injury, property damage or
> advertising injury or damage which occurs partly before and partly within any
> *annual period of this policy*, then each occurrence limit and the applicable
> aggregate limit or limits of the policy shall be reduced by the amount of each
> payment *made by the company* with respect to each occurrence, either under a
> previous policy or policies of which *this policy* is a replacement, or under *this
> policy* with respect to *annual periods* thereof.

*Treesdale*, 418 F.3d at 339 (emphasis added).  The contractual language at issue in *Treesdale*

applied only where "the company" (*i.e.*, the same insurer) had made a payment during a prior

year or "annual period" under the same or a predecessor "policy." *Id.*  The non-cumulation

clause was deemed to be enforceable because, under those circumstances, it did not "eliminate

coverage." *Id.* at 344.

The Non-Settled Insurers correctly argue that an insured entity cannot evade the

operation of a valid non-cumulation clause by selecting years of coverage in reverse

chronological order.  ECF No. 675 at 40; *Treesdale*, 418 F.3d at 340-42.  The Ampco-Pittsburgh

Companies and HNA respond by pointing out that, under the Non-Settled Insurers' interpretation

of the policy language, at least some of the excess insurers would have no coverage obligations

at all.  ECF No. 711 at 44-48; ECF No. 719 at 28-29.  The non-cumulation clauses in the

Highlands policies become operative if the covered loss "is also covered in whole or in part

under *any other excess policy*."  ECF No. 684-17 at 4 (emphasis added); ECF No. 684-18 at 4

(emphasis added); ECF No. 684-19 at 4 (emphasis added); ECF No. 684-20 at 4 (emphasis

added).  If the phrase "any other excess policy" is construed broadly enough to encompass

excess policies issued by other insurers, the non-cumulation clauses would impermissibly

eliminate the coverage obligations of the insurers covering 1982, 1983 and 1984.  "An 'escape'

clause provides that *the company invoking it* is relieved from *any obligation* to the insured if

other coverage is available." *Ins.Co. of N. Am. v. Cont'l Cas. Co.*, 575 F.2d 1070, 1072 (3d Cir.

1978)(emphasis added).  If applied in the manner posited by the Non-Settled Insurers, the non-cumulation provisions would clearly operate as escape clauses.  Under Pennsylvania law, it is simply unacceptable for an insurance company to provide no coverage under a triggered policy for which premiums have been paid.  *Auto. Underwriters, Inc. v. Fireman's Fund Ins. Companies*, 874 F.2d 188, 191 (3d Cir. 1989).

On the other hand, the non-cumulation clauses are enforceable if the phrase "any other excess policy" is construed to include *only* other excess policies issued by the *same insurer*. *Greene, Tweed & Co.*, 2006 U.S. Dist. LEXIS 21447, at *58 (explaining that "an anti-stacking provision is valid so long as the insurer invoking the provision will be required to indemnify the insured pursuant to either the policy containing the provision or other policies it issued to the insured").  Insurance contracts should not be construed in such a way as to neutralize the application of certain provisions.  *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987).  Ambiguous policy provisions must be construed in favor of coverage.  *Egger v. Gulf Ins. Co.*, 903 A.2d 1219, 1226 (Pa. 2006).  When competing interpretations of a contract are presented, Pennsylvania law favors the adoption of the interpretation giving effect to *all* relevant provisions.  *Gaffer Ins. Co. v. Discover Reinsurance Co.*, 936 A.2d 1109, 1113 (Pa.Super.Ct. 2007).  These rules converge in this case.  The more narrow interpretation of the policy language broadens the coverage available to the insured entities while permitting the non-cumulation clauses to be enforced in some way.  Accordingly, the non-cumulation clauses will be construed to reduce the limits of liability available under an excess policy by amounts paid to the insured entity *by the same insurer* during a previous policy period for amounts attributable to the same "loss."  ECF No. 684-17 at 4; ECF No. 684-18 at 4; ECF No. 684-19 at 4; ECF No. 684-20 at 4. Since the clauses apply only to other "excess" policies, they may be invoked only where a

particular insurer has previously paid sums for the same "loss" under an earlier *excess* policy. *Id.* They cannot be utilized by an insurer to reduce the applicable limits of liability by amounts paid at lower layers of coverage. *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 103-05 (2d Cir. 2012).

The court acknowledges that all parties to this case favor the broader interpretation of the policy language. The Non-Settled Insurers acknowledge that the non-cumulation clauses, when construed broadly, would permit the Ampco-Pittsburgh Companies and HNA to access the coverage covering only one year. ECF No. 675 at 37-40; ECF No. 745 at 19-22. In the mistaken opinion of the Non-Settled Insurers, such a result would be permissible under Pennsylvania law. *Id.* While the Ampco-Pittsburgh Companies and HNA alternatively call the more narrow interpretation to the court's attention, they favor the broader interpretation, which would render the clauses unenforceable under Pennsylvania law. ECF No. 711 at 37-48; ECF No. 719 at 33-36. Under these circumstances, however, the policy language in question is readily susceptible to a limiting construction. *Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F.Supp.2d 693, 705-07 (E.D.Wis. 2005). When the phrase "any other excess policy" is construed to include only excess policies issued by the *same insurer*, the non-cumulation clauses permit *each* of the Non-Settled Insurers *individually* (but not *all* of the Non-Settled Insurers *collectively*) to reduce the applicable limits of liability for previous payments attributable to the same "loss." ECF No. 684-17 at 4; ECF No. 684-18 at 4; ECF No. 684-19 at 4; ECF No. 684-20 at 4. That interpretation permits the Ampco-Pittsburgh Companies and HNA to reap the benefits of premiums paid to *each insurer* without allowing them to exceed the policy limits applicable to payments for "losses" caused by the *same* occurrence. *J.H. France*, 626 A.2d at 508. Since the

more narrow interpretation is consistent with the policy language, compatible with Pennsylvania law, and receptive to the interests of all relevant parties, it will be adopted in this case.

### 3.      The Non-Settled Insurers' defense obligations

Under Pennsylvania law, "[a]n insurer's duty to defend is broader than its duty to indemnify." *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010). The Non-Settled Insurers seek a declaration that they have no duty to defend the underlying asbestos lawsuits, and that their financial responsibilities extend only to indemnity payments. ECF No. 671. The Ampco-Pittsburgh Companies and HNA contend that most of the Non-Settled Insurers are obligated to defend the underlying actions, and that they are required to incur the associated costs in addition to their limits of liability. ECF No. 672-1 ¶ 7; ECF No. 677-1 at 2, ¶ 2. The parties agree that the Columbia Casualty policies[12] covering 1983 and 1984 and the Lexington policy[13] covering 1983 do not provide defense coverage. ECF No. 712 at 31; ECF No. 720 at 19. Consequently, the Non-Settled Insurers' motion for summary judgment pertaining to defense obligations will be granted with respect to those three policies. ECF Nos. 684-10, 684-11 & 685-1.

The four umbrella policies issued by Highlands contain the following language:

**Defense.** If no other insurer has the right and duty to do so, the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, but the Company shall not be obligated to defend any suit after the Company's liability has been exhausted; Provided that:

(a)      In connection with the aforesaid right and duty to defend, the Company may make such investigation and settlement of any claim or suit as it deems expedient, including payment on behalf of the Insured of part or all

---

[12] The Columbia Casualty policies incorporate the underlying Highlands policies "except for any obligation to investigate and defend and pay costs and expenses incident to the same." ECF No. 684-10 at 3; ECF No. 684-11 at 3.

[13] The Lexington policy covering 1983 contains unambiguous language *permitting*, but not *requiring*, the insurer to defend the insured entities "at its option." ECF No. 685-1 at 3.

of the Insured's primary limit.  In the event of such payment of part or all of the Insured's primary limit the Insured shall promptly reimburse the Company therefore upon notice of the action taken.

(b)    If the Company is prevented by law or otherwise from defending the Insured as aforesaid, the Company will reimburse the Insured for defense costs and expenses incurred with the written consent of the Company.

(c)    Amounts incurred by the Company in connection with the defense of the Insured as aforesaid, except settlements of claims and suits, are payable by the Company in addition to the Company's limit of liability.

ECF No. 684-17 at 2; ECF No. 684-18 at 2; ECF No. 684-19 at 2; ECF No. 684-20 at 2.  The Non-Settled Insurers concede that the U.S. Fire policy covering 1981 and the Mt. McKinley policies covering 1983 and 1984 incorporate the terms of the underlying Highlands policies. ECF No. 673 at 9, n.2; ECF No. 708 at 37-38.  For this reason, the defense obligations of U.S. Fire and Mt. McKinley[14] can be determined by reference to the Highlands policies.

An agreement executed by the Ampco-Pittsburgh Companies and Utica on June 27, 2003, provided Utica with the right to control the defense of asbestos-related bodily injury claims.[15] ECF No. 685-20 at 134.  The agreement executed on October 5, 2012, requires the settling excess insurers to "pay their respective percentages" of the net defense costs that are not payable under the agreements with Utica.  *Id.* at 8-9.  Since Utica and the eight settling excess insurers "have the right and duty" to defend the underlying claims, the Non-Settled Insurers maintain that they have no such obligation under the language of the Highlands policies.  ECF No. 673 at 9-11.

---

[14] Since Mt. McKinley was formerly known as Gibraltar Casualty Company ("Gibraltar"), the policies at issue bear Gibraltar's name.  ECF No. 685-8 at 2; ECF No. 685-9 at 2.

[15] The Non-Settled Insurers argue that this delegation of authority to Utica precludes the Ampco-Pittsburgh Companies and HNA from holding them jointly and severally liable for indemnity payments under Pennsylvania law.  ECF No. 708 at 35-37.  Their position is based on language in *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 510 (Pa. 1993), permitting the insurers (rather than the insured) to choose the insurer responsible for undertaking a defense.  In *J.H. France*, however, the Pennsylvania Supreme Court went on to state that the insured could "select an insurer" to conduct the defense in the event that the insurers could not reach an agreement. *J.H. France*, 626 A.2d at 510.  Furthermore, as the United States Court of Appeals for the Third Circuit pointed out in *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1452 (3d Cir. 1996), *J.H. France* involved only primary policies rather than a combination of primary and excess policies.  For these reasons, the argument advanced by the Non-Settled Insurers is unavailing.

The Ampco-Pittsburgh Companies and HNA more narrowly read the applicable policy language.  They contend that the phrase "no other insurer," as used in the Highlands policies, should be construed to mean only the providers of primary policies directly underlying the umbrella policies.  ECF No. 682 at 34-38; ECF No. 712 at 9-12.  In other words, the Ampco-Pittsburgh Companies and HNA read the Highlands policies to mean that Highlands has no duty to defend only if Argonaut and Hartford have such a duty pursuant to the underlying primary policies covering 1981, 1982, 1983 and 1984.  *Id.*  If this reading is correct, neither the Utica policies predating 1981 nor the excess policies standing above the umbrella policies issued by Highlands have any bearing on whether Highlands (and the Non-Settled Insurers) incur defense obligations.

Under Pennsylvania law, ambiguous provisions of an insurance policy must be construed in favor of coverage and against the insurer.  *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999).  A policy provision is ambiguous if it is "reasonably susceptible of more than one meaning."  *Donegal Mut. Ins. Co. v. Raymond*, 899 A.2d 357, 361 (Pa. 2006).  "When construing exceptions of doubtful scope in an insurance policy, courts generally avoid any unnecessary narrowing of available coverage."  *Ins.Co. of N. Am. v. Cont'l Cas. Co.*, 575 F.2d 1070, 1073 (3d Cir. 1978)(citing *Walters v. Dunlap*, 368 F.2d 118 (3d Cir. 1966)).

The foregoing principles inevitably lead to the conclusion that the relevant language in the Highlands policies must be construed in the manner advocated by the Ampco-Pittsburgh Companies and HNA.  If construed in the manner advocated by the Non-Settled Insurers, the policy language would most likely be unenforceable in any event.  As this case illustrates, the interpretation favored by the Non-Settled Insurers would permit some excess insurers to evade their contractual obligations by shifting their defense obligations to other excess insurers.

Because that interpretation would permit the Non-Settled Insurers to "avoid all liability" for expenses attributable to defense, it would transform the policy language into an "escape clause" under Pennsylvania law. *Nationwide Ins. Co. v. Horace Mann Ins.Co.*, 759 A.2d 9, 11 (Pa.Super.Ct. 2000). "Since escape clauses purport to relieve an insurer from any obligation to the insured if other coverage is available, courts view them with disfavor and will enforce the policies as if they did not exist." *Harstead v. Diamond State Ins. Co.*, 723 A.2d 179, 182 (Pa. 1999) (citing *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mut. Ins. Co*., 123 A.2d 413, 415 (1956). The language of the Highlands policies relied upon by the Non-Settled Insurers could reasonably be construed (and is most logically understood) to exclude defense coverage only when such coverage is being provided pursuant to an underlying primary policy. In light of this reality, the court has no reason to read the policy language in a manner that would call its validity into question.

This reading of the policy language is also consistent with the overall factual context. The primary policies issued by Argonaut and Hartford provided coverage for defense costs in addition to the applicable limits of liability. ECF No. 684-5 at 2; ECF No. 684-6 at 3; ECF No. 684-7 at 3; ECF No. 684-15 at 2. The umbrella policies issued by Highlands were meant to provide extra layers of protection after the exhaustion of the underlying primary policies. Therefore, the phrase "no other insurer," as used in the language of the Highlands policies, is most naturally understood to refer only to the underlying primary insurers.[16] ECF No. 684-17 at 2; ECF No. 684-18 at 2; ECF No. 684-19 at 2; ECF No. 684-20 at 2. Since the Non-Settled Insurers concede that the excess policies issued by U.S. Fire and Mt. McKinley follow form to

---

[16] The court's reading of the policy language is consistent with Jeffrey M. Posner's declaration, which has been submitted by HNA. ECF No. 716-2 at 5, ¶ 12. Since the parties disagree about whether the declaration should be considered at this stage, the court places no reliance on it in determining the meaning of the policy language. ECF No. 746 at 8 n.6.

the umbrella policies issued by Highlands, the Ampco-Pittsburgh Companies and HNA are

entitled to a declaration that those excess policies establish a duty to defend the underlying

asbestos claims.[17]  ECF No. 673 at 9, n.2; ECF No. 720 at 12.

a.      **The Lexington policies**

The policies issued by Lexington contain the following language:

**V      SETTLEMENT AND DEFENSE**
Anything in the Underlying Insurance to the contrary notwithstanding, the
Company shall not be obligated to assume charge of the settlement or defense of
any claim or suit brought or proceeding instituted against the Insured, but the
Company, at its option but not being required to, shall have the right and be given
the opportunity to associate with the Insured in the defense or control of any
claim, suit or proceeding which appears reasonably likely to involve the
Company, in which event the Insured and the Company shall cooperate in all
things in the defense or control of such claim, suit or proceeding.  In the event
costs are incurred by the Company with respect to such claim, suit or proceeding
the Company shall pay its incurred costs and such expenses incurred by the
Insured with the approval of the Company.

ECF No. 684-23 at 3; ECF No. 684-24 at 3; ECF No. 684-25 at 3; ECF No. 685-1 at 3.  HNA[18]

does not dispute that this language unambiguously provides that Lexington has no duty to defend

against the underlying suits or reimburse the insured entities for their defense costs.  Indeed,

HNA concedes that no such duties arise under the Lexington policy covering 1983.  ECF No.

712 at 31.

The Lexington policies covering 1981 and 1982 contain amendatory endorsements

reading as follows:

It is understood and agreed that this coverage is following form excess to the
primary umbrella and where the excess umbrella liability policy form is
inconsistent with the primary umbrella liability policy form, the primary umbrella
liability policy form shall apply.

All other terms and conditions remain unchanged.

---

[17] With respect to the U.S. Fire policy, the declaration will apply only in relation to HNA.

[18] Due to settlement agreements entered into by the parties, the disputes concerning the TIG, Lexington, London and
U.S. Fire policies remain live only with respect to HNA.  ECF Nos. 800-804, 806.

ECF No. 684-23 at 12; ECF No. 684-25 at 9.  The underlying policies referenced by the amendatory endorsements are the umbrella policies issued by Highlands.  ECF No. 684-23 at 5; ECF No. 684-25 at 4.  Attempting to distinguish the Lexington policies covering 1981 and 1982 from that covering 1983, HNA argues that the language of the amendatory endorsements displaces the unambiguous policy language excluding defense obligations from the Lexington policies.  ECF No. 712 at 28-29.  The Non-Settled Insurers assert that the exclusionary language in the Lexington policies constitutes "terms and conditions [which] remain unchanged" by the amendatory endorsements.  ECF No. 673 at 17-21.

With respect to this issue, the parties are literally arguing in circles.  That circularity should not come as a surprise, since the policy language is itself circular.  The policy language clearly excludes defense coverage, "[a]nything in the Underlying Insurance to the contrary notwithstanding."  ECF No. 684-23 at 3; ECF No. 684-25 at 3.  On the other hand, the amendatory endorsements purport to give effect to "the primary umbrella policy form" even when it is "inconsistent with" the "excess umbrella liability policy form," with the caveat that "[a]ll other terms and conditions remain unchanged."  ECF No. 684-23 at 12; ECF No. 684-25 at 9.  The dispositive question is whether the exclusionary language constitutes a part of the amended "excess umbrella liability policy form," or whether it is more appropriately characterized as a description of "terms and conditions" that "remain[ed] unchanged" by the amendatory endorsements.

The Non-Settled Insurers correctly note that an amendatory endorsement changes a pre-existing policy only to the extent specified therein.  ECF No. 673 at 18.  In support of their position, they rely on the decision of the Delaware Supreme Court in *Intel Corporation v. American Guarantee & Liberty Insurance Co.*, 51 A.3d 442 (Del. 2012).  That case involved a

situation in which an endorsement *itself* excluded "a duty to defend any claim or suit." *Id.* at

448.  In contrast to the situation presented in *Intel Corp.*, the present case involves vague

amendatory endorsements which do not specify the "terms and conditions" that were to be left

intact.  ECF No. 684-23 at 12; ECF No. 684-25 at 9.  The purpose of the endorsements, of

course, was to apply the provisions of the Highlands policies even when they were "inconsistent

with" the provisions of the pre-existing Lexington policies.  *Id.*

Under the heading "Following Form—Excess Liability Policy," the Lexington policies

expressly incorporate "[t]he provisions of the Underlying Polic[es] . . . except as regards . . . the

obligation to investigate and defend and for costs and expenses incident to the same."  ECF No.

684-23 at 2; ECF No. 684-24 at 2; ECF No. 684-25 at 2; ECF No. 685-1 at 2.  This language

suggests that the excess policies issued by Lexington already incorporated the "policy form" of

the umbrella policies issued by Highlands, except for the portions specifically excepted.  When

viewed in this light, the *amendatory* endorsements appear to incorporate portions of the

Highlands policies that had not already been so incorporated.  ECF No. 684-23 at 12; ECF No.

684-25 at 9.  This line of reasoning, of course, does not shed light on what "terms and

conditions" were left "unchanged."  *Id.*  When the amendatory endorsements are combined with

the policy exclusions, the language of the Lexington policies becomes both circular and

ambiguous.

Under Pennsylvania law, ambiguous policy provisions must be construed against the

insurer and in favor of coverage.  *Emp'rs Mut. Cas. Co. v. Loos*, 476 F.Supp.2d 478, 489

(W.D.Pa. 2007).  This rule applies with special force when an amendatory endorsement favoring

the insured conflicts with less favorable language found in pre-existing policy language.  *St. Paul*

*Fire & Marine Ins. Co. v. United States Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981).

Consequently, Lexington's defense obligations with respect to 1981 and 1982 in this case are coextensive with those of Highlands, U.S. Fire and Mt. McKinley.

### b.      The Old Republic policy

The excess policy issued by Old Republic provides coverage "for damages, direct or consequential *and expenses* on account of . . . [p]ersonal injuries, including death at any time resulting therefrom . . . Property Damage . . . [or] Advertising Liability . . . caused by or arising out of each occurrence happening anywhere in the world, and arising out of the hazards covered by and as defined in the Underlying Umbrella policies stated in Item 2 of the Declarations and issued by HIGHLANDS INSURANCE COMPANY & VARIOUS AS ON FILE WITH THE COMPANY (hereinafter called the "Underlying Umbrella Insurers")."  ECF No. 685-12 at 4 (capitalization in original)(emphasis added).  An amendatory endorsement to the policy states as follows:

> IT IS UNDERSTOOD AND AGREED THAT THIS COVERAGE IS
> FOLLOWING FORM EXCESS TO THE PRIMARY UMBRELLA AND
> WHERE THE EXCESS UMBRELLA LIABILITY POLICY FORM IS
> INCONSISTENT WITH THE PRIMARY UMBRELLA LIABILITY POLICY
> FORM, THE PRIMARY UMBRELLA LIABILITY POLICY FORM SHALL
> APPLY.

ECF No. 685-12 at 13 (capitalization in original).  Unlike the amendatory endorsements found in the Lexington policies, the amendatory endorsement found in the Old Republic policy does not provide that "[a]ll other terms and conditions remain unchanged."[19]  *Id.*

HNA argues that the amendatory endorsement incorporates the "broad duty to defend" contained in the underlying Highlands policy.  ECF No. 712 at 30.  The Non-Settled Insurers differently read the endorsement.  They maintain that the endorsement was designed to clarify

---

[19] The court does not understand the Non-Settled Insurers' argument to the contrary.  ECF No. 746 at 21.  They appear to be confusing the language of Old Republic's amendatory endorsement with the amendatory endorsements contained in the Lexington policies.

that the terms of the Highlands policy prevailed over the terms of the *other* underlying excess

policies, and not the terms of the Old Republic policy *itself*.  ECF No. 746 at 18-23.  The Non-

Settled Insurers posit that the endorsement was added to address confusion caused by the

policy's reference to other excess policies "on file with the company."  ECF No. 685-12 at 4

(capitalization omitted).  Taking their argument further, the Non-Settled Insurers assert that since

the coverage clause of the Old Republic policy makes reference to both "damages" and

"expenses," any reimbursement for defense costs owed by Old Republic must fall within the

applicable limits of indemnity coverage.  ECF No. 746 at 18-23.

The arguments advanced by the Non-Settled Insurers are unpersuasive.  The umbrella

policy issued by Highlands is the *only* umbrella policy *specifically* mentioned in the Old

Republic policy.  ECF No. 685-12 at 4-5.  The phrase "primary umbrella liability policy," as it

appears in the amendatory endorsement, clearly refers to the Highlands policy.  *Id.* at 13

(capitalization omitted).  The endorsement clearly expresses an intent to apply that policy

without regard to any inconsistency with "the excess umbrella liability policy form."  *Id.*

(capitalization omitted).  Even if the interpretation advocated by the Non-Settled Insurers is

deemed to be reasonable, any ambiguities in the endorsement must be construed in favor of

coverage.  *St. Paul Fire & Marine Ins. Co.*, 655 F.2d at 524.  Because the endorsement

incorporates the duty to defend found in the Highlands policy, Old Republic is obliged to defend

the underlying asbestos claims asserted against HNA.

c.      **The London policies**

The four excess liability policies issued by the London Market Insurers cover 1981 and

1982.  ECF Nos. 685-3, 685-4, 685-5 & 685-6.  The policies each contain the following

language:

> This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policy/ies stated in Item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder.

ECF No. 685-3 at 10; ECF No. 685-4 at 10; ECF No. 685-5 at 10; ECF No. 685-6 at 9.  The

umbrella policies issued by Highlands and Northbrook are the policies incorporated within the

London policies by reference.  ECF No. 685-3 at 12; ECF No. 685-4 at 12; ECF No. 685-5 at 12;

ECF No. 685-6 at 7.  Each of the four London policies contains an addendum providing as

follows:

ADDENDUM NO. 1

Where costs are not included in the "Ultimate Net Loss" or any similar definition contained in the Underlying Umbrella Policy/ies, the following shall be deemed to be additional Conditions to this wording:--

INCURRING OF COSTS

In the event of claim or claims arising which appear likely to exceed the Underlying Umbrella Limits, no costs shall be incurred by the Assured without the written consent of the Underwriters.

APPORTIONMENT OF COSTS

Costs incurred by or on behalf of the Assured with the written consent of the Underwriters and for which the Assured is not covered by the Underlying Umbrella Policy/ies shall be apportioned as follows:--

(i)     Should any claim or claims become adjustable prior to the commencement of trial for not more than the Underlying Umbrella Limits, then no costs shall be payable by the Underwriters.

(ii)    Should, however, the amount for which the said claim or claims may be so adjustable exceed the Underlying Umbrella Limits, then the Underwriters, if they consent to the proceedings continuing, shall contribute to the costs incurred by or on behalf of the Assured in the ratio that their proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss.

(iii)   In the event that the Assured elects not to appeal a judgment in excess of the Underlying Umbrella Limits, the Underwriters may elect to conduct such appeal at their own cost and expense and shall be liable for the taxable court costs and interest incidental thereto, but in no event shall the

> total liability of the Underwriters exceed their limit of liability as provided
> for in the wording, plus the expenses of such appeal.

All other terms and conditions remain unchanged.

ECF No. 685-3 at 8; ECF No. 685-4 at 8; ECF No. 685-5 at 8; ECF No. 685-6 at 11.  Relying on

this language, the Non-Settled Insurers contend that the London insurers are not obligated to

defend the underlying asbestos claims, and that the addendum establishes the conditions under

which defense costs must be paid under the London policies.  ECF No. 673 at 12-16.

HNA maintains that the addendum does not apply to the London policies covering 1981.

ECF No. 712 at 24-27.  This position is based on language in the Northbrook policies providing

coverage for both "damages" and "expenses."  ECF No. 685-10 at 4; ECF No. 685-11 at 3.  In

HNA's view, the grant of coverage in the 1981 Northbrook policy places "costs" within the

"definition" of "Ultimate Net Loss," thereby making the addendum in the London policies

inapplicable.  ECF No. 685-10 at 4.

The argument advanced by HNA cannot be squared with the relevant policy language.

The addendum appearing in the London policies applies "[w]here costs are not included in the

'Ultimate Net Loss' or any similar definition contained in the Underlying Umbrella Policy/ies."

ECF No. 685-3 at 8; ECF No. 685-4 at 8; ECF No. 685-5 at 8; ECF No. 685-6 at 11.  The plain

language of the addendum refers to a *definition* rather than to a grant of coverage.  *Id.*  The

Northbrook policies specifically *define* only the terms "Named Insured" and "Insured."  ECF No.

685-10 at 3; ECF No. 685-11 at 3.  The policy language clearly states that, aside from those two

definitions, the Northbrook policies are "subject to the same . . . definitions" as the umbrella

policies issued by Highlands.  ECF No. 685-10 at 4; ECF No. 685-11 at 4.  The Highlands

policies define the term "ultimate net loss" as "the total sum which the Insured, or any company

as his underlying insurers as scheduled, or both, become obligated to pay as damages because of

59

personal injury or property damage, either through adjudication or compromise." ECF No. 684-17 at 3; ECF No. 684-18 at 3; ECF No. 684-19 at 3; ECF No. 684-20 at 3.  Since the definition encompasses only sums payable *as damages*, it does not include *costs*.  ECF No. 685-3 at 8; ECF No. 685-4 at 8; ECF No. 685-5 at 8; ECF No. 685-6 at 11.  The applicable policy language is clear and unambiguous.  The court cannot torture clear policy language to find an ambiguity where none exists. *Brosovic v. Nationwide Mut. Ins. Co.*, 841 A.2d 1071, 1073 (Pa.Super.Ct. 2004).  The addendum is applicable with respect to claims arising under all four London policies. Nothing in the 1981 Northbrook policy takes the addendum out of the equation.

Having determined that the addendum applies to all four London policies, the court must consider how it should be construed.  The Non-Settled Insurers read the addendum broadly enough to displace the entire sections of the Highlands policies pertaining to "Defense."  ECF No. 673 at 12-13.  HNA reads the addendum more narrowly, contending that it applies only where the London insurers opt to take an active role in defending claims that are already being defended by Highlands or Northbrook, but that are likely to result in costs exceeding the underlying umbrella limits.  ECF No. 712 at 23-24.  According to HNA, the defense obligations incurred by Highlands and Northbrook are incorporated within the London policies by virtue of the "following form" clauses contained therein.  ECF No. 685-3 at 10; ECF No. 685-4 at 10; ECF No. 685-5 at 10; ECF No. 685-6 at 9.  The Non-Settled Insurers point out that those clauses contain the phrase "except as otherwise provided herein." *Id.*  Because they read the addendum broadly enough to supplant *all* defense obligations found in the Highlands policies, the Non-Settled Insurers assert that the London insurers have no duty to defend the underlying actions. ECF No. 673 at 12-13.

"The recovery for breaching a duty to defend is to require the breaching insurer to pay for costs of defense." *Am. States Ins.Co. v. State Auto Ins.Co.*, 721 A.2d 56, 64 (Pa.Super.Ct. 1998). Although a duty to defend can sometimes be distinguished from a duty to foot the bill for defense costs, the two obligations cannot always be separated as neatly HNA suggests. *Liberty Mut. Ins.Co. v. Pella Corp.*, 650 F.3d 1161, 1169-70 (8th Cir. 2011). In this case, however, the language of the addendum *itself* appears to recognize a distinction between active participation in the defense of an insured and reimbursement for defense costs incurred by an insured.

The addendum applies only where "costs" are not included within the "loss" covered by an underlying umbrella policy. ECF No. 685-3 at 8; ECF No. 685-4 at 8; ECF No. 685-5 at 8; ECF No. 685-6 at 11. That condition would be satisfied in a situation in which an umbrella insurer separately defends and indemnifies an insured. *Gen. Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997)(observing that "the duty to defend is separate from and broader than the duty to indemnify"). The addendum requires the written consent of the London insurers where an insured seeks to incur costs without their active participation. ECF No. 685-3 at 8; ECF No. 685-4 at 8; ECF No. 685-5 at 8; ECF No. 685-6 at 11. It further provides the London insurers with the right to appeal, at their own expense, an underlying judgment in excess of the applicable umbrella limits. *Id.* Furthermore, the addendum provides that "[a]ll other terms and conditions remain unchanged." *Id.* When read in context, the addendum appears to protect the London insurers from being responsible for costs of which they are not aware. It does not sweep broadly enough to displace the provisions of the Highlands policies providing for a duty to defend. Given that the London policies incorporate the Highlands policies "except as otherwise provided," they provide for a duty to defend that is coterminous with that arising under the underlying umbrella policies. *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 203 (3d Cir. 2004).

Where the language of the addendum does not expressly apply, the London insurers' obligation to defend turns solely on the interpretation of the Highlands policies. *Piper Jaffray Companies, Inc. v. Nat'l Union Fire Ins. Co.*, 967 F.Supp. 1148, 1151 (D.Minn. 1997).

The parties appear to disagree about how the addendum should be implemented when it does apply. The Ampco-Pittsburgh Companies previously sought a declaration that the terms of the addendum become operative only where a specific asbestos claim appears likely to exceed the underlying umbrella limits.[20] ECF No. 672-1 at 3-4, ¶ 8. The Non-Settled Insurers correctly point out that such a declaration would be inconsistent with the plain language of the addendum. ECF No. 708 at 44. The addendum makes reference to when "the said claim *or claims*" are likely to exceed the applicable limits of liability. ECF No. 685-3 at 8 (emphasis added); ECF No. 685-4 at 8 (emphasis added); ECF No. 685-5 at 8 (emphasis added); ECF No. 685-6 at 11 (emphasis added). It also provides the London insurers with the option of appealing a "judgment" in excess of those limits. *Id.* Multiple asbestos claims can clearly result in a single judgment. *Treesdale*, 418 F.3d at 336 (explaining that "a single occurrence can clearly result in injuries to multiple persons"). Because the addendum clearly refers to situations involving multiple claims, the court cannot accept the contention that it applies only where the costs associated with a single asbestos claim are likely to exceed the underlying umbrella limits. Multiple claims may be aggregated to invoke the addendum's terms.

A quota-share policy issued by Lexington follows form to one of the London policies covering 1982. ECF No. 684-24 at 6. The court's determinations pertaining to the London policies apply with equal force to the quota-share policy. Insofar as defense and reimbursement obligations are concerned, the quota-share policy issued by Lexington is subject to the same terms and conditions as the applicable London policy.

---

[20] The court addresses this issue only to the extent that it implicates HNA's rights under the London policies.

d.      **The TIG policy**

The excess liability policy issued to the Ampco-Pittsburgh Companies by TIG[21] covered

1982.  ECF No. 684-22 at 4-5.  The "insuring agreement" contained in the TIG policy

established a duty "[t]o indemnify the insured for that amount of loss which exceeds the amount

of loss payable by underlying policies."  *Id.* at 3.  The portion of the policy describing the

applicable "conditions" stated as follows:

> **A. Application of Underlying Insurance.**  Except as otherwise stated herein,
> and except with respect to (1) any obligation to investigate or defend any claim or
> suit, or (2) any obligation to renew, the insurance afforded by this policy shall
> apply in like manner as the underlying insurance described in the Declarations.

*Id.* (boldface type in original).  Relying on this language, the Non-Settled Insurers maintain that

TIG has no obligation to defend the underlying asbestos suits.  ECF No. 746 at 16-18.

The "underlying insurance" described in the TIG policy referred to an excess umbrella

liability policy issued by Northbrook.  ECF No. 684-22 at 5.  During the latter part of 1982, the

Northbrook policy was amended to "follow the terms and conditions" of the underlying

Highlands policy.  ECF No. 685-11 at 12-13; ECF No. 686-30 at 12; ECF No. 688-27 at 2.  The

Ampco-Pittsburgh Companies previously asserted that, as a consequence of the amendment, the

TIG policy incorporated any defense obligations contained in the Northbrook policy, which in

turn incorporated the defense obligations contained in the policy issued by Highlands.[22]  ECF

No. 720 at 11-12.

Even if it is assumed that the amendment incorporated Highlands' defense obligations

within the Northbrook policy, the language of the TIG policy remained unchanged.  The TIG

---

[21] The policy bears the name of International Insurance Company, which was TIG's predecessor.  ECF No. 684-22 at 4.

[22] Unlike the Ampco-Pittsburgh Companies, HNA appears to concede that TIG has no obligation to defend the underlying asbestos suits.  ECF No. 712 at 27.  Since HNA continues to have a live dispute with TIG, the court will explain why the argument previously raised by the Ampco-Pittsburgh Companies was lacking in merit.

policy specifically excepted "any obligation to investigate or defend any claim" from its

incorporation of the Northbrook policy.  ECF No. 684-22 at 3, 5.  Pennsylvania law provides for

the enforcement of unambiguous coverage exclusions.  *Wall Rose Mut. Ins. Co. v. Manross*, 939

A.2d 958, 963 (Pa.Super.Ct. 2007).  Since the insurance contract entered into by the Ampco-

Pittsburgh Companies and TIG does not provide for a duty to defend, TIG has no obligation to

defend HNA against the underlying claims.  *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d

213, 230 (3d Cir. 2009).

TIG's responsibility to reimburse HNA for expenses incurred in defending the underlying

claims presents a more complicated question.  A separate "condition" found in the TIG policy

provides as follows:

> **F.  Expenses.**  Loss and legal expenses incurred by the insured with the consent
> of the company in the investigation or defense of claims, including court costs and
> interest, shall be borne by both the company and the insured in the proportion that
> each party's share of loss bears to the total amount of such loss.  Salaries and
> expenses of the insured's employees shall not be considered as part of the above
> expenses.  Expenses thus paid by the company shall be paid in addition to the
> limit of liability stated in Declaration 6.

ECF No. 684-22 at 3 (boldface type in original).  The Non-Settled Insurers point out that TIG

must "consent" to any costs incurred by the insured entities in order to be responsible for

reimbursement expenses.[23]  ECF No. 673 at 11-12.  The parties are divided as to when such

"consent" may be lawfully refused.  This same issue relates to several of the other excess

policies in dispute.

### e.     Refusal of consent to incur defense costs

---

[23] The Highlands policies, of course, require "the Company [to] reimburse the Insured for defense costs and
expenses incurred with the written consent of the Company" whenever "the Company is prevented by law or
otherwise from defending the Insured."  ECF No. 684-17 at 2; ECF No. 684-18 at 2; ECF No. 684-19 at 2; ECF No.
684-20 at 2.

The Highlands policies require the insurer to "reimburse the Insured for defense costs and expenses incurred with the written consent of the Company" whenever "the Company is prevented by law or otherwise from defending the Insured."  ECF No. 684-17 at 2; ECF No. 684-18 at 2; ECF No. 684-19 at 2; ECF No. 684-20 at 2.  Several of the excess policies also contain language requiring insurers to reimburse defense costs incurred with their "consent."  ECF No. 684-22 at 3; ECF No. 685-3 at 8; ECF No. 685-4 at 8; ECF No. 685-5 at 8; ECF No. 685-6 at 11.  There is considerable disagreement among the parties about whether that kind of language permits an insurer arbitrarily to refuse "consent."

In *AstenJohnson, Inc. v. Columbia Casualty Co.*, 562 F.3d 213, 228-230 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit declined to read an implied prohibition against "unreasonable refusals to defend" into similar contractual language.  The Non-Settled Insurers rely on *AstenJohnson* for the proposition that they may arbitrarily refuse "consent" to the incurring of defense costs for any or no reason.  ECF No. 673 at 10-11.  The holding in *AstenJohnson*, however, does not sweep as broadly as the Non-Settled Insurers suggest.  In that case, the insured entity maintained that *every* "consent to defend" clause incorporated "a prohibition against unreasonable refusals to defend."  *AstenJohnson*, 562 F.3d at 229.  The insured entity specifically conceded that the "consent" issue was "to be resolved as a matter of law from the face of the documents," without reference to extrinsic evidence.  *Id.*  The court of appeals observed that while a jury would have been required to resolve any "material issues of fact" relating to the interpretation of the particular policy in question, "the absence of a jury present[ed] no problem in th[at] context" because the insured entity's generalized argument was not premised on evidence extrinsic to the policy language.  *Id.*

In connection with the 2009 action, HNA presented expert opinions stating that "consent" clauses do not afford insurers an unqualified right to refuse consent to the incurring of defense costs.  ECF No. 716-2 at 8-12, ¶¶ 22-29.  The Non-Settled Insurers maintain that those opinions should not be considered at this time, since an earlier case management order "specifically contemplated summary judgment briefing in advance of expert disclosures."  ECF No. 746 at 8, n.6.  The Ampco-Pittsburgh Companies are not moving for summary judgment with respect to this issue.  ECF No. 720 at 19-21.  They contend that expert discovery could uncover additional evidence concerning the proper interpretation of the "consent" clauses found in the relevant policies.  *Id.* at 20.  Although HNA's position on this issue is less clear, its proposed order contains no language specifically discussing an insurer's refusal of consent.  ECF No. 677-1.

Under Pennsylvania law, extrinsic evidence concerning customs prevailing in the insurance industry may be introduced for the purpose of interpreting an insurance policy.  *Simon Wrecking Co. v. AIU Ins. Co.*, 350 F.Supp.2d 624, 641 (E.D.Pa. 2004).  Such evidence may be considered even where there is no "obvious ambiguity in the words of the contract."  *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001).  The Non-Settled Insurers apparently believe that *AstenJohnson* entitles them to a judgment as a matter of law based solely on the policy language.  ECF No. 673 at 10-11.  If that is their belief, they are mistaken.  Although the court of appeals declined to hold that *every* "consent" clause incorporated "a prohibition against unreasonable refusals to defend," it did not foreclose the possibility that *some* "consent" clauses incorporated such a prohibition.  *AstenJohnson*, 562 F.3d at 229.

In their efforts to obtain summary judgment, the Non-Settled Insurers ask the court to disregard the extrinsic evidence that refutes their position.  ECF No. 746 at 8, n.6.  The Ampco-Pittsburgh Companies and HNA acknowledge that genuine issues of material fact exist about

whether the "consent" clauses in some or all of the contested policies permit an insurer to refuse coverage for arbitrary reasons.  ECF No. 712 at 21; ECF No. 720 at 19-21.  Under these circumstances, it would be inappropriate for the court to decide, as a matter of law, whether the policies implicitly limit the prerogatives of any or all of the Non-Settled Insurers to refuse "consent" to the incurring of defense costs.  The Non-Settled Insurers' motion for partial summary judgment will be denied with respect to this issue.  The denial is without prejudice to the parties' ability to advance their respective arguments after the completion of expert discovery.

### B.    The dispute between HNA and New Hampshire

New Hampshire is incorporated in Pennsylvania.  ECF Nos. 766 & 785 ¶ 11.  During the period of time in question, it maintained offices in New York.  *Id.*  Along with other insurers, New Hampshire subscribed to seven quota-share excess policies covering HNA's activities between May 1, 1995, and June 1, 1999.[24]  ECF Nos. 768 & 782 ¶ 27.  New Hampshire is the only solvent insurer sued by Howden Buffalo in 2009 that did not enter into a settlement agreement with HNA.  *Id.*  As a part of the October 2012 settlement agreement, the settling insurers assigned to HNA their contribution rights against New Hampshire.  *Id.* ¶ 29.

Between 1995 and 1999, Alan Maclachlan ("Maclachlan") served as the director of corporate services for the Howden Entities.  ECF Nos. 768 & 782 ¶ 53.  He was responsible for purchasing liability insurance on behalf of HNA.  *Id.*  During that period of time, the Howden Entities utilized the services of London brokers at Jardine Insurance Services, Limited ("Jardine"), and Jardine's successor, Lloyd Thompson, Limited ("Lloyd Thompson"), to assist in

---

[24] The policies in question are New Hampshire Policy No. 95ML0002160A, New Hampshire Policy No. 96ML0002160A, New Hampshire Policy No. 97ML0002180A, New Hampshire Policy No. 97ML0002160A, New Hampshire Policy No. LH9712521, New Hampshire Policy No. LH9813535, and New Hampshire Policy No. LH9813364.  ECF No. 769 at 1-2.

the procurement and placement of insurance policies.  *Id.* ¶ 54.  Maclachlan and O'Connell provided the brokers with information about operations, products, revenue, and claims history of the Howden Entities in general and HNA in particular.  *Id.* ¶ 55.  The brokers regularly met with Maclachlan in Renfrew, Scotland, and London, England.  *Id.* ¶ 56.

The London insurance market is a "subscription" market.  ECF Nos. 768 & 782 ¶ 57.  In such a market, multiple insurers underwrite percentages of the policy limits in exchange for equal percentages of the premium.  *Id.*  Maclachlan, along with brokers from Jardine and Lloyd Thompson, negotiated policy wording with a lead underwriter.  *Id.*  Winterthur International Insurance Company, Ltd., n/k/a XL Insurance Company, Ltd. ("XL"), served as the lead underwriter for all the excess policies issued by New Hampshire.  *Id.* ¶ 58.  Those policies followed form to several underlying policies.  *Id.*  XL also served as the lead underwriter for the underlying policies.  *Id.*  After Howden and XL personnel agreed on policy wording, they would meet with underwriters for the other insurers.  *Id.* ¶ 59.  At that point, those insurers would sign onto different percentages of the policy limits.  *Id.*  New Hampshire was one of those insurers.  *Id.*

New Hampshire's business in the London market was conducted through employees of its affiliate, AIG Europe, Ltd. ("AIG").  ECF Nos. 768 & 782 ¶ 62.  AIG personnel typically stamped the insurance policies on New Hampshire's behalf.  *Id.*  HNA was the Howden Entities' largest U.S.-based risk.  *Id.* ¶ 65.  The Howden Entities' U.S.-based risks constituted a major factor in the underwriting process.  *Id.*  Angela Colas ("Colas"), a New Hampshire employee located in the United States, and Joanne Glover ("Glover"), an AIG Europe employee, discussed those risks on some occasions.  *Id.* ¶¶ 64, 66.  In 1995, Glover referred the Howden Entities' risk to Colas.  *Id.* ¶ 66.  Glover observed that twenty-five percent of the Howden Entities' revenue

was attributable to their operations in North America.  *Id.*  She again referred the Howden

Entities' risk to Colas in 1996.  *Id.* ¶ 67.  Responding to the referral on April 2, 1996, Colas

stated that it would be "very hard to assess" the risk incurred by the Howden Entities without

getting "a handle on the US loss experience."  *Id.*  She eventually authorized New Hampshire's

1996 subscription.  *Id.*  Colas continued to be involved with the underwriting and approval of the

New Hampshire policies issued in 1997 and 1998.  *Id.* ¶ 68.  The Howden Entities' worldwide

operations were factored into the underwriting process.  *Id.* ¶¶ 71-72.

In 2003, HNA commenced a declaratory judgment action against several primary and

umbrella insurers.  ECF Nos. 766 & 785 ¶ 22.  The action was resolved in 2005 by the execution

of an agreement.  *Id.*  The parties to the agreement were Howden Buffalo, Utica Mutual

Insurance Company, Argonaut Insurance Company, Argonaut Midwest Insurance Company,

Argonaut Southwest Insurance Company, Hartford Accident and Indemnity Company, Liberty

Mutual Insurance Company, Pacific Employers Insurance Company, and XL.  *Id.*  Pursuant to

the agreement, the insurers agreed to pay specified percentages of defense costs incurred by

HNA on or after May 20, 2005, for "Non-Governmental" bodily injury claims related to asbestos

exposure.  *Id.* ¶ 23.  The portion of the agreement pertaining to indemnity costs contained the

following language:

> Except as otherwise provided for Governmental Claims in Section V.,
> Contribution Percentages for Indemnity Costs shall be calculated as a fraction for
> each Policy within whose policy period any portion of the claimant's Injury
> Allocation Period falls (including each Umbrella Policy, but only to the extent
> that it overlaps with the policy period of an Exhausted Primary Policy).  The
> numerator of that fraction shall be the number of months in the claimant's Injury
> Allocation Period for which that Policy affords coverage, and the denominator
> shall be the total number of months in the claimant's Injury Allocation Period.

ECF No. 766-32 at 12.  The respective "defense shares" of the parties apparently changed on

November 1, 2012, due to the exhaustion of some primary policies issued by Utica.  ECF No.

785-33 at 2.

On September 21, 2011, New Hampshire sued HNA in the High Court of Justice,

Queen's Bench Division, seeking a declaration that its excess policies were governed by English

law.[25]  ECF Nos. 768 & 782 ¶ 93; ECF No. 772-24.  That same day, New Hampshire moved for

the dismissal of the claims asserted against it in this action on the ground of *forum non*

*conveniens*.  ECF No. 273.  This court denied New Hampshire's motion to dismiss in a

memorandum opinion and order dated June 21, 2012.  *Howden N. Am., Inc. v. ACE Prop. & Cas.*

*Ins. Co.*, 875 F.Supp.2d 478, 500 (W.D.Pa. 2012).  In denying the motion to dismiss, the court

expressed doubt that this matter would be governed by English law.  *Id.* at 498.  On December

12, 2012, the English Court of Appeal dismissed New Hampshire's case on the ground that it had

no "utility."  ECF Nos. 768 & 782 ¶ 93; ECF No. 773-16.


1.      **New Hampshire's motion to dismiss HNA's cross-claim based upon lack
of subject-matter jurisdiction (ECF No. 690).**

The High Excess Howden Group Insurers filed a motion to dismiss on December 21,

2012, contending that no justiciable controversy existed between them and HNA.  ECF No. 690.

On January 30, 2013, HNA filed a consolidated response to both pending motions to dismiss,

including the earlier motion filed by Old Republic, Mt. McKinley and Columbia Casualty.  ECF

No. 714.  In June 2013, the parties stipulated to the dismissal of all crossclaims asserted against

HDI-Gerling Industrie Versicherung AG, Swiss Re Europe S.A., QBE Insurance (Europe) Ltd.,

Portman Insurance Ltd., and ACE European Group Ltd.  ECF Nos. 797 & 798.  Although the

---

[25] New Hampshire's action in the High Court of Justice was joined by the other High Excess Howden Group
Insurers.  ECF No. 772-24 at 2.

High Excess Howden Group Insurers' motion to dismiss is now moot with respect to five of the six movants, it remains pending with respect to New Hampshire.

HNA argues that New Hampshire conceded the existence of a justiciable "case or controversy" by seeking declaratory relief in England. ECF No. 714 at 23-24. According to HNA, New Hampshire is now bound by that "concession." *Id.* This argument, however, is plainly wrong. Positions previously taken by New Hampshire in the English action (or even in *this* action) have no bearing on whether HNA's claims are justiciable under Article III. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S.Ct. 817, 824 (2013). The motion to dismiss cannot be denied solely because New Hampshire initiated parallel proceedings overseas.

New Hampshire's jurisdictional challenge relates to only one of the seven excess policies issued to the Howden Entities. ECF No. 749 at 1-2. That policy appears to follow form to the same underlying policy language governing the interpretation of the other six New Hampshire policies. ECF No. 769-35 at 8. HNA correctly points out that the court will have to resolve all substantive issues raised by the parties regardless whether New Hampshire's motion to dismiss is granted. ECF No. 714 at 9-10. Since the underlying policy language will have to be considered in any event, the jurisdictional issue relates only to whether any declarations issued in this case will apply to the particular high excess policy referenced by New Hampshire.

New Hampshire argues that since HNA has incurred less than $3,000,000.00 in settlement costs from roughly 12,000 claims in the last fourteen years, it cannot show that the $15,700,000.00 attachment point for the high excess policy will ever be reached. ECF No. 749

at 1-2.  HNA bears the burden of establishing that jurisdiction exists.  *DaimlerChrysler Corp.*,
547 U.S. at 342.  To satisfy its burden, however, HNA is not required to establish that the high
excess policy will definitely be reached.  *Mendelson*, 112 F.Supp.2d at 396.  Because the
claimants in the underlying actions have already been injured, "an actual, concrete, and definite
controversy" exists between HNA and New Hampshire concerning the scope of coverage
available under the high excess policy.  *Id.* at 396-97.

The court acknowledges that justiciability under Article III must be considered on a
claim-specific basis.  *McFarland v. Folsom*, 854 F.Supp. 862, 871 (M.D.Ala. 1994).  In this case,
however, HNA seeks the *same* declaration in relation to the policy language governing each of
the New Hampshire policies.  ECF No. 763-1 at 1.  New Hampshire does not dispute that an
actual "controversy" exists about whether *that language* should be construed in accordance with
New York or Pennsylvania law.  Moreover, the other High Excess Howden Group Insurers have
already settled their disputes with HNA.  It is no secret that any declarations issued in this case
are likely to affect "the consideration of settlement offers and the conduct of settlement
negotiations."  *ACandS, Inc.*, 666 F.2d at 823.  On the basis of the existing record, it plainly
appears that a declaration regarding the high excess policy issued by New Hampshire would
"strongly affect present behavior, have present consequences and resolve a present dispute."  *Id.*
For these reasons, the motion to dismiss will be denied.  ECF No. 690.

**2.      Choice of law – cross motions for summary judgment (ECF Nos. 763 & 764).**

HNA and New Hampshire filed cross-motions for summary judgment on March 8, 2013.
ECF Nos. 763 & 764.  The main issue dividing the parties is whether the policies issued by New
Hampshire are governed by New York or Pennsylvania law.  The relevant differences between
the rules prevailing in the two jurisdictions were already explained.

HNA moved to consolidate the 2009 and 2011 cases on November 14, 2012.  ECF No. 620.  Although New Hampshire opposed the motion to consolidate mostly on procedural grounds, it expressly declined to concede that "the factual and/or legal issues [we]re the same in both actions or that any subsequent briefing of summary judgment motions would be the same." ECF No. 638 at 1, n.1.  HNA's motion to consolidate was granted on December 12, 2012.  ECF No. 652.  Nevertheless, the court severed HNA's claims against the High Excess Howden Group Insurers from its claims against the Non-Settled Insurers pursuant to Federal Rules of Civil Procedure 21 and 42(b).  *Id.*  Rule 42(b) provides for severance if it is needed "to avoid prejudice" to a particular party.  FED. R. CIV. P. 42(b).  At the time of the consolidation, the court informed the parties that they could seek reconsideration of the severance order at a later time. ECF No. 652 at 2.  HNA seeks reconsideration of that order at the present time.  ECF No. 793 at 11-12.

For the reasons discussed earlier, the fifteen excess policies issued to the Ampco-Pittsburgh Companies by the Non-Settled Insurers are governed by Pennsylvania law.  Having successfully moved to consolidate the two cases, HNA relies on Pennsylvania's contacts to the Non-Settled Insurers' policies in an effort to establish that New Hampshire's policies are similarly governed by Pennsylvania law.  ECF No. 767 at 26-39.  HNA argues that the choice-of-law analysis turns entirely on whether New York or Pennsylvania is more intimately concerned with the outcome of the litigation as a whole.  ECF No. 784 at 13.  Contrary to HNA's belief, Pennsylvania's choice-of-law rules do not require the wholesale application of the law of a single jurisdiction.  "Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'"  *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006).

During the relevant period of time, O'Connell served as the chief administrative officer of HNA's corporate parent, Howden Group America, Inc. ("HGA"). ECF No. 773-2 at 2, ¶ 1. O'Connell testified that HGA's 1993 acquisition of Buffalo Forge II from Ampco-Pittsburgh had provided HNA with rights under the Non-Settled Insurers' policies. ECF No. 687-8 at 47-48. The contract of insurance, rather than the underlying tort, controls the choice-of-law analysis. *Hammersmith*, 480 F.3d at 232-33. Since the Non-Settled Insurers' policies were issued to the Ampco-Pittsburgh Companies, the rights acquired by HNA under *those policies* must be determined in accordance with Pennsylvania law. That line of reasoning, however, does not apply with equal force to the quota-share policies issued by New Hampshire in the late 1990s. HNA cannot bootstrap its way to Pennsylvania law simply by pointing out that the *other* fifteen policies in question are governed by Pennsylvania law. A determination to the contrary would compel New Hampshire to suffer the very "prejudice" that the severance order was designed to prevent. FED. R. CIV. P. 42(b).

Like HNA, New Hampshire believes that the law of one jurisdiction should be applied to the policies at issue in this case. ECF No. 783 at 6. Unlike HNA, however, New Hampshire maintains that the applicable substantive law should be that of New York. ECF No. 783 at 11-13. New Hampshire suggests that the court consider not only its policies and those issued to the Ampco-Pittsburgh Companies by the Non-Settled Insurers, but also those issued to the Buffalo Forge entities between 1961 and 1981. *Id.* HNA objects to such consideration of the pre-1981 policies on the ground that they were not subject to discovery in this case. ECF No. 793 at 9-10. The court need not enter that fray, since the choice-of-law determination turns on the insurance contracts themselves rather than on the underlying asbestos suits. *Howden*, 875 F.Supp.2d at 498. In any event, HNA's insistence that the Non-Settled Insurers' policies be factored into the

choice-of-law inquiry is inconsistent with its opposition to New Hampshire's reliance on pre-1981 policies as a basis for putting the overall dispute in context.  If the court were to focus on the underlying controversies rather than on the disputed policies themselves, it would make little sense to arbitrarily draw the line at 1981.

Seizing on New Hampshire's position that the law of one jurisdiction should be applied to all twenty-two policies at issue in this case, HNA contends that the choice-of-law analysis should proceed on the premise that the New Hampshire policies must be governed by the same law as the Non-Settled Insurers' policies.  ECF No. 784 at 3.  Nonetheless, the court does not understand New Hampshire to concede that *its* policies should be governed by Pennsylvania law *if* the Non-Settled Insurers' policies are governed by Pennsylvania law.  Instead, New Hampshire argues that *if* the law of a single jurisdiction applies to all twenty-two policies, it must be that of New York.[26]  ECF No. 783 at 11.  By strenuously distinguishing its policies from those issued by the Non-Settled Insurers, New Hampshire clearly articulates a preference for a split decision over a decision applying Pennsylvania law to every policy contested in this case.  *Id.* at 5-7.

Under the present circumstances, a "true" conflict exists between New York and Pennsylvania law.  As the United States Court of Appeals for the Third Circuit recognized in *Hammersmith v. TIG Insurance Co.*, 480 F.3d 220, 232 (3d Cir. 2007), New York has an interest in protecting not only resident insurers, but also nonresident insurers doing business within its borders.  Although the Ampco-Pittsburgh Companies are not insured under the New Hampshire policies, New Hampshire acknowledges that a determination in its favor could accelerate the erosion of the Ampco-Pittsburgh Companies' coverage under the Non-Settled Insurers'

---

[26] HNA faults New Hampshire for switching its preferred jurisdiction from England to New York.  ECF No. 784 at 3.  New Hampshire's switch, however, does not undermine the credibility of its choice-of-law argument.  The change in New Hampshire's position was triggered by this court's prior opinion, which suggested that English law was unlikely to be applied in this case.  *Howden N. Am., Inc. v. ACE Prop. & Cas. Co.*, 875 F.Supp.2d 478, 498 (W.D.Pa. 2012); ECF No. 765 at 6 n.1.

policies.[27]  ECF No. 783 at 18-19.  Consequently, a more detailed choice-of-law analysis is necessary.

The first step of the inquiry is to ascertain "the principal location of the insured risk." RESTATEMENT (SECOND) CONFLICT OF LAWS § 193.  The applicable policy language defines the term "occurrence" to mean "a single occurrence or claim or a series of claims arising out of any one event or attributable to any single cause."  ECF Nos. 768 & 782 ¶ 35; ECF No. 769-23 at 15. Coverage is provided

> for any sums which [the insured entities] may become legally liable to pay (whether under contract or otherwise) in respect of claims made against them for damages and claimants' costs and expenses in respect of or in consequence of . . . personal injury . . . or . . . loss of or damage to material property happening anywhere in the World during the period stated in the Schedule.

ECF Nos. 768 & 782 ¶ 33; ECF No. 769-23 at 10.  The policy language designates the "Assured" as follows:

> Howden Group[PLC and/or] subsidiary companies and/or any entity formed[,] acquired and/or financially controlled by the aforementioned companies during the period of this insurance.

ECF Nos. 768 & 782 ¶ 38; ECF No. 769-23 at 7; ECF No. 769-25 at 6.  The parties agree that the Howden Entities' U.S.-based risks constituted "a major underwriting factor."  ECF Nos. 768 & 782 ¶ 65.  Those risks attracted a higher premium rating than risks arising in other parts of the world.  *Id.* ¶ 72.  Given the broad reach of the "insured risk," it cannot be cabined within a "principal location."  *Specialty Surfaces*, 609 F.3d at 233.  For present purposes, it suffices to say that the "insured risk" is not concentrated in either New York or Pennsylvania.

---

[27] In view of the existing contacts, the law of either New York or Pennsylvania could be constitutionally applied to the New Hampshire policies.  *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 307-20 (1981)(plurality opinion).  Therefore, the choice-of-law determination turns solely on the application of Pennsylvania's choice-of-law rules.  *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010).

Since there is no "principal location of the insured risk," the court must consider the factors enumerated in § 188(2) of the RESTATEMENT. *Hammersmith*, 480 F.3d at 233. The first contact listed in that section is "the place of contracting." RESTATEMENT (SECOND) CONFLICT OF LAWS § 188(2)(a). A contract is deemed to have been *made* in the jurisdiction of its *delivery*. *Harry L. Sheinman & Sons, Inc.*, 125 F.2d at 444. At an earlier stage in this litigation, HNA argued that the New Hampshire policies had been delivered in New York. ECF No. 300 at 51. The court concluded that the policies[28] had been delivered somewhere in the United States (rather than in a jurisdiction located in the United Kingdom). *Howden*, 875 F.Supp.2d at 497. Discovery has now revealed, and the parties agree, that the New Hampshire policies were delivered to Maclachlan in Scotland. ECF Nos. 768 & 782 ¶ 75. It is also undisputed that the XL policies, to which the New Hampshire policies followed form, were delivered to O'Connell's offices in Hyde Park, Massachusetts, and Nashua, New Hampshire.[29] *Id.*; ECF No. 773-2 ¶¶ 6, 19. Therefore, the contracts were made in Scotland, Massachusetts and New Hampshire.

The record indicates that negotiations relating to the XL and New Hampshire policies occurred in Renfrew, Scotland, and London, England. ECF Nos. 768 & 782 ¶¶ 53-63. HNA acknowledges, however, that New Hampshire's negotiations in the United Kingdom were overseen and approved by Colas. ECF No. 768 ¶ 64. Although HNA's concise statement of material facts vaguely refers to Colas as "a U.S. employee of New Hampshire," the testimonial record suggests that she worked out of an office located in New York. ECF No. 766-8 at 7-8. In its principal brief, HNA acknowledges that "New Hampshire's underwriting was supervised

---

[28] The "policies" referenced in the court's earlier opinion included all twenty-two policies in question, including the fifteen policies issued to the Ampco-Pittsburgh Companies by the Non-Settled Insurers. *Howden North America, Inc. v. ACE Prop. & Cas. Ins. Co.*, 875 F.Supp.2d 478, 497 (W.D.Pa. 2012). Those fifteen policies were delivered in Pennsylvania. *Id.*

[29] HGA previously maintained its corporate headquarters in Hyde Park, Massachusetts. ECF No. 773-2 ¶ 6. HGA relocated its operations to Nashua, New Hampshire, in 1997. *Id.* O'Connell acted on HNA's behalf from his HGA offices. *Id.* ¶ 20.

from New York, and [that] approval from the home office was obtained before New Hampshire

signed onto policies because of [the] Howden Group's U.S.-based risks." ECF No. 767 at 28.  In

a declaration dated March 7, 2013, O'Connell stated that he had participated in the negotiations

from his offices in Massachusetts and New Hampshire.  ECF No. 773-2 ¶ 16.  He further

declared that he had corresponded with Maclachlan and reviewed proposed policy language

when the operations of HGA and HNA were at issue.  *Id.*  Some of the other insurers subscribing

to quota-share policies following form to the XL policies conducted their negotiations out of

Germany.  ECF Nos. 768 & 782 ¶¶ 69-70.  The policies were obviously negotiated in various

locations throughout the United States and Europe.  As far as the court can tell, however, *none* of

the negotiations took place in Pennsylvania.  Since Colas operated out of a New York office, the

second contact relevant to the analysis weighs in favor of applying New York law.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)(b).

The sections of the New Hampshire policies providing coverage for asbestos suits contain

the following language:

> This Policy Section shall operate precisely as if a separate Policy were issued to
> each Assured entitled to indemnity hereby; provided that nothing in this
> memorandum shall operate to increase Insurers' maximum liability beyond the
> limits of indemnity expressed in this Policy.

ECF Nos. 768 & 782 ¶ 40; ECF No. 769-23 at 11.  In his declaration, O'Connell stated that

every entity insured under the New Hampshire (and parallel quota-share) policies was

responsible for paying a portion of the premium for each policy.  ECF No. 773-2 ¶ 18.  He also

declared that, at his direction, HGA had sent HNA's share of the premium to Maclachlan, who

was located in Scotland.  *Id.*  The premium payments were forwarded to the brokers in London,

who proceeded to forward them directly to the quota-share insurers.[30]   ECF Nos. 768 & 782 ¶

78.  An insurance contract is "performed" where premium payments are received.

*Hammersmith*, 480 F.3d at 234 n.13.  When that place cannot be ascertained, the place to which

notice of claims should be provided is deemed to be the relevant "place of performance." *Pacific*

*Emp'rs*, 693 F.3d at 437.  "[N]otice is due where the entity to be notified is located. . . ." *Id.*

O'Connell provided notice of third-party asbestos claims against HNA to the brokers in London

from his offices in Massachusetts and New Hampshire.  ECF No. 773-2 ¶ 20.  Regardless which

link controls this factor, it weighs in favor of a British jurisdiction rather than in favor of either

New York or Pennsylvania.  *Howden*, 875 F.Supp.2d at 497.

Some consideration must be given to "the location of the subject matter of the contract."

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)(d).  As explained earlier, however, "the

insured risk in this case is spread throughout numerous states and countries." *Hammersmith*, 480

F.3d at 234.  Accordingly, this factor is neutral.

The final contacts relevant to the analysis are the parties' respective domiciles, places of

incorporation and places of business.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS §

188(2)(e).  Although New Hampshire is incorporated in Pennsylvania, it operates primarily out

of New York.  ECF Nos. 766 & 785 ¶ 11.  Indeed, HNA previously referred to New Hampshire

as "a Pennsylvania corporation based in New York."  ECF No. 300 at 51.  HNA is a Delaware

---

[30] It is not entirely clear where New Hampshire received the premium payments forwarded by the brokers.  ECF
Nos. 768 & 782 ¶ 78; ECF No. 770-11 at 14-15.  Since New Hampshire was based in New York, the premium
payments forwarded by the brokers were presumably received in New York. *Specialty Surfaces International, Inc.*
*v. Continental Casualty Co.*, 609 F.3d 223, 234 (3d Cir. 2010).  This court has previously suggested that the place of
performance was London, since premium payments were initially sent to the brokers located there. *Howden North*
*America, Inc. v. ACE Property & Casualty Insurance Co.*, 875 F.Supp.2d 478, 497 (W.D.Pa. 2012).  Irrespective
whether the relevant contact was in New York or London, it was clearly not in Pennsylvania. *Specialty Surfaces*,
609 F.3d at 234 (assuming that premium payments were ultimately received in Pennsylvania, where an insurance
company maintained its principal place of business, rather than in its state of incorporation or in other states in
which it conducted business).

corporation maintaining its principal place of business in South Carolina.[31]  ECF Nos. 766 & 785 ¶ 2.  The parties dispute the location of HNA's headquarters during the period of time covered by the contested New Hampshire policies.  New Hampshire contends that HNA maintained its principal place of business in Buffalo, New York, between 1993 and 1999.  ECF No. 766 ¶¶ 5-7. HNA contends that its New York employees reported to superiors located in Massachusetts and New Hampshire.  ECF No. 785 ¶ 5.  In any event, the record conclusively establishes that, during the late 1990s, HNA operated factories or offices in Illinois, Massachusetts, Ohio, New York and Mexico.[32]  ECF No. 770-23 at 3-4; ECF Nos. 768 & 782 ¶ 10; ECF No. 773-2 ¶ 5.

The Ampco-Pittsburgh Companies were never insured under the New Hampshire policies.  The choice-of-law analysis pertaining to those policies cannot be conducted through the prism of the fifteen excess policies issued by the Non-Settled Insurers.  When the Non-Settled Insurers' policies are removed from the equation, the only contact weighing in favor of Pennsylvania is New Hampshire's incorporation there.  Pennsylvania's interest in applying its law to the New Hampshire policies is not significantly weighty under the present circumstances. In *General Star National Insurance Co. v. Liberty Mutual Insurance Co.*, 960 F.2d 377, 379 (3d Cir. 1992), the United States Court of Appeals for the Third Circuit remarked that "the protection of insured parties is the primary public policy behind laws governing duties owed by an insurer to an insured. . . ."  In this case, New Hampshire is the *insurer* rather than the *insured*. Moreover, the policies issued by New Hampshire were quota-share policies following form to other policies negotiated by parties located throughout the United States (including New York) and Europe.  Since none of the other quota-share insurers are incorporated in Pennsylvania, New

---

[31] HNA is the successor to the New Philadelphia Fan Company ("New Philadelphia").  ECF Nos. 768 & 782 ¶ 16. Although New Philadelphia's former parent corporations maintained their principal places of business in Pennsylvania, they were never insured under the contested New Hampshire policies.  *Id.*
[32] O'Connell also testified that HNA had operated a factory and office in Dearborn, Michigan, during the relevant period of time.  ECF No. 770-23.

Hampshire's state of incorporation cannot be given significant weight in the choice-of-law analysis. Pennsylvania law disfavors any approach that would allow the rules prevailing in multiple jurisdictions to govern the interpretation of the same insurance contract. *United Brass Works, Inc.*, 819 F.Supp. at 469. HNA points to nothing in the record which suggests that individuals or entities operating in Pennsylvania were involved in negotiating or procuring the policies to which the New Hampshire policies follow form.

Admittedly, the broad reach of the policies makes it difficult to link the "contract of insurance" to any particular jurisdiction. *Hammersmith*, 480 F.3d at 232-33. In this context, however, the court need only concern itself with the relative contacts of New York and Pennsylvania. *Gen. Star*, 960 F.2d at 380 n.3. Even though Pennsylvania is New Hampshire's state of incorporation, Colas oversaw the negotiations of the policies from its New York office. ECF No. 766-8 at 7-8; ECF No. 767 at 28. A corporation's principal place of business is a more important contact than its place of incorporation. *Specialty Surfaces*, 609 F.3d at 234; *Hidden Brook Air, Inc. v. Thabet Aviation International, Inc.*, 241 F.Supp.2d 246, 278 (S.D.N.Y. 2002); *Kelly v. Ford Motor Co.*, 933 F.Supp. 465, 469 (E.D.Pa. 1996). In this respect, the sole contact leaning toward Pennsylvania is overcome by New Hampshire's presence in New York. Assuming *arguendo* that HNA did not maintain its headquarters in New York during the relevant coverage period, it clearly maintained a presence there. ECF No. 770-23 at 3-4; ECF Nos. 768 & 782 ¶ 10; ECF No. 773-2 ¶ 5. Unlike Pennsylvania, New York had contacts with *both* HNA *and* New Hampshire. Between the two competing jurisdictions, New York clearly has "the most significant relationship to the transaction and the parties." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1).

HNA contends that if Pennsylvania law does not apply to the policies, the next best alternative is Scottish law.  ECF No. 784 at 14-18.  Taking its argument one step further, HNA asserts that since "there is no Scottish law resolving the trigger or scope of coverage for asbestos personal injury claims," Pennsylvania law must be applied.  ECF No. 784 at 15.  The position taken by HNA is based on language in *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (3d Cir. 1978), stating that the law of a "sister state" is presumed to be the same as that of Pennsylvania if it cannot be ascertained.  HNA goes on to speculate that Scottish law would most likely differ from English law, which was previously favored by New Hampshire.[33] *Id.* at 16-18.

The relevant inquiry compares only the relative interests and contacts of the two *competing* jurisdictions.  *Hammersmith*, 480 F.3d at 234 (resolving a choice-of-law factor in favor of New York, as compared to Pennsylvania, even though it seemed to weigh in favor of Texas).  If the law of the *alternative* jurisdiction put forth by the parties (*i.e.*, New York) could not be ascertained, it would be presumed to be identical to that of Pennsylvania.  *Melville*, 584 F.2d at 1308.  As the parties clearly recognize, however, clear differences exist between the law of New York and the law of Pennsylvania.  The conflict between the laws of the two competing jurisdictions cannot be avoided by the simple expedient of pointing to a third interested jurisdiction located overseas.

Moreover, the escape mechanism invoked by HNA cuts in both directions.  HNA's primary witness confirmed his involvement in the negotiation and procurement of the quota-share policies from HGA offices located in Massachusetts and New Hampshire.  ECF No. 773-2

---

[33] The court notes that the New Hampshire policies governing the period of time immediately postdating the period of time presently in dispute contain choice-of-law clauses requiring the policy language to be construed in accordance with the laws of England or the United Kingdom.  ECF Nos. 768 & 782 ¶ 46.  Those policies are not at issue in this case.

¶¶ 13-20.  No guesswork would be required to ascertain the law of those jurisdictions.  In *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517, 526-527 (N.H. 2007), the New Hampshire Supreme Court adopted a *pro rata* allocation rule similar to that adopted by the New York Court of Appeals in *Consolidated Edison*.  The Supreme Judicial Court of Massachusetts did likewise in *Boston Gas Co. v. Century Indemnity Co.*, 910 N.E.2d 290, 292-316 (Mass. 2009).  Neither Massachusetts nor New Hampshire follows the rule announced by the Pennsylvania Supreme Court in *J.H. France*.  If the court were to broaden the inquiry enough to *speculate* about the content of Scottish law, it would certainly have to give similar consideration to the *established* rules in Massachusetts and New Hampshire.  Those rules mirror the law of New York.  After considering all the relevant contracts, the court concludes the policies issued by New Hampshire are governed by New York law.

### 3.    The application of New York law

HNA appears to question whether the *pro rata* allocation formula announced in *Consolidated Edison* remains the law of New York.  ECF No. 784 at 18.  Indeed, HNA even suggests that New York law essentially requires the contested policy language to be construed in the same manner as Pennsylvania law.  *Id.*  The court acknowledges that the rule adopted in *Consolidated Edison* (like the contrary rule adopted in *J.H. France*) could be circumvented by policy language clearly expressing an intent to establish different contractual terms.  *Consolidated Edison*, 774 N.E.2d at 695 (finding a *pro rata* allocation to be "consistent with the language of the policies" even though it was "not explicitly mandated by the policies").  HNA is clearly mistaken, however, to the extent that it believes that subsequent decisions have undermined *Consolidated Edison*.

The final briefs submitted by the parties were filed on April 29, 2013.  ECF Nos. 793 &

796.  Eight days later, in *Roman Catholic Diocese of Brooklyn v. National Union Fire Insurance

Co. of Pittsburgh, PA*, 21 N.Y.3d 139 (N.Y. 2013), the New York Court of Appeals applied the

holdings in both *Consolidated Edison* and *Appalachian Insurance Co.* in a case involving acts of

sexual molestation spanning several policy periods.  *Diocese of Brooklyn* involved a claim

brought by a Diocese of the Roman Catholic Church against a liability insurance carrier for

indemnification and defense costs attributable to settlement payments made to a minor who had

allegedly been molested by a priest on several occasions between August 1996 and May 2002.

*Diocese of Brooklyn*, 21 N.Y.3d at 143-46.  The policy at issue defined the term "occurrence" as

"an accident, including continuous or repeated exposure to substantially the same general

harmful conditions."  *Id.* at 148.  Applying *Appalachian Insurance Co.*, the court of appeals held

that the discrete incidents of sexual abuse "constituted multiple occurrences" because they were

"not part of a singular causal continuum."  *Id.* at 149.  It was noted that the policy in question

contained no language "indicating an intent to aggregate the sexual abuse into a single

occurrence."  *Id.* at 152.  Moving on to the allocation issue, the court of appeals observed:

> A pro rata allocation is consistent with the language of the policies at issue here.
> By example, National Union's 1995-1996 policy provides coverage for bodily
> injury only if the bodily injury "occurs during the policy period" and is caused by
> an "occurrence."  Plainly, the policy's coverage is limited only to injury that
> occurs within the finite one-year coverage period of the policy.  To that end,
> assuming that the minor plaintiff suffered "bodily injury" in each policy year, it
> would be consistent to allocate liability across all implicated policies, rather than
> holding a single insurer liable for harm suffered in years covered by other
> successive policies.  There is no indication that the parties intended that the
> Diocese's total liability for bodily injuries sustained from 1996 to 2002 would be
> assumed by a single insurer.  Furthermore, like *Consolidated Edison*, a joint and
> several allocation is not applicable in this case as the Diocese cannot precisely
> identify the sexual abuse incidents to particular policy periods.

*Id.* at 154.   In light of the reasoning employed in *Diocese of Brooklyn*, it is clear that the rule

announced by the Pennsylvania Supreme Court in *J.H. France* remains inconsistent with New

York law.   The court cannot accept HNA's assertion to the contrary.

The 2005 agreement executed by HNA and eight insurers apportions liability payments

only to years in which HNA's asbestos liabilities were insured.   ECF No. 716-1 at 6, ¶ A.

Although several plaintiffs in the underlying actions allege exposure to asbestos predating June

1, 1961, the "Injury Allocation Period" defined in the agreement begins on that date.   ECF No.

685-20 at 69-70.   The definition also excludes certain periods covering times in which HNA had

no coverage for its asbestos liabilities.   ECF No. 716-1 at 6, ¶ A.   The first excluded period

began on September 1, 1986, and ended on May 1, 1995.   ECF No. 685-20 at 69-70.   The second

excluded period commenced on July 1, 2002, and continues through the present.   *Id.*   In addition,

the 2005 agreement utilizes a "collapsing coverage block" to apportion defense costs in equal

amounts only to unexhausted policies issued by participating insurers.   ECF No. 716-1 at 6, ¶ C.

Some jurisdictions employing a *pro rata* allocation method require insured entities to

absorb the costs of ongoing injuries attributable to uninsured periods.   *Towns v. N. Sec. Ins. Co.*,

964 A.2d 1150, 1167 (Vt. 2008).   New Hampshire maintains that New York law "allocates costs

across all triggered policy periods and the insured for any uninsured periods, but not for those

periods when coverage for [the underlying] claims was unavailable."   ECF No. 765 at 14.

According to New Hampshire, the 2005 agreement artificially "exhausted" some of the

underlying policies prematurely by collapsing the *pro rata* allocation within periods in which

HNA was insured.   ECF No. 765 at 14-18; ECF No. 796 at 8.   New Hampshire also complains

that, with respect to defense costs, the 2005 agreement "shrink[s] the allocation period each time

a participating policy exhausts," thereby accelerating the exhaustion of the underlying XL policy.

*Id.* at 19-20.  These arguments are based primarily on the non-contribution clauses of the New

Hampshire policies, which provide as follows:

> This insurance does not cover any loss or damage which at the time of the
> happening of such loss or damage is insured by or would, but for the existence of
> this Policy, be insured by any other existing Policy or Policies except in respect of
> any excess beyond the amount which would have been payable under such other
> Policy or Policies had this insurance not been effected.

ECF No. 769-23 at 19; ECF No. 769-27 at 23; ECF No. 769-29 at 27; ECF No. 769-30 at 15;

ECF No. 769-31 at 14.  In New Hampshire's view, these clauses require exhaustion to be

measured by reference to amounts that "would have been payable" under the *underlying policies*

rather than by reference to amounts actually paid in accordance with the 2005 agreement.  ECF

No. 765 at 16.

HNA describes the 2005 agreement as a good faith compromise that cannot be

collaterally attacked by New Hampshire.  ECF No. 784 at 22.  In addition, HNA asserts that New

Hampshire cannot reallocate amounts already paid by settling insurers to exhaust the underlying

policies.  *Id.* at 19.  New Hampshire responds by clarifying that it is not seeking to challenge the

2005 agreement itself, but to avoid responsibility for gaps in payment suffered by HNA because

of the agreement.  ECF No. 796 at 8-10.  Furthermore, New Hampshire accuses HNA of

accelerating the exhaustion of the 1997-1999 XL policy by reducing its limits by $1,000,000.00.

*Id.* at 9-10.  The testimonial record suggests that a compromise may have occurred in order to

clarify how an *annual* limit would be applied to a policy period spanning eighteen months.  ECF

No. 766-11 at 4.

In support of its position, New Hampshire relies on *Stonewall Insurance Co. v. Asbestos

Claims Management Corp.*, 73 F.3d 1178 (2d Cir. 1995).  In *Stonewall Insurance Co.*, the United

States Court of Appeals for the Second Circuit, in a case governed by New York law, declared

86

that an insured manufacturer must "accept a proportionate share of a[ny] risk that it [has] elected to assume, either by declining to purchase available insurance or by purchasing what turn[s] out to be an insufficient amount of insurance." *Stonewall Ins. Co.*, 73 F.3d at 1204.  That decision, of course, predated *Consolidated Edison*.  Without taking a position on the issue, the New York Court of Appeals observed in *Consolidated Edison* that courts across the country "differ on how to treat self-insured retentions, periods of no insurance, periods where no insurance is available and settled policies under various allocation methods." *Consol. Edison*, 774 N.E.2d at 695.  No determinations relating to those issues were necessary, since the trial court had dismissed claims against policies that would not have been reached under the insured entity's "highest estimate of damages." *Id.*  Nevertheless, it was noted that the decision in *Consolidated Edison* would not be "the last word on proration." *Id.*

In *United States Fidelity & Guaranty Co. v. Treadwell Corp.*, 58 F.Supp.2d 77 (S.D.N.Y. 1999), the United States District Court for the Southern District of New York stated that "treating a primary insurer's settlement with an insured as binding for allocation purposes, at least in the absence of evidence of collusion to defraud an excess insurer, further[ed] the strong public interest in promoting settlement." *Treadwell Corp.*, 58 F.Supp.2d at 107.  In that case, a settlement payment was allocated to a particular policy period even though it exceeded the settling primary insurer's *pro rata* responsibility for that period. *Id.* at 106-10.  The district court specifically noted, however, that the nonsettling excess insurer had declined an invitation to participate in the settlement negotiations. *Id.* at 110.

Contending that the 2005 agreement did not result from collusion, HNA relies on *United States Fidelity* in order to refute New Hampshire's position.  ECF No. 784 at 20-21.  New Hampshire argues that since it was not involved in the negotiation of the agreement and "had no

say in the memorialized allocation methods agreed to," it cannot be held responsible for more than its *pro rata* share of liability.  ECF No. 765 at 17.  The decision in *United States Fidelity* was predicated on a determination that the nonsettling excess insurer had received "notice of the ongoing negotiations" and been "invited to participate."  *United States Fid.*, 58 F.Supp.2d at 110. New Hampshire was not a party to the 2003 litigation or the 2005 agreement.  HNA points to nothing in the record which suggests that New Hampshire was given an opportunity to assert its interests during the settlement negotiations.  Therefore, the reasoning employed in *United States Fidelity* is inapplicable to this case.  Since New Hampshire never had a chance to assert its own interests, the existence or absence of collusion is not dispositive.

Under the non-contribution clauses, coverage under the New Hampshire policies for "any loss or damage" is measured in relation to the obligations of other policies "at the time of the happening of such loss or damage."  ECF No. 769-23 at 19; ECF No. 769-27 at 23; ECF No. 769-29 at 27; ECF No. 769-30 at 15; ECF No. 769-31 at 14.  It is not measured by reference to amounts paid pursuant to an *agreement* executed apart from the underlying *policies*.  Since the policy language is clear and unambiguous, it must be given effect.  *Fed. Ins. Co. v. Int'l Business Machs. Corp.*, 965 N.E.2d 934, 936 (N.Y. 2012).  Payments exceeding the settling insurers' *pro rata* shares of liability pursuant to the 2005 agreement cannot be used to accelerate the exhaustion of the underlying policies.  To the extent that the agreement allocated more money to the relevant policy years than New York law would otherwise dictate, that money did not exhaust the underlying policies *for purposes of the New Hampshire policies*.  *Homestead Vill. Assocs., L.P. v. Diamond State Ins. Co.*, 818 F.Supp.2d 642, 651 (E.D.N.Y. 2011).

**4.      New Hampshire's obligation to reimburse HNA for defense costs**

"New Hampshire seeks a declaration that it has no obligation to reimburse HNA for defense costs unless HNA provides New Hampshire with notice of its claims and obtains consent from New Hampshire to incur such defense costs."  ECF No. 764 ¶ 6.  The New Hampshire policies (and the underlying policies to which they follow form) contain the following language:

> This Policy shall indemnify the Assured in respect of all costs and expenses incurred by or with the consent of the Underwriters in the settlement or defence of any claim, and these shall be paid by Underwriters within the Limits of Indemnity stated in the Schedule.

ECF No. 769-23 at 17; ECF No. 769-27 at 21; ECF No. 769-29 at 25; ECF No. 769-30 at 13; ECF No. 769-31 at 12.  The policies also contain claims notification clauses stating as follows:

> The Assured shall not admit liability for or offer or agree to settle any claim without the consent of the Underwriters who shall be entitled to take over the conduct in the name of the Assured the defence of any claim and to prosecute in the Assured's name for Underwriters' benefit any claim for indemnity or damages or otherwise against a Third Party and shall have full discretion in the conduct of any negotiations and proceedings and the settlement of any claim.

> The Assured shall give to the Underwriters such information and assistance as the Underwriters may reasonably require.

ECF No. 769-23 at 9; ECF No. 769-27 at 14; ECF No. 769-30 at 6; ECF No. 769-31 at 5.  The parties agree that the New Hampshire policies "do not include a duty to defend."  ECF Nos. 768 & 782 ¶ 85.  It is clear from the policy language that payments attributable to defense costs constitute "indemnification" payments and count against the applicable limits of liability.  The only question dividing the parties is whether, and under what circumstances, New Hampshire can withhold its "consent" to the incurring of defense costs.

New Hampshire relies on *Stonewall Insurance Co.* for the proposition that "consent" provisions are enforceable under New York law.  ECF No. 765 at 23.  The policies at issue in that case required the insurer to pay a proportion of "expenses and/or defense costs in connection with any claim or suit" that were "incurred jointly by mutual consent."  *Stonewall Ins. Co.*, 73

F.3d at 1219.  The insured party argued that it was not required to get the insurers' approval

before incurring legal costs, and that the insurers were permitted to deny coverage only for

"unreasonable or excessive defense costs incurred."  *Id.*  Rejecting that argument, the United

States Court of Appeals for the Second Circuit explained:

> [W]e agree with the District Court that, pursuant to this provision, the insurer has
> no duty to defend or pay costs, but only has the right to do so at its own election.
> The insurer can permit the insured's defense to proceed and take the chance that
> the insured might exceed the limits of other liability coverage, or participate in the
> defense and agree to pay all or part of the defense costs incurred.  The consent
> provision does not require the insurer to indemnify NGC for defense costs unless
> the parties mutually agree beforehand to this arrangement.

*Id.*  The court of appeals' analysis in *Stonewall Insurance Co.* does not speak to the question of

when, and under what circumstances, an insurer may refuse an insured's *request* for consent.

Instead, it speaks only to the enforceability of policy provisions requiring an insured to *seek*

consent *before* incurring covered defense costs.  Since HNA does not dispute the enforceability

of the claims notification clauses, *Stonewall Insurance Co.* does not help New Hampshire's

argument.

Under New York law, the initial interpretation of a contract presents a question of law for

the court.  *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996).  "If a

contract is unambiguous, courts are required to give effect to the contract as written and may not

consider extrinsic evidence to alter or interpret its meaning."  *Consarc Corp. v. Marine Midland*

*Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993).  "Where the language used is susceptible to

differing interpretations, each of which may be said to be as reasonable as another, and where

there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become

an issue of fact and summary judgment is inappropriate."  *Seiden Assocs., Inc. v. ANC Holdings,*

*Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).

"The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). "'An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"" *Morgan Stanley Grp., Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)(quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)). In other words, "the customs, practices, usages and terminology as generally understood in the particular trade or business" affects not only the ultimate question of how disputed contractual language should be construed, but also the threshold question of whether that language is ambiguous. *Id.*

HNA has procured expert reports from Jeffrey M. Posner ("Posner") and Timothy G. Holloway ("Holloway"). ECF No. 716-2. In their reports, Posner and Holloway respectively stated that, in the American and British insurance markets, "consent" clauses do not provide insurers with the prerogative to withhold consent for any or no reason. *Id.* at 12, ¶ 29. Holloway concluded his report by opining that "New Hampshire must pay HNA's defence costs so long as those costs are reasonable and have been incurred in good faith." *Id.* at 32. Consequently, the record contains evidence suggesting that the policy language, when viewed through the prism of the "industry practice and custom," does not afford New Hampshire an unqualified right to refuse consent for the incurring of defense costs. *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 873 (N.Y. 2004).

New Hampshire is the only party moving for summary judgment with respect to the issue of "consent."  ECF No. 764 ¶¶ 6-7.  HNA does not move for a declaration that New Hampshire *cannot* withhold consent for any or no reason.  ECF No. 763.  Therefore, the only question is whether New Hampshire is entitled to a declaration that it *can* exercise an unqualified option to withhold consent.  That question must be answered in the negative.  New Hampshire points to nothing in the evidentiary record which suggests that its reading of the policy language is correct.  ECF No. 765 at 21-23; ECF No. 783 at 24; ECF No. 796 at 10-11.  With respect to this issue, New Hampshire's motion for summary judgment is grounded entirely in *Stonewall Insurance Co.*[34]  ECF No. 765 at 23; ECF No. 783 at 24.  For the reasons discussed earlier, that decision does not speak to the question whether, and under what circumstances, an insurer's *request* for consent can be refused.  *Stonewall Ins. Co.*, 73 F.3d at 1218-19.

New Hampshire's motion for summary judgment will be granted to the extent that it seeks a declaration that HNA must provide "notice of its claims" and *request* "consent" before incurring chargeable defense costs.  ECF No. 764 ¶ 6.  Since the policy language plainly provides that "all costs and expenses incurred by or with the consent of the Underwriters in the settlement or defence of any claim . . . shall be paid by Underwriters within the Limits of Indemnity stated in the Schedule," the motion will also be granted insofar as it requests a declaration that defense costs paid by New Hampshire count against the applicable limits of liability.  ECF No. 769-23 at 17; ECF No. 769-27 at 21; ECF No. 769-29 at 25; ECF No. 769-30 at 13; ECF No. 769-31 at 12.  The motion will be denied to the extent that it seeks clarification as

---

[34] Since the matter is governed by New York law, the court need not address New Hampshire's alternative argument concerning the potential application of *AstenJohnson, Inc. v. Columbia Casualty Co.*, 562 F.3d 213 (3d Cir. 2009). ECF No. 765 at 22-23.  It is worth noting, however, that New Hampshire's argument relating to *AstenJohnson* mirrors the argument advanced by the Non-Settled Insurers, which the court already rejected.

to whether, and under what circumstances, New Hampshire may *withhold* consent to HNA's incurring of defense costs.[35]

## V.    Conclusion

It has not gone unnoticed that the Ampco-Pittsburgh Companies and HNA seek declarations confirming the exhaustion or erosion of certain policies underlying the excess policies at issue in this case.  ECF No. 672-1 ¶¶ 4-5; ECF No. 763-1 ¶ 3.  The numbers put forth by those parties appear to be based on assumptions dictating the application of their respective formulas.  For the reasons discussed earlier, however, none of moving parties are entitled to summary judgment in all respects.  In view of the numerous mathematical scenarios posited by the parties, it is not clear whether the exhaustion and erosion reports supplied by the Ampco-Pittsburgh Companies and HNA will change based on the decisions articulated in this opinion. In the exercise of its sound discretion, the court will not issue any declarations at the present time concerning the exhaustion or erosion of specific policies.  *State Auto Ins. Co. v. Summy*, 234 F.3d 131, 135 (3d Cir. 2000).  The parties remain free to seek such declarations, if they become necessary, at a later date.

The declarations issued by this court constitute a "binding judgment" between the parties concerning the meaning and application of the twenty-two insurance policies at issue.  *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 319 (3d Cir. 2011).  Nothing in this opinion, however, precludes the parties from contractually altering their respective obligations through the execution of settlement agreements.  Several parties to this case already *replaced* their pre-existing contracts with settlement agreements crafted to facilitate the payment of indemnity and

---

[35] At this time, the court has no occasion to consider whether the resolution of this issue would require a jury trial. *AstenJohnson, Inc. v. Columbia Casualty Co.*, 562 F.3d 213, 222-226 (3d Cir. 2009)(discussing the differences between legal and equitable relief in actions brought under the Declaratory Judgment Act, and the extent to which that distinction affects the parties' right to a jury trial).  The parties remain free to address that issue at a later time.

defense costs in a workable manner.  ECF No. 685-20 at 21, 265.  The parties presently moving for partial summary judgment are free to do likewise.

      In accordance with the foregoing analysis, both motions to dismiss will be denied.  ECF Nos. 579 & 690.  The motions for partial summary judgment filed by the Ampco-Pittsburgh Companies, the Non-Settled Insurers and New Hampshire, and the first motion for partial summary judgment filed by HNA, will be granted in part and denied in part.  ECF Nos. 671, 672, 674, 677 and 764.  HNA's second motion for partial summary judgment will be denied.  ECF No. 763.  An appropriate order will be entered.

By the Court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge

Dated:  September 27, 2013