**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AIR & LIQUID SYSTEMS | ) | |
| CORPORATION and AMPCO- | ) | |
| PITTSBURGH CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-247 |
| | ) | |
| ALLIANZ UNDERWRITERS | ) | |
| INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

### I.       Introduction

This matter concerns the coverage obligations owed by excess liability insurers to insured entities that have been sued by individuals alleging injuries caused by exposure to asbestos.  The insured entities sought relief pursuant to the Declaratory Judgment Act, which permits a court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  In an order dated September 27, 2013, the court issued several declarations clarifying the respective rights and obligations of the insured entities and the excess liability insurers. (ECF No. 811.)  Pending before the court are motions for reconsideration filed by two of the insurers, (ECF Nos. 817, 819 & 821), and a motion for leave to file additional briefing, filed by certain insurers, (ECF No. 868).  For the reasons that follow, those motions will be denied.

## II.    Background[1]

Ampco-Pittsburgh Corporation ("Ampco-Pittsburgh") and Air & Liquid Systems Corporation ("Air & Liquid") (collectively referred to as the "Ampco-Pittsburgh Companies") are Pennsylvania corporations maintaining their principal places of business in Pittsburgh, Pennsylvania.  (ECF No. 758 ¶ 1.)  Air & Liquid is a wholly-owned subsidiary of Ampco-Pittsburgh.  (ECF No. 756 ¶ 1.)  During the early 1980s, the Ampco-Pittsburgh Companies were engaged in business activities relating to railroad freight cars, air and liquid handling equipment, specialty metal products, steel products, and farm equipment.  (Id. ¶ 2.)

Buffalo Forge Company ("Buffalo Forge I"), a New York corporation operating out of North Tonawanda, New York, was engaged in the business of manufacturing industrial pumps.  (ECF No. 758 ¶¶ 10, 13.)  Ampco-Pittsburgh acquired Buffalo Forge I in 1981.  (Id. ¶ 15.)  In 1982, Buffalo Forge I merged with a New Jersey corporation known as Aerofin Corporation ("Aerofin").  (Id. ¶ 16.)  Shortly thereafter, a Delaware corporation known as the Buffalo Forge Company ("Buffalo Forge II") assumed Buffalo Forge I's pre-merger assets and liabilities.  (Id.)  Buffalo Pumps, Inc. ("Buffalo Pumps"), a Delaware subsidiary of Ampco-Pittsburgh, acquired from Buffalo Forge II the assets and liabilities of Buffalo Forge I's Buffalo Pumps Division.  Id.  The company resulting from the merger of Buffalo Forge I and Aerofin merged into Air & Liquid on December 31, 2009, thereby making Air & Liquid the successor-by-merger to Buffalo Forge I.  (Id.)

---

[1] Given that the parties are familiar with the procedural and factual background to this case, the court will only discuss matters that are directly relevant to the pending motions for reconsideration. Howden N. Am., Inc. v. ACE Prop. & Cas. Ins. Co., 875 F.Supp.2d 478, 484 n. 4 (W.D. Pa. 2012).  A more extensive discussion of the facts in this case appears in the court's memorandum opinion filed on September 27, 2013.  Air & Liquid Sys.Corp. v. Allianz Underwriters Ins. Co., Civil Action No. 11-247, 2013 U.S. Dist. LEXIS 142359 (W.D. Pa. Sept. 27, 2013).

Ampco-Pittsburgh Securities V Corporation is a wholly-owned subsidiary of Ampco-Pittsburgh. (ECF No. 758 ¶ 17.) In May 1993, Howden Group America, Inc., Howden Group Canada, Ltd., and Howden Group Plc. (collectively referred to as the "Howden Entities") entered into a stock purchase agreement with Ampco-Pittsburgh and Ampco-Pittsburgh Securities V Corporation. (Id.) Pursuant to that agreement, the Howden Entities acquired Buffalo Forge II's outstanding stock. (Id.) They also acquired its rights under certain pre-acquisition liability insurance policies purchased by Ampco-Pittsburgh. (ECF No. 687-8 at 47; ECF No. 755 ¶ 9.) Buffalo Forge II was renamed the Howden Fan Company in 1994. (ECF No. 758 ¶ 18.) The name was changed to Howden Buffalo, Inc. ("Howden Buffalo"), in 1999. (Id.) In 2000, Howden Buffalo moved its headquarters from Buffalo, New York, to Camden, South Carolina. (Id.) Howden Buffalo's name was changed to Howden North America, Inc. ("HNA"), in 2010. (Id.)

Since 1999, Air & Liquid and its predecessors have faced thousands of lawsuits in forty different states stemming from injuries allegedly caused by asbestos. (ECF No. 756 ¶¶ 22, 26.) The claims arise primarily from the manufacture of industrial pumps by the Buffalo Pumps Division. (Id. ¶ 23.) Some of those claims are based on injuries allegedly resulting from the plaintiffs' exposure to heat exchange coils and air handlers. (Id. ¶ 24.) Because of the underlying personal-injury actions, Ampco-Pittsburgh and its affiliates have incurred indemnity and defense costs amounting to millions of dollars. (Id. ¶ 27.)

On February 24, 2011, the Ampco-Pittsburgh Companies commenced this action against HNA and numerous domestic and foreign insurers who had issued excess liability policies covering the period of time beginning on January 1, 1981, and ending on January 1, 1985, seeking declaratory relief defining their right to indemnification and defense costs from each

defendant.  (ECF No. 1.)  HNA filed counterclaims against the Ampco-Pittsburgh Companies, cross-claims against the insurer-defendants, and additional claims against thirteen other insurance companies.  (ECF No. 31; ECF No. 755 ¶ 17.)  On December 12, 2012, this action was consolidated with a separate action that had been commenced by Howden Buffalo in 2009.  (ECF No. 652.)  HNA's disputes with several other insurers, including New Hampshire Insurance Company ("New Hampshire"), were severed pursuant to Federal Rules of Civil Procedure 21 and 42(b).  (Id.)  The parties collectively filed two motions to dismiss and six motions for partial summary judgment.  (ECF Nos. 579, 671, 672, 674, 677, 690, 763 & 764.)  All eight motions were resolved in a memorandum opinion dated September 27, 2013.  Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co., Civil Action No. 11-247, 2013 U.S. Dist. LEXIS 142359 (W.D. Pa. Sept. 27, 2013).  After ruling on the parties' respective motions, the court entered certain declarations defining the rights and obligations of the insured entities and the excess liability insurers. (ECF No. 811.)

Old Republic Insurance Company ("Old Republic") and New Hampshire filed motions for reconsideration on October 25, 2013, seeking amendments to the declarations entered by the court. (ECF Nos. 817, 819 & 821.)  Defendant-insurers Columbia Casualty Company, Mt. McKinley Insurance Company, and Old Republic, referred to collectively as "Certain Insurers," filed a motion for leave to file a) motions for clarification, and b) additional motions for partial summary judgment, and to serve contention discovery on Ampco-Pittsburgh and HNA (collectively, the "Policyholders"). (ECF No. 868 (the "motion for leave").)  All motions pending in this case will be addressed in this memorandum opinion.

### III.    The Motion Filed by Old Republic

Ampco-Pittsburgh's operations in 1982 were covered by a primary insurance policy

issued by Argonaut Insurance Company.  (ECF No. 684-6 at 2.)  Highlands Insurance Company

("Highlands") issued an umbrella liability insurance policy covering Ampco-Pittsburgh's

activities during that same year.  (ECF No. 684-18 at 6.)  Fearing that the applicable policy limits

would be insufficient to cover its liabilities and costs, Ampco-Pittsburgh layered its protection by

purchasing excess liability insurance policies from Northbrook Excess and Surplus Insurance

Company, International Insurance Company, Lexington Insurance Company ("Lexington"), the

London Market Insurers, Federal Insurance Company, First State Insurance Company, Transit

Insurance Company, Integrity Insurance Company, American Excess Insurance Company,

Associated International Insurance Company, and Old Republic.  (ECF No. 682 at 45 & 47; ECF

Nos. 684-3, 684-22, 684-24, 684-25, 684-30, 684-31, 684-36, 684-37 & 684-40.)

The court's subject-matter jurisdiction to entertain this action is premised on the diverse

citizenship of the parties.  U.S. CONST., ART. III, § 2; 28 U.S.C. § 1332(a)(1).  An exercise of

diversity jurisdiction is permissible under the Constitution "so long as any two adverse parties

are not co-citizens."  State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 531 (1967).

Nonetheless, the statutory provision authorizing the exercise of such jurisdiction "applies only to

cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant."

Caterpillar, Inc. v. Lewis, 519 U.S. 61, 68 (1996).  Old Republic is a Pennsylvania corporation

maintaining its principal place of business in Greensburg, Pennsylvania.  (ECF No. 758 ¶ 7.)

Like the Ampco-Pittsburgh Companies, Old Republic is a "citizen" of Pennsylvania for purposes

of diversity jurisdiction.  28 U.S.C. § 1332(c)(1).  Although Old Republic is similarly situated to

the other excess insurers in most respects, the Ampco-Pittsburgh Companies did not name it as a

defendant in this action. (ECF No. 744 at 4 n. 6.) The Ampco-Pittsburgh Companies' decision

not to name Old Republic as a defendant apparently resulted from their desire to ensure the

"complete diversity" required by statute. <u>Lincoln Prop. Co. v. Roche</u>, 546 U.S. 81, 89 (2005).

The only claims asserted against Old Republic in this action are the additional-party claims

brought by HNA. (ECF No. 31 ¶ 78.)

> Federal Rule of Civil Procedure 54(b) provides:
>
> When an action presents more than one claim for relief—whether as a claim,
> counterclaim, crossclaim, or third-party claim—or when multiple parties are
> involved, the court may direct entry of a final judgment as to one or more, but
> fewer than all, claims or parties only if the court expressly determines that there is
> no just reason for delay. Otherwise, any order or other decision, however
> designated, that adjudicates fewer than all the claims or the rights and liabilities of
> fewer than all the parties does not end the action as to any of the claims or parties
> and may be revised at any time before the entry of a judgment adjudicating all the
> claims and all the parties' rights and liabilities.

FED. R. CIV. P. 54(b). The plain language of Rule 54(b) provides a federal court with "general

discretionary authority to review and revise interlocutory rulings" prior to the entry of a final

judgment.[2] <u>Wagoner v. Wagoner</u>, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991). In the order entered

on September 27, 2013, the court declared that a "duty to defend" arose out of eleven different

excess liability insurance policies, including the policy issued by Old Republic. (ECF No. 811 at

3, ¶ 5.) The court further declared that any "[a]mounts incurred in defending the underlying

claims, except settlements of claims and suits, [we]re payable in addition to the applicable limits

of liability." (<u>Id.</u>) Old Republic presently seeks amendments to those declarations. (ECF No.

815.) In the alternative, Old Republic asks that judgment be entered against it pursuant to Rule

---

[2] Since no final judgment has been entered in this case, the motions for reconsideration filed by
Old Republic and HNA do not constitute "motion[s] to alter or amend a judgment" within the
meaning of Federal Rule of Civil Procedure 59(e). FED. R. CIV. P. 59(e); <u>Pellicano v. Blue Cross
Blue Shield Ass'n</u>, 540 F.App'x 95, 97 n.4 (3d Cir. 2013).

54(b), thereby rendering the challenged declarations immediately appealable under 28 U.S.C. § 1291.[3]  (Id.)

The umbrella policy issued by Highlands provides that Highlands has "the right and duty to defend any suit against the Insured seeking damages on account of . . . personal injury or property damage" in the event that "no other insurer has the right and duty to do so."  (ECF No. 684-18 at 2.)  The policy states that "[a]mounts incurred by the Company in connection with the defense of the Insured as aforesaid, except settlements of claims and suits, are payable by the Company in addition to the Company's limit of liability."  (Id. (emphasis added).)  In the prior opinion, the court construed the phrase "no other insurer," as used in the Highlands policy, to refer only to the underlying primary insurers covering the same policy year.  Air & Liquid Sys. Corp., 2013 U.S. Dist. LEXIS 142359, at *147-54.  Given that interpretation, it was determined that a duty to defend arose under the Highlands policy.  Id. at *154.  The Old Republic policy generally follows form[4] to the underlying umbrella policy issued by Highlands.  (ECF No. 685-12 at 13.)  For this reason, the declaration concerning Old Republic's duty to defend closely resembles the language found in the Highlands policy.  (ECF No. 811 at 3, ¶ 5.)  Old Republic maintains that the court misconstrued the language of the excess policy in determining that it mirrored the defense coverage available under the umbrella policy.  (ECF No. 816 at 4-9.)

---

[3] Federal Rule of Civil Procedure 54(a) defines the term "judgment" broadly enough to include "a decree and any order from which an appeal lies." FED. R. CIV. P. 54(a).

[4] An excess liability insurance policy "follows form" to an underlying policy when it incorporates the terms and conditions of that policy by reference. Lexington Ins. Co. v. W. Pa. Hosp., 318 F.Supp.2d 270, 274 n. 3 (W.D. Pa. 2004).

The argument advanced by Old Republic can only be understood by reference to the relevant policy language. The applicable language of the Old Republic policy provides:

EXCESS UMBRELLA LIABILITY

NAMED ASSURED. As stated in Item 1 of the Declaration forming a part hereof AMPCO PITTSBURGH CORPORATION, ETAL. and/or subsidiary, associated, affiliated companies owned or controlled companies as now or hereafter constituted and of which prompt notice has been given to the Company.

INSURING AGREEMENTS

I.    COVERAGE

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability
(a) imposed upon the Assured by law, or
(b) assumed under contract or agreement by the Named Assured and/or any officer, director, stockholder, partner or employee of the Named Assured, while acting in his capacity as such,
for damages, direct or consequential and expenses on account of:

    (i)    Personal Injuries, including death at any time resulting therefrom,
    (ii)    Property Damage,
    (iii)    Advertising Liability,

caused by or arising out of each occurrence happening anywhere in the world, and arising out of the hazards covered by and as defined in the Underlying Umbrella policies stated in Item 2 of the Declarations and issued by HIGHLANDS INSURANCE COMPANY & VARIOUS AS ON FILE WITH THE COMPANY (hereinafter called the "Underlying Umbrella Insurers").

\*\*\*

CONDITIONS

\*\*\*

2.    MAINTENANCE OF UNDERLYING UMBRELLA

This policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella policies stated in Item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder.

It is a condition of this policy that Underlying Umbrella policies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences during the period of this policy.

(ECF No. 685-12 at 4 (capitalization in original).)  The policy became effective on January 1, 1982.  (Id. at 2.)  On March 15, 1982, an amendatory endorsement was added to the policy.  (Id. at 13.)  The amendatory endorsement states:

IT IS UNDERSTOOD AND AGREED THAT THIS COVERAGE IS FOLLOWING FORM EXCESS TO THE PRIMARY UMBRELLA AND WHERE THE EXCESS UMBRELLA LIABILITY POLICY FORM IS INCONSISTENT WITH THE PRIMARY UMBRELLA LIABILITY POLICY FORM, THE PRIMARY UMBRELLA LIABILITY POLICY FORM SHALL APPLY.

(Id. (capitalization in original).)  The amendatory endorsement was made retroactively effective to the effective date of the policy as a whole.  (Id.)  Immediately under the effective date appears a phrase stating that "[a]ll other terms and conditions remain unchanged."  (Id.)

Since the coverage available under the Old Republic policy extends to both "damages" and "expenses," Old Republic contends that the court erred in declaring that "[a]mounts incurred in defending the underlying claims . . . are payable in addition to the applicable limits of liability." (ECF No. 811 at 3, ¶ 5 (emphasis added); ECF No. 816 at 3.)  According to Old Republic, the amendatory endorsement was designed to clarify that the terms of the Highlands policy would control over any conflicting terms found in *other* excess policies (rather than over conflicting terms found in the Old Republic policy itself). (ECF No. 816 at 4-9.)  Old Republic asserts that the language including "expenses" within the applicable limits of liability expressed terms that were intended to "remain unchanged" by the amendatory endorsement.  (Id. at 5.)

As an initial matter, the court acknowledges the existence of an error in the prior opinion. The language stating that "[a]ll other terms and conditions remain[ed] unchanged" by the amendatory endorsement appears at the bottom of the page, under the effective date. (ECF No. 685-12 at 13.) It does not appear in the language of the amendatory endorsement itself. (Id.) The Lexington policies covering 1981 and 1982 contain amendatory endorsements in which that language is more prominently displayed. (ECF No. 684-23 at 12; ECF No. 684-25 at 9.) Comparing Lexington's amendatory endorsements to Old Republic's amendatory endorsement, the court mistakenly observed that the relevant statement was not present in the Old Republic policy. Air & Liquid Sys. Corp., 2013 U.S. Dist. LEXIS 142359, at *161. That mistake, however, was not dispositive of the issues disputed by the parties. Even though the applicable language appeared in the amendatory endorsements to the Lexington policies, the court nevertheless found that language to be ambiguous. Id. at *159. The relevant portion of the prior opinion reads as follows:

> Under the heading "Following Form—Excess Liability Policy," the Lexington policies expressly incorporate "[t]he provisions of the Underlying Polic[es] [sic] . . . except as regards . . . the obligation to investigate and defend and for costs and expenses incident to the same." ECF No. 684-23 at 2; ECF No. 684-24 at 2; ECF No. 684-25 at 2; ECF No. 685-1 at 2. This language suggests that the excess policies issued by Lexington already incorporated the "policy form" of the umbrella policies issued by Highlands, except for the portions specifically excepted. When viewed in this light, the *amendatory* endorsements appear to incorporate portions of the Highlands policies that had not already been so incorporated. ECF No. 684-23 at 12; ECF No. 684-25 at 9. This line of reasoning, of course, does not shed light on what "terms and conditions" were left "unchanged." *Id.* When the amendatory endorsements are combined with the policy exclusions, the language of the Lexington policies becomes both circular and ambiguous.

Id. Under Pennsylvania law, ambiguous policy provisions must be "construed in favor of the insured and against the insurer, the drafter of the agreement." Madison Constr. Co. v.

<u>Harleysville Mut. Ins. Co.</u>, 735 A.2d 100, 106 (Pa. 1999). That is especially true when an amendatory endorsement favoring the insured conflicts with pre-existing policy language, since endorsements are often used to adjust "the standard conditions in the underlying form" to meet the "particular needs of the insured." <u>St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.</u>, 655 F.2d 521, 524 (3d Cir. 1981). Applying these principles, the court found Lexington's defense obligations to be "coextensive with those of Highlands." <u>Air & Liquid Sys. Corp.</u>, 2013 U.S. Dist. LEXIS 142359, at *159-60. This reasoning applies with equal force to the Old Republic policy.

Old Republic attempts to distinguish its policy from the Lexington policies by pointing out that its policy follows form to "various" underlying policies, rather than only to the Highlands policy. (ECF No. 844 at 2.) Notwithstanding the policy's reference to "various" underlying policies, however, the "primary umbrella liability policy form" referenced in the amendatory endorsement clearly refers to the form of the Highlands policy. (ECF No. 685-12 at 13.) The Old Republic policy describes itself as an "excess umbrella liability" policy. (<u>Id.</u> at 2, 4 (capitalization omitted).) The other insurance companies providing underlying umbrella and excess coverage (including Highlands) are referred to as the "Underlying Umbrella Insurers." (<u>Id.</u> at 4.) After declaring the coverage provided under the Old Republic policy to be "following form excess" to the coverage available under the Highlands policy, the amendatory endorsement states that the form of the Highlands policy "shall apply" even when it is inconsistent with the "excess umbrella liability" policy form. (<u>Id.</u> at 13 (capitalization omitted).) The endorsement does *not* state that the Highlands policy controls when it conflicts with policies issued by the other "Underlying Umbrella Insurers." Instead, the endorsement appears to clarify that the Highlands policy controls when it conflicts with the Old Republic policy itself, which is

specifically described as an "excess umbrella liability" policy. (Id. at 2, 4, 13.) In light of the phraseology used in *both* the Old Republic policy *and* the amendatory endorsement, the "excess umbrella liability policy form" discussed in the endorsement refers to the form of the Old Republic policy itself. (Id. at 13 (capitalization omitted).) Even if the interpretation posited by Old Republic is reasonable, the ambiguous language must be construed in favor of coverage. Employers' Mut. Cas. Co. v. Loos, 476 F.Supp.2d 478, 489 (W.D. Pa. 2007).

Attempting to undercut the basis for the declaration describing its defense obligations, Old Republic maintains that the court mistakenly provided declaratory relief that had never been sought by HNA. (ECF No. 816 at 3.) That argument is unavailing. HNA's motion for partial summary judgment expressly defined the term "Excess Insurers" broadly enough to include Old Republic. (ECF No. 677 at 1.) The motion requested a declaration stating that HNA was "entitled to full defense coverage under the policies issued or subscribed by the Excess Insurers." (*Id.* at 3, ¶ 3 (emphasis added).) In its own motion for partial summary judgment, Old Republic asked for a declaration stating that "no duty to defend" arose under its policy. (ECF No. 671 at 2, ¶ 5.) Old Republic specifically argued that it was only required to "reimburse defense expenses within the policy limits for otherwise covered claims." (ECF No. 673 at 22.) The prior filings of HNA and Old Republic confirm that the matter was properly presented to the court within the context of their respective motions. Having lost the argument, Old Republic cannot

claim in hindsight that the issue was never before the court in the first place.[5]  For these reasons, Old Republic's motion for reconsideration will be denied.

Old Republic alternatively asks that final judgment be entered with respect to the challenged declaration, thereby facilitating an immediate appeal to the United States Court of Appeals for the Third Circuit.  (ECF No. 821 at 1.)  A decision may be regarded as "final" if it constitutes "an ultimate disposition of an individual claim entered in the course of a multiple claims action."  Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436 (1956).  Once it is determined that the decision at issue is "final," a court presented with a motion for the entry of judgment "must go on to determine whether there is any just reason for delay."  Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 8 (1980).  "[I]n deciding whether there are no just reasons to delay the appeal of individual final judgments in a setting such as this, a district court must take into account judicial administrative interests as well as the equities involved."  Id. Factors relevant to a determination under Rule 54(b) include "the relationship between the adjudicated and unadjudicated claims," "the possibility that the need for review might or might not be mooted by future developments in the district court," "the possibility that the reviewing court might be obliged to consider the same issue a second time," "the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final," and "miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like."  Berckeley Inv.

---

[5] Old Republic contends that extrinsic evidence is necessary to resolve the ambiguity created by the language used in the amendatory endorsement.  (ECF No. 844 at 4.)  Old Republic previously argued that extrinsic evidence should not be considered for the purpose of determining its coverage obligations.  (ECF No. 369 at 2.)  In any event, ambiguous policy language must ordinarily be construed in favor of coverage regardless whether extrinsic evidence would counsel in favor of an alternative construction.  Peele v. Atl. Express Transp. Grp., Inc., 840 A.2d 1008, 1012-13 (Pa. Super. Ct. 2003).

Grp., Ltd. v. Colkitt, 455 F.3d 195, 203 (3d Cir. 2006) (citing Allis-Chalmers Corp. v. Phila. Elec. Co., 521 F.2d 360, 364 (3d Cir. 1975)).

"Certification of a judgment as final under Rule 54(b) is the exception, not the rule, to the usual course of proceedings in a district court." Elliott v. Archdiocese of New York, 682 F.3d 213, 220 (3d Cir. 2012). The instant matter is not an exceptional case in which an immediate appeal is warranted. Since HNA's claims against Old Republic are inextricably intertwined with claims asserted against several other excess insurers, this is a case in which the entry of judgment under Rule 54(b) would clearly be inappropriate. Panichella v. Pa. R.R. Co., 252 F.2d 452, 455 (3d Cir. 1958). Like the other excess policies at issue, the Old Republic policy follows form to the umbrella policy issued by Highlands. (ECF No. 685-12 at 4, 13.) The relevant coverage issues concerning all excess policies in dispute (including the Old Republic policy) generally turn on the proper interpretation of the Highlands policy. Houbigant, Inc. v. Fed. Ins. Co., 374 F.3d 192, 203 (3d Cir. 2004). If judgment were to be entered against Old Republic, the court of appeals could be presented with disputed issues relating to the Highlands policy that would similarly be presented in later appeals filed by other excess insurers. Even if it is assumed that no appeals will be taken concerning this court's construction of the Highlands policy, the arguments advanced by Old Republic mirror the arguments previously rejected in relation to the Lexington policies. Air & Liquid Sys. Corp., 2013 U.S. Dist. LEXIS 142359, at *155-63. The prospect of multiple appeals in this case would create a substantial likelihood that the court of appeals would be forced to consider the same issues multiple times. Berckeley, 455 F.3d at 203. The immediate entry of judgment in this case would undermine, rather than advance, the purposes of Rule 54(b). Carter v. City of Phila., 181 F.3d 339, 345 (3d Cir. 1999)(describing a requirement that a district court state its reasons for entering judgment under Rule 54(b) as "a

prophylactic means of enabling the appellate court to ensure that immediate appeal will advance the purposes of the rule"). Accordingly, Old Republic's alternative motion for the immediate entry of judgment will be denied.

## IV.    The Motion Filed by HNA

The London insurance market is a "subscription" market in which multiple insurers underwrite percentages of a policy's limits in exchange for equal percentages of the premium. (ECF Nos. 768 & 782 ¶ 57.) Along with several other insurers, New Hampshire subscribed to seven quota-share excess policies covering HNA's activities between May 1, 1995, and June 1, 1999. (Id. ¶ 27.) Winterthur International Insurance Company, Ltd., n/k/a XL Insurance Company, Ltd. ("XL"), served as the lead underwriter for both the excess policies issued by New Hampshire and the underlying policies to which the excess policies followed form. (Id. ¶ 58.) New Hampshire is the only solvent insurer sued by Howden Buffalo in 2009 that has not entered into a settlement agreement with HNA. (Id. ¶ 27.) In the order entered on September 27, 2013, the court declared that "[p]ayments made in excess of the settling insurers['] *pro rata* shares of liability, in accordance with [an earlier agreement executed in 2005], [could not] be used to accelerate the exhaustion of the underlying policies." (ECF No. 811 at 4, ¶ 9.) HNA seeks reconsideration of that declaration at this time. (ECF Nos. 817 & 819.)

The 2005 agreement executed by HNA and several other insurers apportions liability payments only to years in which HNA's asbestos liabilities were insured. (ECF No. 716-1 at 6, ¶ A.) Although several plaintiffs in the underlying tort actions alleged injuries caused by asbestos exposure before June 1, 1961, the "Injury Allocation Period" defined in the agreement begins on that date. (ECF No. 685-20 at 69-70.) The definition also excludes periods covering times in which HNA was uninsured. (ECF No. 716-1 at 6, ¶ A.) The first excluded period began on

September 1, 1986, and ended on May 1, 1995. (ECF No. 685-20 at 69-70.) The second

excluded period commenced on July 1, 2002, and continues through the present. (Id.) In

addition, the 2005 agreement utilizes a "collapsing coverage block" to apportion defense costs in

equal amounts only to unexhausted policies issued by participating insurers. (ECF No. 716-1 at

6, ¶ C.)

In support of its earlier motion for partial summary judgment, New Hampshire argued

that the 2005 agreement had artificially "exhausted" some of the underlying primary and

umbrella policies by prematurely collapsing the *pro rata* allocation applicable under New York

law within periods in which HNA was insured. (ECF No. 765 at 14-18; ECF No. 796 at 8.) New

Hampshire maintained that, with respect to defense costs, the agreement had shrunk the

allocation period each time a participating policy exhausted, thereby accelerating the exhaustion

of the underlying XL policy. (ECF No. 765 at 19-20.) The arguments advanced by New

Hampshire were based on non-contribution clauses found in the New Hampshire policies, which

provide as follows:

> This insurance does not cover any loss or damage which at the time of the
> happening of such loss or damage is insured by or would, but for the existence of
> this Policy, be insured by any other existing Policy or Policies except in respect of
> any excess beyond the amount which would have been payable under such other
> Policy or Policies had this insurance not been effected.

(ECF No. 769-23 at 19; ECF No. 769-27 at 23; ECF No. 769-29 at 27; ECF No. 769-30 at 15;

ECF No. 769-31 at 14.) Since coverage under the New Hampshire policies for "any loss or

damage" was measured in relation to the obligations of other policies "at the time of the

happening of such loss or damage" rather than by reference to amounts paid pursuant to

agreements executed outside of those underlying policies, the court construed the New

Hampshire policies to mean that "[p]ayments exceeding the settling insurers' *pro rata* shares of

liability pursuant to the 2005 agreement [could ]not be used to accelerate the exhaustion of the underlying policies." Air & Liquid Sys. Corp., 2013 U.S. Dist. LEXIS 142359, at *216-17.

In United States Fid. & Guar. Co. v. Treadwell Corp., 58 F.Supp.2d 77, 106-10 (S.D.N.Y. 1999), the United States District Court for the Southern District of New York permitted a settlement payment made by a settling primary insurer to be allocated to the relevant policy period for exhaustion purposes even though it had been attributable to a continuous injury partially occurring outside of that period. The district court determined that the amount "actually paid" by a settling insurer was binding on excess insurers for the purpose of determining whether the underlying primary policy had been exhausted. United States Fidelity, 58 F.Supp.2d at 106. The decision in United States Fidelity was grounded in a belief that "treating a primary insurer's settlement as binding for allocation purposes, at least in the absence of evidence of collusion to defraud an excess insurer, further[ed] the strong public interest in promoting settlement." Id. at 107. It was specifically noted that the excess insurer in question had been provided with "notice of the ongoing [settlement] negotiations" and "invited to participate." Id. at 110.

In the earlier opinion issued in this case, the court distinguished United States Fidelity by asserting that HNA had pointed to nothing in the record suggesting that New Hampshire had been "given an opportunity to assert its interests during the settlement negotiations." Air & Liquid Sys. Corp., 2013 U.S. Dist. LEXIS 142359, at *216. "[T]he existence or absence of collusion" was deemed to be inconsequential because New Hampshire had not been afforded "a chance to assert its own interests." Id. Attempting to undermine the basis for that determination, HNA now presents new evidence which suggests that New Hampshire may have been made aware of the negotiations resulting in the 2005 settlement agreement. John G. Buchanan ("Buchanan"), a partner at a law firm representing HNA, declared on October 25, 2013, that

Andy O'Hara ("O'Hara"), a claims adjustor acting on behalf of New Hampshire, had been present for settlement discussions on July 25, 2005, and presented with documents discussing the effect that the "proposed allocation framework" would have on New Hampshire. (ECF No. 820-1 at 3-5, ¶¶ 6-10.) Buchanan stated that HNA had never received a "substantive response from anyone at New Hampshire." (Id. at 5, ¶ 10.) In a subsequent declaration made on November 14, 2013, O'Hara acknowledged that he had attended the meeting in order to "learn the background of the case and the pending settlement between the parties," and to "pass this information along to other claims handlers." (ECF No. 830-1 at 2, ¶ 7.) Nevertheless, O'Hara declared that his "participation in the settlement negotiations" had "essentially ceased" after the meeting. (Id. at 2, ¶ 8.) He stated that "the persons with knowledge of any further involvement by New Hampshire" in the settlement negotiations were no longer employed by AIG UK Ltd., which had acted as New Hampshire's "claims handling entity" during the relevant period of time. (Id. at 1-2, ¶¶ 4, 9-10.)

The limited evidence presented by HNA does not establish that New Hampshire was provided with a sufficient opportunity to assert its interests during the course of the settlement negotiations. At this late date, HNA still cannot produce the documents that were allegedly forwarded to New Hampshire personnel in July 2005.[6] (ECF No. 820-1 at 4, ¶ 8.) At most, the record suggests that New Hampshire's involvement in the process was quite minimal.

Even if it is assumed that the reasoning in United States Fidelity weighs in favor of HNA's position, that decision preceded the New York Court of Appeals' decision in Consol. Edison Co. of New York, Inc. v. Allstate Ins. Co., 774 N.E.2d 687 (N.Y. 2002). In Consolidated

---

[6] HNA produced a copy of the documents provided to a different quota-share insurer. (ECF No. 820-3.) In his declaration, Buchanan stated that it was HNA's "understanding" that the same documents had been forwarded to New Hampshire personnel. (ECF No. 820-1 at 4, ¶ 8.)

Edison, the New York Court of Appeals adopted a *pro rata* allocation framework in order to enforce policy language providing indemnification for liability incurred as a result of accidents occurring *during* the relevant policy period. Consolidated Edison, 774 N.E.2d at 695. In any case involving a contractual provision, the function of the court "is to construe a *particular contract* entered into by *particular parties*." Fed. Ins. Co. v. Cont'l Cas. Co., Civil Action No. 05-305, 2006 U.S. Dist. LEXIS 85323, at *53 (W.D. Pa. Nov. 22, 2006)(emphasis in original). "This function is quite different from that of construing a constitutional or statutory provision enacted by a legislative body." Id. Unlike judicial decisions defining legal prescriptions that apply equally to all parties, decisions interpreting contractual provisions are of "diminished precedential value" when they involve different agreements entered into by different parties. Trunzo v. Allstate Ins. Co., Civil Action No. 04-1789, 2006 U.S. Dist. LEXIS 68566, at *32-33 (W.D. Pa. Sept. 25, 2006). Under the law of New York, "the language of the policy" defines the applicable terms of coverage. Consolidated Edison, 774 N.E.2d at 693. The court's prior opinion in this case was firmly grounded in the language of the New Hampshire policies. Air & Liquid Sys. Corp., 2013 U.S. Dist. LEXIS 142359, at *211-17. The fact that the decision rendered in this case may seem to be inconsistent with the decision issued in United States Fidelity does not mean that either decision is contrary to New York law. It merely illustrates that the law of contracts generally permits parties to agree to lawful terms of their own choosing. The policy language presently in dispute highlights this point.

In support of its position, HNA calls the court's attention to language in the New Hampshire policies providing as follows:

> In consideration of the premium for which this Policy is written, in the event of reduction or exhaustion of the aggregate limit or limits contained in such primary and/or underlying Policy or Policies solely by payment of such losses in respect to accidents or occurrences during the period of such primary and/or underlying

> Policy or Policies it is hereby understood and agreed that such insurance as is
> afforded by this Policy shall apply in excess of the reduced underlying limit or, if
> such limit is exhausted, shall apply as underlying insurance and shall pay excess
> of the Assured's retention, notwithstanding anything to the contrary in the terms
> and conditions of this Policy.

(ECF No. 769-27 at 13; ECF No. 769-29 at 16; ECF No. 769-30 at 5; ECF No. 769-31 at 4; ECF No. 840 at 6, n. 5 (emphasis added).)  Focusing on the words "solely by payment," HNA maintains that the underlying policies can be exhausted for purposes of the New Hampshire policies by settlement payments in excess of the payments that would have otherwise been due under the pre-existing primary policy terms. (ECF No. 840 at 6, n. 5.)  The problem with HNA's argument is that the cited policy provision specifically refers to "losses in respect to accidents or occurrences during the [policy] period"[7] and permits exhaustion to occur by the "payment of such losses." (ECF No. 769-27 at 13 (emphasis added); ECF No. 769-29 at 16 (emphasis added); ECF No. 769-30 at 5 (emphasis added); ECF No. 769-31 at 4 (emphasis added).)  The 2005 agreement entitles HNA to settlement payments for injuries occurring (or partially occurring) outside of the relevant policy periods. (ECF No. 685-20 at 69-70; ECF No. 716-1 at 6, ¶ A.) New York law calls for the enforcement of the policy language limiting coverage (and exhaustion) to injuries occurring within the "finite" coverage periods.  Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, 991 N.E.2d 666, 675-676 (N.Y. 2013).

The position taken by New Hampshire in this case is consistent with the decision of the United States Court of Appeals for the Fifth Circuit in Service Corp. Int'l v. Great Am. Ins. Co. of New York, 264 F.App'x 431 (5th Cir. 2008).  In Service Corporation, a primary liability insurer covering a single policy year paid the full $25 million available under its policy to its

---

[7] HNA omitted this language of the contract from its quotation of the policy language when it initially raised this argument in support of its motion for reconsideration. (ECF 840 at 6 n. 5.)

insured entity in connection with a global settlement resolving claims arising both during and outside of the covered year. Service Corp., 264 F.App'x at 432. An excess policy providing coverage in the amount of $50 million contained language stating that, "[i]n the event of . . . exhaustion of the aggregate limit or limits designated in the underlying policy or policies solely by payment of losses in respect to claims, accidents or occurrences during the period of such underlying policy or policies, it [was] understood and agreed that such insurance as [was] afforded by [the excess] policy [would] apply as underlying insurance, notwithstanding anything to the contrary in the terms and conditions [stated therein]." Id. at 433. Because the $25 million paid by the primary insurer had been partially attributable to the settlement of claims occurring outside of the covered year, the excess insurer contended that the underlying policy had not been exhausted and refused to cover additional expenses. Id. at 432. Since the language of the excess policy "did not contemplate that the [primary insurer] would pay its policy limits without regard to whether the payment would be used for covered claims," the court of appeals concluded that the underlying policy had not been exhausted for the purpose of triggering the excess layer of coverage. Id. at 433-34.

The holding in Service Corporation suggests that exhaustion (and the concomitant attachment of an excess policy) does not occur if the payments provided by primary insurers are "arbitrarily made without regard to the coverage provided by the underlying policies or the coverage year in which the payments properly could be assigned for exhaustion purposes." D.R. Horton, Inc. v. Am. Guar. & Liab. Ins. Co., 864 F.Supp.2d 541, 566 (N.D. Tex. 2012). The language of the excess policy construed and applied in Service Corporation was materially indistinguishable from the policy language relied upon by HNA. Service Corp., 264 F.App'x at 433; (ECF No. 891-6 at 13.) The court acknowledges that Service Corporation involved an

application of Texas law. Service Corp., 264 F.App'x at 433.  Nonetheless, the reasoning

employed in that decision is consistent with the rule adopted by the New York Court of Appeals

in Consolidated Edison, which enforces language limiting coverage to particular policy periods

by allocating coverage spanning multiple policy years on a *pro rata* basis. Consolidated Edison,

774 N.E.2d at 695.

HNA relies on Indemnity Insurance Co. v. Integrated Health Services, Inc., 375 B.R. 730,

739 (D.Del. 2007), for the proposition that the manner in which a primary policy is exhausted

has no bearing on the obligations of an excess insurer when "the terms of the [excess] policy do

not require an inquiry [into] whether the [underlying] payments were proper."  (ECF No. 895 at

3-5.)  The holding in that case does not support HNA's position.  In Integrated Health Services,

an excess insurer attempted to comprehensively avoid all its coverage obligations by arguing that

the insolvency of a primary insurer had rendered the exhaustion of the underlying primary policy

impossible, thereby creating a situation in which its excess policy could never be reached.

Integrated Health Services, 375 B.R. at 738.  The United States District Court for the District of

Delaware rejected that argument on the basis of a provision in the excess policy stating that the

coverage provided thereunder would not be affected by the "bankruptcy or insolvency of an

underlying insurer." Id. at 734, 738-39.  Acknowledging that the excess insurer was not required

to "drop down to provide coverage within a lower level of insurance," the district court

concluded that the primary insurer's insolvency (and concomitant inability to exhaust the

primary policy through "actual cash payments of claims and defense costs") did not relieve the

excess insurer of its payment obligations "within [its] own layer of coverage." Id. at 739.

In contrast to the excess insurer in Integrated Health Services, New Hampshire is not

attempting to avoid coverage obligations existing under its policies based on the status of

primary insurers.  Instead, New Hampshire is merely asserting that its coverage obligations remain unaffected by settlement agreements to which it is not a party.  (ECF No. 893 at 5-6.) HNA is the party attempting to move the goalposts with the ball already in the air.  While the settling parties were free to *replace* their contracts with new settlement agreements, the terms of those agreements cannot be imposed on New Hampshire, which never agreed to the applicable settlement terms. Air & Liquid Sys. Corp., 2013 U.S. Dist. LEXIS 142359, at *215-17, 226. HNA's motion for reconsideration will be denied.

## V.      The Motion Filed by Columbia, Mt. McKinley, and Old Republic

Certain Insurers filed a motion for leave to file a) motions for clarification, and b) additional motions for partial summary judgment, and to serve contention discovery on the Policyholders. (ECF No. 868 (the "motion for leave").)  According to the Certain Insurers, further proceedings pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), are currently necessary "because it appears that the parties have different views concerning implementation of the court's ruling to erode and exhaust various underlying policies," and because the court's September 27, 2013 opinion left some issues "unclearly resolved," or "unresolved," while at the same time creating "newly raised" issues. (Id. at 1-3.)

The Certain Insurers allege that clarification is needed because the Policyholders might misinterpret and misapply the September 27, 2013 decision on the issues of allocation and settlement credits. (Id. at 7-9, 12.)  The Certain Insurers contend that further summary judgment practice is required because the September 27, 2013 decision created "certain follow-on issues" with respect to application of the non-cumulation clause to settled and insolvent insurers, adequate notice of underlying impairment, and double-counting by Ampco-Pittsburgh and HNA of the same dollars to spike different years ("double-counting/spiking" issue). (Id. at 10-12.)  The

Certain Insurers, however, indicate that they must be first permitted to serve contention interrogatories on the Policyholders, followed by depositions, in order to determine "if…the Policyholders…disagree with Certain Insurers on the operation of the Partial Summary Judgment Ruling." (Id. at 9, 12-13.) The Certain Insurers note that discovery could reveal "additional issues on which clarification is needed" or "as to which the parties disagree." (Id. at 9-10, 12.) If the court does not permit further discovery and motions practice at this juncture the Certain Insurers will a) seek appellate review of the September 27, 2013 decision, b) seek a stay of enforcement of the September 27, 2013 order, or c) challenge exhaustion of the underlying policies at the time the Policyholders claim that Certain Insurers' policies are attached, or some combination of these options. (ECF No. 868 at 3 n.2 and 4 n.3.)

Ampco-Pittsburgh opposes the Certain Insurers' motion on the grounds that the "unclearly resolved" or "unresolved" issues either were, or could have been, raised during the initial summary judgment briefing, and that the "newly raised" issues ask this court to decide hypothetical and abstract applications of the September 27, 2013 decision to future claims that have not yet been submitted. (ECF No. 878 at 2.) Ampco-Pittsburgh opposes reopening fact discovery because the request is untimely and because the Certain Insurers' proposed inquiries into how the Policyholders might interpret the September 27, 2013 decision at some time in the future are not a proper basis for discovery. (Id. at 11-12.)

HNA opposes the Certain Insurers' motion on similar grounds, emphasizing, however, that this court previously cautioned the parties that all fact discovery was to be completed and all summary judgment motions were to be filed at the same time. (ECF No. 888 at 4, 5-7.) HNA also points out that Certain Insurers' policies will not be reached for some time, and that the court can rule on any disputes concerning interpretation or application of the

September 27, 2013 decision, when, or if, they are reached in the context of a "concrete and justiciable setting." (Id. at 5.)

In their response, Certain Underwriters at Lloyd's, London, Certain London Market Insurance Companies, and Lexington Insurance suggest, particularly with respect to the double-counting/spiking issue, that the court should exercise its discretion under § 2201(a) and decline to issue further declarations until the facts have been more completely developed. (ECF No. 877 at 1-2.) The Certain Insurers likewise recognize that staying proceedings and administratively closing this case and resolving the issues raised in their motion for leave only when, or if, Certain Insurers' policies are ever implicated is an option, albeit a "less-desirable" one. (ECF No. 884 at 10 n.8.)

The Certain Insurers' motion for leave asks for permission to file two distinct categories of motions: a motion for clarification and additional motions for summary judgment. (ECF No. 868.) The court concludes that neither kind of motion is appropriate at this juncture.

## A. Motion for Clarification

With respect to the motion for clarification, the Certain Insurers are correct that a motion for clarification differs from a motion for reconsideration in that its purpose is to explain or clarify something ambiguous or vague about a court's decision, not to alter or amend it. Montgomery Cnty. v. Microvote Corp., No. 97-6331, 2000 WL 341566, at *1 (E.D. Pa. Mar. 31, 2000) (citing Resolution Trust Co. v. KPMG Peat Marwick, No. 92-1373, 1993 WL 211555, at *2 (E.D. Pa. June 8, 1993)). Certain Insurers are also correct that the twenty-eight day time limit set forth in Federal Rule of Civil Procedure 59(e) does not, by its terms, explicitly apply to motions for clarification. Fed. R. Civ. P. 59(e); but see S.E.C. v. Dowdell, 144 F.App'x 716, 720 (10th Cir. 2005) (finding that a "motion for clarification is not defined by the nomenclature used

by the movant," characterizing a motion for clarification as one to alter or amend judgment, and applying Rule 59(e)'s then-ten day deadline to the motion). The Certain Insurers are likewise correct that Rule 54(b) allows a decision or order that adjudicates fewer than all the claims of fewer than all the parties to be revised at any time before entry of final judgment. FED. R. CIV. P. 54(b). On the facts of this case, the Certain Insurers' motion for leave to file a motion for clarification is nevertheless untimely filed.

Following issuance of the September 27, 2013 decision, the court held a conference on January 15, 2014, in order to schedule this matter for trial. (ECF No. 851.) The court acknowledged that motions for reconsideration of the September 27, 2013 decision were pending. (Id. at 4-5.) No party indicated that the September 27, 2013 decision was ambiguous or vague, and would have to be clarified before this case could proceed to trial. The Certain Insurers did not indicate that clarification of the September 27, 2013 decision would be necessary until the court conducted a second scheduling conference on March 21, 2014, following completion of a court-ordered global mediation session. (ECF No. 865.) At that time, counsel for Mt. McKinley, one of the Certain Insurers, informed the court that although it originally believed that the court's decision was clear, application of that decision to the facts of the case had caused additional legal issues to arise. (ECF No. 865 at 9-10.)

Even assuming that the twenty-eight day deadline set forth in Rule 59(e) does not apply to a motion to clarify, and recognizing the open-endedness of Rule 54(b), the delay of nearly six months in seeking to clarify this court's decision is excessive. The issues on which the Certain Insurers seek clarification, i.e., allocation and settlement credits, were central to the various motions for summary judgment. If the September 27, 2013 decision was unclear or incomplete with respect to these issues, the Certain Insurers should have immediately recognized

that deficiency. The Certain Insurers offer no plausible explanation with respect to why it took them six months to realize that the "opinion gave the parties a roadmap, but the roadmap isn't complete." (ECF No. 865 at 15.) Vague references to statements made by Air & Liquid's counsel "suggesting" a "different understanding of how [the decision] will operate" do not establish that the Certain Insurers' six-month delay was unavoidable. (ECF No. 868 at 7-8.) The delay is excessive, and, on this record, unjustified.

Additionally, with respect to the proposed motion for clarification, the Certain Insurers indicate that the motion can be filed only after a period of additional discovery so that they can ascertain the Policyholders' interpretation of this court's decision. (ECF No. 868 at 9-10.) After this discovery is taken, the Certain Insurers contend that they will know whether the Policyholders disagree with them on the issues specifically raised in their motion for leave, or on any other issues, and, only then, could they file a motion for clarification of this court's September 27, 2013 decision. (Id.) The Certain Insurers' own brief reflects the tentative nature of their request. (ECF No. 868 at 8 ("the parties may dispute," "[t]he Policyholders may take the position") and 9 n.5 ("[t]he parties may also dispute").) The Certain Insurers demonstrate, in their own words, that this court's opinion is not incomplete, unclear, ambiguous, or vague, making any motion for clarification inappropriate. The Certain Insurers do not seek clarification of an unclear decision; instead, they want this court to opine on how their opponents can, and cannot, interpret that decision at some point in the future, and to guide the parties' claims administration going forward. This kind of future guesswork is not the proper function of a motion for clarification.

The court concludes that any motion for clarification would be untimely, and, even if timely, would be improper because it would not explain or clarify something ambiguous or vague about the court's September 27, 2013 decision.

### B. Additional Motions for Summary Judgment

In addition to asking for permission to file a motion to clarify this court's September 27, 2013 summary judgment decision, the Certain Insurers request leave to file additional summary judgment motions with respect to a) application of the non-cumulation clause to settled and insolvent insurers, b) adequate notice of underlying impairment, and c) double-counting by Ampco-Pittsburgh and HNA of the same dollars to spike different years. (ECF No. 868 at 10-12.)  According to the Certain Insurers, these issues were not raised during summary judgment briefing in 2013 "because they arise concretely only because of" the September 27, 2013 decision. (Id. at 10.)

The court disagrees and concludes that these matters either were raised, or could have been raised, or involve non-justiciable questions that are based on hypothetical factual scenarios that may never occur.  In reaching this holding, this court is mindful that this case is proceeding under the Declaratory Judgment Act, 28 U.S.C. § 2201-02, which affords district courts substantial discretion in deciding whether, and when, to declare the rights of litigants. Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995); see State Auto Ins. Cos. v. Summy, 234 F.3d 131, 133 (3d Cir. 2000); Gov't Employees Ins. Co. v. Dizol, 133 F.3d 1220, 1223 (9th Cir.

1998).[8] No further summary judgment briefing on those issues will be permitted at this time. The court will confer with all counsel at the previously-scheduled September 23, 2014 status conference with respect to whether certain claims are bench trial-ready, and whether other claims should be administratively closed and stayed, or finalized for purposes of appeal. The reasons for each of the matters raised not being appropriate for additional summary judgment motions at this time will be addressed.

### (1) Non-cumulation Clauses

Ampco-Pittsburgh and HNA are correct that this court already resolved issues pertaining to how the non-cumulation clauses apply to settling and insolvent insurers, which is the first category on which the Certain Insurers wish to file a second round of summary judgment motions. (ECF Nos. 878 at 7-8 and 888 at 12-14.) The parties were repeatedly cautioned that serial summary judgment motions would not be accepted by the court, placing an obligation on the parties to raise all issues involving settling and insolvent insurers and the non-cumulation clauses at once. Under the circumstances the Certain Insurers have a heavy burden to establish that the court's decision does not apply to a precise factual scenario, or, if it does not, that they were unable to anticipate such a factual scenario during summary judgment. The Certain Insurers failed to meet either burden. This court determined how the non-cumulation clauses in insolvent and settled insurers' policies applied. (ECF No. 878 at 7-8 and 888 at 12-14.) Any precise issue that the Certain Insurers claim was not decided, could have, and should have, been

---

[8] The court's statement in the September 27, 2013 decision that the parties remain free to seek declarations concerning the exhaustion or erosion of specific policies, if such declarations become necessary, was not an invitation to immediately file a second round of summary judgment motions. (ECF No. 810 at 93.) Instead, that statement recognizes that no claims have yet been made under any of the defendant-insurers' excess policies, and that, only when such claims are made can specific determinations be made with respect to exhaustion. The statement, in fact, supports deferring further action on such matters unless, or until, any claims are submitted to the excess insurers.

raised during summary judgment briefing concerning those clauses. For these reasons, this court

will not entertain a second round of summary judgment briefing with respect to application of

the non-cumulation clauses to insolvent and settling insurers.

### (2) Adequate Notice and Double-counting/Spiking

With respect to the last two issues on which the Certain Insurers seek discovery

and a second round of summary judgment briefing, i.e., adequate notice and double-

counting/spiking, the court concurs with Ampco-Pittsburgh and HNA that the Certain Insurers'

proposed motions would do no more than raise hypothetical questions about how the September

27, 2013 decision might be applied to facts that have not yet occurred, and may never occur.

(ECF Nos. 878 at 9-10 and 888 at 14-17.) At the March 2014 conference, the court explicitly

asked Mt. McKinley's counsel whether these kinds of questions would raise a justiciable case or

controversy, and directed the insurers to file a motion specifically addressing whether the

purportedly new legal issues could qualify as a live case or controversy. (ECF No. 865 at 10-11,

20.) Despite this unambiguous directive, the Certain Insurers' briefing on this issue consists of

nine lines of text, which includes no citation to legal authority and inexplicably cross-references

sections of this court's September 27, 2013 decision that discuss choice of law, pro rata

allocation, and reimbursement of defense costs. (ECF No. 868 at 4.) This briefing does not

satisfy the Certain Insurers' burden to establish that the issues it seeks to raise in a second round

of summary judgment briefing are justiciable. Even in their reply brief, the Certain Insurers do

no more than argue that because this court found some issues involving these parties and their

insurance policies or settlement agreements justiciable, it must follow that any and all issues

touching on those documents and this court's prior decision are also justiciable. (ECF No. 884 at 6.)[9]  The Certain Insurers did not satisfy their burden to establish justiciability.

### a) Adequate Notice

The Policyholder's briefs do address the question of justiciability, and indicate that any declaration concerning the notice provisions of the various Certain Insurers' policies would be premature and advisory under the circumstances. (ECF No. 878 at 9-10 and 888 at 14-15.)  As HNA explains, the "notice and cooperation" clauses have not yet been triggered, but, in any event, information is being provided to the Certain Insurers as a precaution. (ECF No. 888 at 14.)  Ampco-Pittsburgh confirms that "no claims have as yet been tendered to any of the Certain Insurers" and notes that the Certain Insurers acknowledged in discovery that their affirmative defenses based on the "notice and cooperation" clauses were only conditional and prophylactic because no claims had yet been tendered to them. (ECF No. 878 at 9-10.)  The Certain Insurers do not dispute these facts, but claim only that an innocuous statement concerning procedural matters, made by one Policyholder's attorney at a court conference, indicates that no further information will be supplied to the Certain Insurers going forward. (ECF No. 884 at 6-7 & n.6.) This statement, even if interpreted as the Certain Insurers propose, does not create a live case or controversy between the parties with respect to the notice provision.  This court will not entertain a second round of summary judgment briefing with respect to the notice provisions of the Certain Insurers' policies because the Certain Insurers failed to establish that a live case or controversy presently exists.

---

[9] This court's previous denial of these Certain Insurers' motion to dismiss, which motion was based on an assertion that the excess policies are so unlikely to be reached that any declarations about them would be purely advisory, is not determinative of the instant motion. (ECF No. 810 at 13.)  The declaratory relief now being sought, and the specificity and hypothetical nature of the factual predicate for that relief, distinguishes the present motion from this court's previous decision.

**b) Double-counting/Spiking**

The Policyholders' briefs also address the justiciability of the double-counting/spiking issue. Ampco-Pittsburgh takes the position that the court's September 27, 2013 decision already decided the issue, in favor of the Certain Insurers. (ECF No. 878 at 7 n.13.) HNA argues that calculation of settlement setoffs, including spiking to particular years, cannot occur until "a host of facts that cannot be known until HNA or Ampco requests payment" occur. (ECF No. 888 at 16-17.) HNA contends that the Certain Insurers are asking this court to render an advisory opinion based on a hypothetical set of facts, which is improper. (Id. at 16 (citing Step-Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643, 649 (3d Cir. 1990), and Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1155 (3d Cir. 1995)).) The Certain Insurers appear to overlook this portion of HNA's brief, and contend that HNA is "strangely silent on the topic," but assert that fact discovery will reveal HNA's position on the issue of double-counting/spiking. (ECF No. 884 at 7.)

Again, the Certain Insurers fail to address the dispositive issue, i.e., whether a live case or controversy exists between the parties with respect to the double-counting/spiking issue. HNA's briefing on this issue explains why a live case or controversy does not exist. (ECF No. 888 at 16-17.) Actual values cannot yet be assigned to set-offs, as the insurers acknowledged during summary judgment briefing. (ECF No. 810 at 36.) The specific factual scenario on which the Certain Insurers base their motion, i.e., that Ampco-Pittsburgh spikes a given year using indemnity dollars, and then HNA counts the same dollars to spike a different year, (ECF No. 868 at 12), has not occurred. It may never occur. This court cannot render an advisory opinion with respect to what should happen if one particular factual scenario were to occur in the future. Article III's case or controversy requirement prevents this court from issuing advisory

opinions. <u>Public Serv. Com. v. Wycoff Co.</u>, 344 U.S. 237, 242–43 (1952); <u>Burkey v. Marberry</u>, 556 F.3d 142, 147 (3d Cir. 2009)(a district court has no power to decide questions that cannot affect the rights of litigants before it; Article III confines courts to resolving live controversies admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts).

A decree from this court that HNA and Ampco-Pittsburgh cannot use the same dollars to spike different years in the future would provide the Certain Insurers no present relief; the situation might never arise, and the decree would do nothing to address the innumerable alterative factual scenarios concerning set-offs that might arise in the future, to which the Certain Insurers could object at that time. <u>Id.</u> This court will not entertain a second round of summary judgment briefing with respect to the double-counting/spiking issue because the Certain Insurers failed to establish that a live case or controversy presently exists.

## VI.     Conclusion

For the foregoing reasons, the court will deny the motions for reconsideration filed by Old Republic and HNA. (ECF Nos. 817, 819 & 821.)  Old Republic's alternative motion for the immediate entry of judgment, (ECF No. 821), and the Certain Insurer's motion for leave, (ECF No. 868), will also be denied.   An appropriate order will be filed contemporaneously with this opinion.


August 15, 2014                                               BY THE COURT:


                                                              <u>/s/ *Joy Flowers Conti*</u>
                                                              Joy Flowers Conti
                                                              Chief United States District Judge